Marc S. Dreier
Richard B. Friedman
Adam M. Ostreicher
DREIER LLP
499 Park Avenue
New York, New York 10022
(212) 328-6100

*Attorneys for Plaintiffs*
*Dr. Olivia N. Serdarevic and Bosiljka Serdarevic*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

DR. OLIVIA N. SERDAREVIC and        :
BOSILJKA SERDAREVIC,                :
                                    :        No. 08 Civ. 5563 (KMK)
                    Plaintiffs,     :
                                    :        **FIRST AMENDED COMPLAINT**
        -against-                   :
                                    :
CENTEX HOMES, LLC,                  :
                                    :
                    Defendant.      :

-------------------------------------------------------------- x

      Plaintiffs Dr. Olivia N. Serdarevic ("Dr. Serdarevic") and Bosiljka Serdarevic (collectively, the "Serdarevics" or "Plaintiffs"), by and through their undersigned counsel, for their Complaint herein, allege as follows:

### THE NATURE OF THE ACTION

      1.    This is an action for breach of contract. Defendant Centex Homes, LLC ("Centex" or "Defendant"), one of the largest home builders in the United States, entered into three separate agreements with the Serdarevics to purchase and develop property they owned in Goshen, New York. Centex agreed to use its "best efforts" to obtain the necessary governmental approvals in order to build the agreed upon housing and commercial developments. Far from using its best efforts, however, when the housing market began to decline, Centex first delayed

the project and then purported to unilaterally terminate the agreements, manufacturing excuses out of whole cloth in its effort to avoid its contractual obligations. As a result, not only have the Serdarevics been denied the contractual benefits to which they were entitled, including millions of dollars of deposits, but also their property has been greatly diminished in value.

## THE PARTIES

2.    Plaintiff Dr. Olivia Serdarevic is a citizen of the State of New York, residing at 45 Reservoir Road, Goshen, New York.

3.    Plaintiff Bosiljka Serdarevic is a citizen of the State of New York, residing at 45 Reservoir Road, Goshen, New York.

4.    Upon information and belief, defendant Centex is a Delaware Limited Liability Company with its principal place of business located at 500 Craig Road, Manalapan, New Jersey 07726. Upon information and belief, Centex is wholly owned by Centex Homes, a Nevada General Partnership, with its principal place of business in Dallas, Texas. Upon information and belief, the Managing General Partner of Centex Homes is Centex Real Estate Corporation, a Nevada Corporation with its principal place of business in Dallas, Texas. Upon information and belief, the other Partners of Centex Homes are citizens of the States of Delaware and Nevada and have their principal place of business in Nevada and Texas.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), as there is complete diversity between the parties and the matter in controversy exceeds $75,000.

6.    Venue is proper pursuant to 28 U.S.C. § 1391(a).

## THE FACTS

7.    On May 9, 2005, the Serdarevics entered into three agreements with Centex pursuant to which Centex agreed to buy and develop certain property owned by the Serdarevics in Goshen, New York.

8.    The first agreement (hereinafter, the "Hamlet Agreement"), entered into between Dr. Serdarevic, as Seller, and Centex, as Buyer, concerns a parcel of land in the Town of Goshen described as Section 11, Block 1, and Lot 46 on the Town of Goshen Tax Map ("Lot 46" or the "Hamlet Parcel"). A true and correct copy of the Hamlet Agreement is annexed hereto as Exhibit A.

9.    The second agreement (hereinafter, the "Active Adult Agreement"), entered into between the Serdarevics, as Sellers, and Centex, as Buyer, concerns a parcel of land located in the Town of Goshen, Orange County, State of New York, described as Section 15, Block 1, and Lot 59 on the Town of Goshen Tax Map ("Lot 59" or the "Active Adult Parcel"). A true and correct copy of the Active Adult Agreement is annexed hereto as Exhibit B.

10.    The third agreement (hereinafter, the "Parcel 3 Agreement"), entered into between the Serdarevics, as Sellers, and Centex, as Buyer, concerns a parcel of land located in the Town of Goshen described as Section 15, Block 1, and Lot 33 on the Town of Goshen Tax Map. A true and correct copy of the Parcel 3 Agreement is annexed hereto as Exhibit C.

### The Relevant Provisions of the Hamlet and Active Adult Agreements

11.    The relevant provisions of the Hamlet and Active Adult Agreements are substantially similar.

12.  Pursuant to Section 1.a of the Hamlet Agreement, Centex agreed to pay Dr. Serdarevic $33,562,500.00 for Lot 46. The purchase price was based on Centex building (i) 320 units and (ii) 50,000 square feet of retail space.

13.  Pursuant to Section 1.a of the Active Adult Agreement, Centex agreed to pay the Serdarevics $48,050,000.00 for Lot 59. The purchase price was based on Centex building: (i) 380 active adult units (*i.e.*, housing geared towards seniors); (ii) 20 market rate single family units; (iii) 120 active adult condominiums; and (iv) 40,000 square feet of retail space.

14.  In total, based on the number of units contemplated in the Hamlet and Active Adult Agreements, Centex agreed to pay the Serdarevics over $80 million. It was agreed, however, that the purchase price for both the Hamlet and Active Adult Agreements would be adjusted based on the actual number of units built and the amount of retail space approved by the relevant governmental authorities. *See* Hamlet and Active Adult Agreements, at §§ 1.a and 5.a.

15.  Pursuant to Section 1.b of the Hamlet and Active Adult Agreements, Centex agreed to provide the Serdarevics with five deposits at fixed times throughout the development of the Hamlet and Active Adult Parcels ('the "Deposits"). The Deposits for each Agreement were comprised of: (i) a First Deposit of $100,000.00, due upon the execution of the Agreement; (ii) a Second Deposit of $900,000.00, due upon the expiration of the "Feasibility Period" (defined below); (iii) a Third Deposit of $500,000.00, due upon Centex securing zoning for the developments; (iv) a Fourth Deposit of $500,000.00, due upon approval by the municipality of the Concept Plan; and (v) a Fifth Deposit of $1,000,000.00, due upon the earlier of preliminary site plan and/or subdivision approval of all state and local government requirements regarding public potable water and public sanitary sewer service. Thus, each Agreement provides for the payment by Centex of deposits equaling $3 million, for a total of $6 million.

16.    In addition to the Deposits, pursuant to Section 5.j of the Hamlet and Active Adult Agreements, Centex agreed to pay the Serdarevics the non-refundable sum of $250,000.00 under each Agreement twenty-four and thirty-six months after the completion of the Feasibility Period (a sixty-day period from the effective date of the Agreements for Centex to determine through various studies whether development of the Hamlet and Active Adult Parcels was feasible). Accordingly, under the foregoing provision in both agreements, Centex was obligated to pay the Serdarevics a total of $1 million.

17.    Pursuant to Section 5 of both the Hamlet and Active Adult Agreements, Centex was obligated to use its "best efforts" to obtain all necessary governmental approvals that were conditions precedent to the closing of the sale. Section 5 states in pertinent part:

> Buyer acknowledges that Seller is detrimentally relying upon the diligent and professional efforts of the Buyer to complete and satisfy all of the conditions precedent. It shall exercise best efforts to complete the conditions precedent in a timely and professional fashion. Buyer shall not engage, directly or indirectly, in any acts or omissions which might prejudice the successful closure of all conditions precedent. Any willful or negligent acts which cause the conditions precedent to fail shall be deemed a material breach of this Contract of Sale.

18.    Pursuant to Section 13 of both the Hamlet and Active Adult Agreements, in the event of Centex's breach of those Agreements, Dr. Serdarevic and the Serdarevics, respectively, were granted as liquidated damages all of the deposit monies provided for by the Agreements.

19.    Pursuant to Section 18.o of the Hamlet and Active Adult Agreements, in the event of litigation arising out of the Agreements or any duty or obligation that either party had to the other, the prevailing party is entitled to recover from the other party the reasonable attorneys fees and other costs incurred in such litigation.

**Centex's Breach of the Hamlet and Active Adult Agreements**

20.    As set forth above, Centex entered into the Hamlet and Active Adult Agreement in May 2005. In accordance with the Agreements, simultaneously with their execution, Centex paid the Serdarevics the First Deposits, totaling $200,000.00.

21.    Thereafter, the Agreements provided Centex with 60 days during which it had the right to terminate the Agreements and have its deposits returned if its studies indicated that development of the Serdarevics' property was not feasible. This timeframe, denominated the "Feasibility Period," was extended at Centex's request for 6 days, from July 9, 2005 to July 15, 2005.

22.    At the end of the Feasibility Period, Centex became obligated to pay the Serdarevics the Second Deposits. In July 2005, in accordance with the Hamlet and Active Adult Agreements, Centex paid such Deposits, totaling $1,800.000.00.

23.    In August 2005, Centex paid the Third Deposit under the Hamlet Agreement in the amount of $500,000.00.

24.    Upon information and belief, over the next several months, Centex created several concept plans for the development of the property and met informally and formally with representatives of the Town of Goshen concerning the development.

25.    Upon information and belief, in the summer of 2006, Centex submitted a formal concept plan to the Town of Goshen detailing its proposed development of the property (the "Concept Plan"). Notwithstanding the plain language of the Active Adult Agreement and the best efforts clause therein, upon information and belief, Centex did not provide for any senior housing. Rather, the Concept Plan provided only for traditional homes, condominiums and townhouses.

26.    Upon information and belief, the Concept Plan was revised several times during the summer based on Centex's meetings with representatives of the Town of Goshen and its Planning Board.

27.    At its September 21, 2006 Planning Board meeting, the Town of Goshen approved the Concept Plan.  The Concept Plan provided for Centex to build approximately 570 units on the Hamlet and Active Adult Parcels, consisting of a mix of single family homes, townhouses and condominium-type units.

28.    Following the Town's approval of the Concept Plan, Centex became obligated to pay the Fourth Deposit under the Hamlet Agreement, in the amount of $500,000, and the Third and Fourth Deposits under the Active Adult Agreement, totaling $1 million.  *See* § 1(b)(iii)(iv) of the Hamlet and Active Adult Agreements, respectively.  Centex, however, failed to pay those Deposits.

29.    Upon information and belief, shortly after the Town's approval of the Concept Plan, as a result of the decline of the real estate market, Centex determined to walk away altogether from developing the Serdarevics' property.

30.    However, rather than outright terminating the agreements and honoring its obligation to pay the remaining deposits under the Agreements, Centex decided to delay its work on the development and to invent excuses for not moving forward, all in an improper effort to avoid paying the monies owed to the Serdarevics.

31.    In addition, upon information and belief, Centex intentionally took steps to hinder and derail the approval process for the development.

32.    In the fall of 2006, Centex stopped all work on the development.

33.    Thereafter, on February 12 and 13, 2007, Centex sent Dr. Serdarevic two letters, one addressing the Hamlet Parcel and the other Active Adult Parcel, in which Centex contended that purported problems with the property would require a drastic reduction in the number of units built and a lowering of the price per unit that Centex would pay.

34.    In the February 13 letter, Centex sought to avoid its obligations under the Hamlet Agreement, contending that supposed "environmental constraints" on the Hamlet Parcel would limit the number of units it could build to hundreds less than the approximately 397 units provided for in the Town-approved Concept Plan. A copy of the February 13, 2007 letter is annexed hereto as Exhibit D. Centex also stated that the new number of units were less than the minimum number provided for in the Hamlet Agreement, which was a condition precedent to closing. Using that pretext, Centex proposed to renegotiate the Hamlet Agreement using per unit prices far lower than those that had been agreed upon.

35.    None of the supposed problems Centex raised in its letter concerning the Hamlet Agreement had any basis in fact whatsoever.

36.    Similarly, in the February 12 letter, Centex contended that it was not possible to proceed with the Active Adult Agreement because the Town of Goshen purportedly would not rezone the parcel to allow for the development of senior housing. As a result, Centex requested that the Serdarevics acknowledge the futility of proceeding with a formal rezoning petition and agree to the termination of the Active Adult Agreement. In the alternative, Centex asked the Serdarevics to consent to the filing of a rezoning petition with the Town.  A copy of the February 12, 2007 letter is annexed hereto as Exhibit E.

37.    Centex's February 12 letter, however, was no more than a baseless effort to extricate itself from its obligations under the Active Adult Agreement. Indeed, Centex's letter

ignored the fact that it was Centex -- not the Town of Goshen -- who unilaterally determined long before not to proceed with senior housing, and, upon information and belief, created and submitted a concept plan that omitted such housing.

38.    Furthermore, even assuming that Centex had a good faith desire to proceed with senior housing or that a rezoning petition was even necessary -- neither of which is the case -- Centex breached its obligation to use its "best efforts . . . in a timely and professional fashion" to gain the necessary zoning approvals for the development.  To first draft a rezoning petition in February 2007 -- after failing to provide for such housing in the Concept Plan and long after Centex purported to have known that the zoning laws had to be changed to accommodate senior housing -- only confirms the fact that Centex had abandoned its obligations under the Active Adult Agreement.

39.    In response to Centex's letters, Serdarevic's representative contacted Centex's representative, Robert Fourniadis, Centex's Senior Vice President responsible for the Hamlet and Active Adult development, to suggest that the parties meet to discuss the matter.  During that discussion, Mr. Fourniadis admitted that it was Centex's "wish" to walk away from the development of the Serdarevics' property.

40.    Notwithstanding Mr. Fourniadis' admission, the parties met on March 22, 2007, in an effort to resolve their dispute, but no resolution was reached.

41.    By letters dated March 29, 2007, in furtherance of its goal to avoid its obligations to the Serdarevics, Centex informed Dr. Serdarevic that (i) it was in the process of preparing a new, drastically scaled back, concept plan for the Hamlet Parcel, and (ii) the Serdarevics were in default under the Active Adult Agreement by reason of their not signing the rezoning petition or

renegotiating the Agreement.  Copies of the March 29, 2007 letters are annexed hereto as Exhibits F and G.

42.    By letter dated April 23, 2007, Dr. Serdarevic, through her counsel, responded to Centex's March 29 letters, refuting Centex's contentions.  A copy of the April 23, 2007 letter is annexed hereto as Exhibit H.

43.    By letter dated May 10, 2007, Centex's counsel provided Dr. Serdarevic with a drastically scaled back concept plan for the Hamlet Parcel.  Centex also concocted yet another reason for not proceeding with the Town-approved Concept Plan:  a purported newly-discovered lack of adequate water supply on the parcel.  Centex's counsel concluded the letter by suggesting that the parties meet again to discuss whether a resolution of the parties' disputes could be reached.  A copy of the May 10, 2007 letter is annexed hereto as Exhibit I.

44.    In accordance with Centex's request, Dr. Serdarevic met with Centex's representatives on May 30, 2007.  Dr. Serdarevic refuted Centex's contentions concerning the purported lack of available water, as well as the number of units that could be built on the Hamlet and Active Adult Parcels.  She also stated that she was prepared to renegotiate some of the per unit pricing to be paid by Centex, provided that Centex agree to develop the property substantially in conformity with the Town-approved Concept Plan, which provided for approximately 570 units.  Centex's representatives agreed to proceed on that basis.

45.    Notwithstanding that oral agreement, by letter dated July 6, 2007, Centex reversed its position and stated that it was unwilling to develop the property in accordance with the Town-approved Concept Plan and that it would not renegotiate its Agreements with the Serdarevics -- despite having repeatedly asked Dr. Serdarevic to do just that.  A copy of the July 6, 2007 letter is annexed hereto as Exhibit J.

46.    Shortly thereafter, Dr. Serdarevic learned that the Town of Goshen was in the process of proposing zoning changes that, if enacted, would severely limit one's ability to build a full scale hamlet style residential development on the Serdarevics' property.

47.    Dr. Serdarevic's representatives suggested a meeting with Centex's representatives to discuss the Town's proposed zoning changes and preparation of opposition to that proposal.

48.    On August 10, 2007, the parties met for that purpose. Centex again expressed a supposed willingness to develop the property in substantial conformity with the Town-approved Concept Plan.

49.    In September 2007, Orange County's Department of Planning issued a report concerning its review of the Town of Goshen's proposed zoning changes, in which the Department stated its opinion that the Hamlet and Active Parcels were likely "the best placed" of the properties in Goshen for a hamlet style development. *See* Orange County Department of Planning Report, annexed hereto as Exhibit K, at § 3.3.

50.    In October 2007, Centex and Dr. Serdarevic met with the Town planners and its attorneys. The Town planners indicated that the Town board was very interested in developing the Serdarevics' property in accordance with the previously approved Concept Plan.

51.    By letter dated October 23, 2007, counsel for Dr. Serdarevic reminded Centex that (i) pursuant to the Hamlet Agreement, the Fourth Deposit for $500,000 was past due; (ii) pursuant to the Active Adult Agreement, the Third and Fourth Deposits for $500,000 each were past due; and (iii) pursuant to Section 5.j. of the Hamlet and Active Adult Agreements, the sum of $500,000 ($250,000 for each Agreement), had become due on July 15, 2007, that date being

the twenty-fourth month following the completion of the Feasibility Period. A copy of the October 23, 2007 letter is annexed hereto as Exhibit L.

52.     Faced with its obligation to make such payments, Centex's ruse was finally exposed. By letters dated October 30, 2007, Centex informed Dr. Serdarevic that it was unilaterally terminating the Hamlet and Active Adult Agreements. Copies of those letters are attached as Exhibits M and N.

53.     In those letters, Centex asserted, *inter alia*, that it was terminating the Hamlet and Active Adult Agreements purportedly because it would "likely" be at least six months to a year until the Town completed its environmental impact analysis for the proposed rezoning amendments, and then "at least a year or two" after that for the development's application to go through the environmental review process, thereby "rendering it impossible to meet the condition precedent of obtaining governmental approval by [July 15, 2009]," the date specified in the Agreements. It also repeated its prior assertion -- albeit baseless -- that there was an insufficient water supply.

54.     None of Centex's purported reasons for terminating the Agreements has any basis in fact or law, as stated in a letter sent on November 5, 2007 by the Serdarevics' representative to Centex. A copy of the November 5, 2007 letter is annexed hereto as Exhibit O.

55.     By delaying its performance under the Agreements and now terminating the Agreements, not only has Centex cost the Serdarevics ten of millions of dollars, but also likely has irretrievably cost them the opportunity to sell their property to another developer.

## COUNT ONE
### Breach of the Hamlet Agreement

56.     Dr. Serdarevic repeats and realleges the allegations contained in paragraphs 1 through 55 of the Complaint as if fully set forth herein.

57.     Dr. Serdarevic has fully performed her obligations under the Hamlet Agreement.

58.     Centex has materially and substantially breached the Hamlet Agreement.

59.     Centex has breached Section 1.b of the Hamlet Agreement by failing to remit to Dr. Serdarevic the Fourth Deposit of $500,000.00, despite due demand by Dr. Serdarevic.

60.     Centex has breached Section 5.j of the Hamlet Agreement by failing to remit to Plaintiffs the sum of $250,000.00 that came due on each of July 15, 2007 and July 15, 2008, twenty-four and thirty-six months, respectively, following the completion of the Feasibility Period.

61.     Centex has breached Section 5 of the Hamlet Agreement by, *inter alia*, failing to use its "best efforts to complete the conditions precedent of the Hamlet Agreement in a timely and professional fashion" by, *inter alia*, delaying its efforts to obtain the necessary approvals from the Town.

62.     Centex also has breached the Hamlet Agreement by terminating it without due cause.

63.     Upon information and belief, Centex has breached the implied covenant of good faith and fair dealing implicit in the Hamlet Agreement.

64.     Upon information and belief, Centex has breached the Hamlet Agreement by intentionally taking steps to hinder and derail the approval process for the development.

65.     Centex's breaches were wanton and willful, particularly in light of the fact that it acknowledged in the Hamlet Agreement that Dr. Serdarevic was "detrimentally relying upon the diligent and professional efforts of [Centex] to complete and satisfy all of the conditions precedent." Further, Centex's breach of its obligations to Dr. Serdarevic also adversely affects the general public by, *inter alia*, limiting the housing available in the Town of Goshen.

66.    By reason of the foregoing, Dr. Serdarevic is entitled to judgment against Centex (i) declaring that she is entitled to the Deposits that Centex paid; (ii) awarding her the remaining unpaid Deposits under the Hamlet Agreement of $1,500,000.00; (iii) awarding her the twenty-four month and thirty-six month payments under the Hamlet Agreement in the amount of $250,000.00 each; and (iv) awarding her, pursuant to Section 18.o of the Hamlet Agreement, her reasonable attorneys' fees and costs associated with this action.

### COUNT TWO
### Breach of the Active Adult Agreement

67.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 55 of the Complaint as if fully set forth herein.

68.    Plaintiffs have fully performed their obligations under the Active Adult Agreement.

69.    Centex has materially and substantially breached the Active Adult Agreement.

70.    Centex has breached Section 1.b of the Active Adult Agreement by failing to remit to Plaintiffs the Third and Fourth Deposits of $500,000.00 each, despite due demand by Plaintiffs.

71.    Centex has breached Section 5.j of the Active Adult Agreement by failing to remit to Plaintiffs the sum of $250,000.00 that came due on each of July 15, 2007 and July 15, 2008, twenty-four and thirty-six months, respectively, following the completion of the Feasibility Period.

72.    Centex has breached Section 5 of the Active Adult Agreement by failing to use its "best efforts to complete the conditions precedent of the Active Adult Agreement in a timely and professional fashion" by, *inter alia* (i) failing to submit to the Town of Goshen a concept plan

that provided for active adult housing and/or delaying in seeking to submit a rezoning petition; and/or (ii) delaying its efforts to obtain the necessary approvals from the Town.

73.    Centex also has breached the Active Adult Agreement by terminating it without due cause.

74.    Centex has breached the implied covenant of good faith and fair dealing implicit in the Active Adult Agreement.

75.    Upon information and belief, Centex has breached the Active Adult Agreement by intentionally taking steps to hinder and derail the approval process for the development.

76.    Centex's breaches were wanton and willful, particularly in light of the fact that it acknowledged in the Active Adult Agreement that the Serdarevics were "detrimentally relying upon the diligent and professional efforts of [Centex] to complete and satisfy all of the conditions precedent." Further, Centex's breach of its obligations to the Serdarevics also adversely affects the general public by, *inter alia*, limiting the housing available in the Town of Goshen.

77.    As a direct result of the foregoing, Plaintiffs are entitled to judgment against the Centex (i) declaring that Plaintiffs are entitled to the Deposits that Centex has paid; (ii) awarding Plaintiffs the remaining unpaid Deposits under the Active Adult Agreement of $2,000,000.00; (iii) awarding Plaintiffs the twenty-four month and thirty-six month payments under the Active Adult Agreement of $250,000.00 each; and (iv) awarding Plaintiffs, pursuant to Section 18.o of the Active Adult Agreement, their reasonable attorneys' fees and costs associated with this action.

## COUNT THREE
### Breach of the Parcel 3 Agreement

78.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 55 of the Complaint as if fully set forth herein.

79.    Pursuant to section 1.a of the Parcel 3 Agreement, Centex agreed to pay the Serdarevics $3,000,000.00 for Section 15, Block 33, Lot 1. The purchase price was based on Centex building and selling 10 single family lots at the price of $300,000.00 per lot.

80.    Pursuant to section 1.b of the Parcel 3 Agreement, Centex agreed to provide the Serdarevics with four deposits at fixed times throughout the development of Section 15, Block 33, Lot 1. The deposits included: (i) a first deposit of $100,000.00, due upon the execution of the agreement; (ii) a second deposit of $100,000.00, due upon the expiration of the "Feasibility Period"; (iii) a third deposit of $100,000.00, due upon Centex receiving zoning approval for the development; and (iv) a fourth deposit of $50,000.00, due upon approval by the municipality of the Concept Plan.

81.    In addition to the foregoing deposits, pursuant to Section 5.i of the Parcel 3 Agreement, Centex agreed to pay the Serdarevics the non-refundable sum of $250,000.00 twenty- four and thirty-six months, respectively, after the completion of the Feasibility Period.

82.    Pursuant to section 7.a of the Parcel 3 Agreement, Centex was provided with a period of time to determine the feasibility of the development: "Buyer shall have a period of sixty (60) days from the date hereof (the 'Feasibility Period') to make such zoning, legal, title (updating and verifying the state of title as set forth in the Title Report attached hereto and made apart hereof as Exhibit B), engineering, environmental, soil, geological, financial and technical studies, and such other tests, investigations and inquiries (hereinafter, 'Feasibility Studies') as it

shall deem necessary and appropriate, all at its own cost and expense, in order to determine whether to proceed with the acquisition of the Property."

83.    Pursuant to section 7.b of the Parcel 3 Agreement, Centex was given the right to void the agreement after doing its feasibility study: "In the event that Buyer determines, in the exercise of its discretion, that it cannot proceed with the acquisition of the Property based upon the Feasibility Studies, Buyer shall have the right, at its option, upon written notice to Seller which said Notice shall specify that Buyer is electing to terminate this Agreement and the specific reasons therefore, delivered on or before the last day of the Feasibility Period, time being of the essence, to cancel this Agreement and recover the Deposit, following which there shall be no further liability or obligation on either of the parties hereto and this Agreement shall become NULL AND VOID." (emphasis added).

84.    In July 2005, Centex purported to exercise its right to terminate the Parcel 3 Agreement within the Feasibility Period.  Section 7.b of the Parcel 3 Agreement, however, requires that any termination of the Parcel 3 Agreement be "based upon the Feasibility Studies" to be effective.  No such studies were performed by Centex.

85.    Centex has materially and substantially breached the Parcel 3 Agreement by failing to perform a feasibility study within the specified time period, which was a condition precedent to the effective termination of the agreement.

86.    Centex's purported termination is in breach of Section 7.b of the Parcel 3 Agreement.

87.    Pursuant to Section 13 of the Parcel 3 Agreement, upon Centex's breach, the Serdarevics were entitled to the foregoing deposits provided for by the agreement as liquidated damages.

88.     Pursuant to Section 18.o of the Parcel 3 Agreement, in the event of litigation arising out of the Agreement or any duty or obligation that either party had to the other, the prevailing party is entitled to recover from the other party the reasonable attorneys' fees and other costs incurred in such litigation.

89.     By purportedly terminating the Parcel 3 Agreement without performing any feasibility studies, Centex also has breached the implied covenant of good faith and fair dealing.

90.     Plaintiffs have fully performed their obligations under the Parcel 3 Agreement.

91.     As a direct result of the foregoing, Plaintiffs are entitled to judgment against the Centex (i) awarding Plaintiffs the deposits under the Parcel 3 Agreement in an amount not less than $350,000.00; (ii) awarding Plaintiffs the twenty-four month and thirty-six month payments under the Parcel 3 Agreement of $250,000.00 each; and (iii) awarding Plaintiffs, pursuant to Section 18.o of the Parcel 3 Agreement, Plaintiffs' reasonable attorneys' fees and costs associated with this action.

WHEREFORE, Plaintiffs demand judgment as follows:

A.      On Count One, declaring that Dr. Serdarevic is entitled to the Deposits that Centex has paid, awarding Dr. Serdarevic damages against Centex in an amount not less than $2,000,000.00 to be determined at trial, and awarding Dr. Serdarevic the reasonable attorneys' fees and costs associated with this action;

B.      On Count Two, declaring that Plaintiffs are entitled to the Deposits that Centex has paid, awarding Plaintiffs damages against Centex in an amount not less than $2,500,000.00 to be determined at trial, and awarding Plaintiffs the reasonable attorneys' fees and costs associated with this action;

C.    On Count Three, awarding Plaintiffs damages against Centex in an amount not less than $850,000.00 to be determined at trial, and awarding Plaintiffs the reasonable attorneys' fees and costs associated with this action; and

D.    Awarding Plaintiffs prejudgment interest and such other and additional relief as the Court deems just and proper.

Dated: New York, New York
          August 20, 2008

                                   DREIER LLP


                            By: _____
                                   Marc S. Dreier
                                   Richard B. Friedman
                                   Adam M. Ostreicher
                            499 Park Avenue
                            New York, New York 10022
                            Telephone: (212) 328-6100
                            Facsimile:  (212) 328-6101

                            *Attorneys for Plaintiffs*
                            *Dr. Olivia N. Serdarevic and Bosiljka Serdarevic*

**Exhibit A**

AGREEMENT
(HAMLET)

THIS AGREEMENT (the "Agreement") made and entered into this 9th day of May 2005 by and between:

DR. OLIVIA N. SERDAREVIC having an address at 103 East 84th Street , New York, NY 10028 (hereinafter called "Seller") and: CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquarters at 500 Craig Road, Manalapan, New Jersey 07726 (hereinafter collectively "Buyer").

WITNESSETH:

WHEREAS, Seller is the sole fee owner of that certain parcel of land located in the Town of Goshen, Orange County, State of New York, commonly known as Section 11- Block 1- and Lot 46 in Block on the Town of Goshen Tax Map, as shown on the map attached hereto as Exhibit "A" (hereinafter the "Property");

WHEREAS, Seller desires to sell the Property and Buyer desires to acquire the Property on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Buyer and Seller, Seller hereby agrees to sell and convey the Property to Buyer upon the terms and conditions hereinafter set forth.

1.    PURCHASE PRICE.

a.    Buyer agrees to pay and Seller agrees to accept a Purchase Price for the Property in the amount of Thirty-Three Million Five Hundred Sixty Two Thousand Five Hundred ($33,562,500.00) Dollars. The Purchase Price is based on three hundred twenty (320) units ("Lots") at a price of $100,000.00 per unit. In addition, the Purchase Price is based upon approval of 50,000 square feet of retail space at $31.25 per square foot. The actual Purchase Price shall be adjusted based upon the actual numbers of units and retail square footage approved. Seller will receive no monetary consideration for approved Affordable Housing Units (as defined below).

In the event that the Property or any portion of the Property is developed so that the dwellings to be constructed on the Property will be owned under a condominium form of ownership as opposed to fee simple ownership, then the term "Lot" or "Lots" shall be deemed to mean the individual residential condominium unit created on the Property pursuant to the Approvals, as defined below. These residential condominium units shall be referred to as "Unit" or "Units" for all purposes under this Agreement and shall be interchangeable with the terms "Lot" or "Lots".

For the purposes of this Agreement, the term "Units" and "lots" shall not include any dwelling Unit, the sale, resale, lease or release of which is subject to restriction pertaining to the income level of the Buyer or Lessee thereof (hereinafter "Affordable Housing Units"). It is expressly understood and agreed that no consideration will be paid by Buyer to the Seller for any Affordable Housing Units required to be constructed on the property.

b.    Deposit.

i. First Deposit. Upon the execution of this Agreement, Buyer shall pay a Deposit of One Hundred Thousand ($100,000.00) Dollars (the "First Deposit") to Seller.

ii.    Second Deposit. Upon the expiration of the Feasibility Period (as hereinafter defined), Buyer shall pay a second deposit (the "Second Deposit"), by wire transfer Nine Hundred

Thousand Dollars ($900,000) Dollars.

    iii. <u>Third Deposit</u>. Upon securing zoning Buyer shall pay by wire transfer a third deposit of Five Hundred Thousand Dollars ($500,000) Dollars.

    iv. <u>Fourth Deposit</u>. Upon approval by the municipality of the Concept Plan Buyer shall pay by wire transfer a fourth deposit of Five Hundred Thousand Dollars ($500,000) Dollars

    v. <u>Fifth Deposit</u>. Upon the earlier of Preliminary site plan and/or subdivision approval for all municipal, county and state approvals for public potable water and public sanitary sewer service. Buyer shall pay by wire transfer a fifth deposit of One Million ($1,000,000) Dollars

    vi. The First, Second, Third, Fourth and Fifth Deposit shall be collectively referred to in this Agreement as the "Deposit". The deposit shall be credited against the Purchase Price at the First Closing.

    vii Following expiration of the Feasibility Period the Second Deposit shall be tendered to Seller. Prior to release and/or payment of the Second, Third Fourth and Fifth Deposit to Seller, the following conditions must be satisfied: (i) title to the Property shall be as set forth in Paragraph 2 hereinbelow, (ii) Seller shall have executed and delivered to Buyer a first mortgage in recordable form, in the form commonly know as NYBTU 8014 (the "Deposit Mortgage") attached hereto as Exhibit C , in an aggregate amount equal to Deposit disbursed (the "Deposit Mortgage") and (iii) the Memorandum of Agreement described in paragraph 16, below, shall have been recorded. In the event that Buyer is entitled to the return of the Deposit under this Agreement, and after Buyer has complied with the Condition Precedent set forth in 1 B (viii) herein below, Seller shall repay the Deposit to Buyer, commencing the first day of the month succeeding eighteen (18) months after the date that the event ("Termination Event") which gives rise to Buyer's right to receive the return of the Deposit takes place. The Deposit Mortgage shall be a lien against that certain parcel commonly known as Section 15, Lot 1 in Block 33 on the Town of Goshen Tax Map

    viii. Should Buyer elect to terminate this Contract of Sale and require re-payment of the Deposit, Buyer shall physically restore the physical and legal status except as to zoning and condition of the Premises, and state of title, to its status as of the date hereof. Such reversionary acts shall include but is not limited to re-zoning and termination of any and all recorded agreements, memoranda, easements, covenants which Buyer shall have directly or indirectly caused to be recorded pursuant to this Agreement. Buyer must complete restoration within ninety (90) days of the Termination Event, time being of the essence.

    ix. For purposes of this paragraph 1 the term "Zoning" shall mean any required rezoning or use variance or zone change required in order for the Property to be developed as contemplated by this Agreement. The term "Concept Plan" shall mean a concept plan or schematic plan presented to the appropriate governmental authority of the Town of Goshen which governmental authority thereupon consents to otherwise approves of the same. The term "Preliminary Site Plan and/or Subdivision Approval" shall mean the approval granted by the appropriate governmental authority of the Town of Goshen which vests the development rights in the property as set forth in such approval.

c.    <u>Payment of the Balance of the Purchase Price</u>. The Purchase Price at each Closing shall be paid by wire transfer in accordance with Paragraph 3, below.

d.    <u>Costs and Expenses related to Transfer</u>. Buyer agrees to be responsible for all transfer taxes and recording fees. Buyer further agrees that should Seller be required to execute any documents or

applications during the term of the Agreement and Seller desires to have same reviewed by an attorney or other consultants as the same may be appropriate in Seller's reasonable commercial judgment, the reasonable costs to be incurred by Seller in connection therewith shall be paid to Seller by Buyer.

2.       TITLE. As of the Closing, title to the Property shall be good and insurable, in accordance with the title report issued by Landstar Title Agency LT 8952 attached hereto and made a part hereof and as to those items not set forth in the Report title shall be good and insurable as to (i) liens mortgages and encumbrances, (ii) restrictions, easements, covenants, and other agreements of record which would prevent or unreasonably interfere with the use of the Property as contemplated by this Agreement, (iii) liens for taxes and assessments, and shall be insurable at regular rates and without special exception which would materially affect the use of the Premises as intended by this Contract of Sale.. Those items created or expressly assumed by Buyer, zoning ordinances, privileges or rights of public service companies will not constitute objections to title. during the Feasibility Period described in Paragraph 7 below, Buyer shall have the right to update the title search on the Property in order to determine whether or not material variations have occurred from title as attached hereto and made a part hereof as Exhibit B. If the title is determined to not so comply with the foregoing, then Seller shall have thirty (30) days within which to commence cure and diligently prosecute thereafter to completion any such title defects. If Seller is unable to cure such title defects within twelve (12) months after notice of the same, then Buyer shall have the right to terminate this Agreement, and shall be entitled to a return of the Deposit in accordance with 1 B (iv) hereinabove. Except as required by the preceding sentence in order to cure any title defects, Seller will do nothing while this Agreement is in effect to alter or otherwise encumber title to the Property.

3.       CLOSING OF TITLE. Seller and Buyer agree that closing of title (the "Closing") will be accomplished in two (2) closings, the first of which will take place thirty (30) days after the conditions set forth in Paragraph 5 below have been satisfied and the second 1 year thereafter. The Purchase Price at each Closing shall be paid by wire transfer to an account designated by Seller in writing. No less than 50% of the Units shall be purchased at the first Closing . Closing of title shall take place at office of Seller's attorney 350 5th Avenue, Ste 4613, New York, NY 10118, or at the offices of a title company insuring fee title to Buyer if said office is located in the County, City and State of New York. Seller shall deliver to Buyer, free and clear of all tenancies and other occupancies, title in and to the Property, together with all the tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining, and the reversion or reversions, remainder and remainders, rent, issues and profits thereof, if any, and all the estate, right, title, interest, property, possession, claim and demand whatsoever, in law as well as in equity, and every part and parcel thereof. Further, title to be conveyed to Buyer shall include all of Seller's right, title and interest, if any, in and to any lands lying in the bed of any existing or proposed street in front of or adjoining the Property. Seller agrees that at the time of the Closing of Title hereunder, Seller shall grant to Buyer an easement over that portion of the Property which Buyer has not yet purchased as reasonably required by Buyer to construct the improvements and infrastructure required or contemplated by the Approvals as necessary for Buyer to proceed with the development of the portions of the Property to which Buyer has taken title, at no additional consideration to Seller. Notwithstanding the foregoing Buyer shall bear any and all costs, fees and expenses incurred or to be incurred in connection with the grant, draft and recordation of any such easements including but not limited to recordation charges and attorneys fees. Title to the easements described in this subparagraph (g) shall comply with Paragraph 2 hereof.

4.       DELIVERIES AT CLOSING OF TITLE. At each closing, Seller shall deliver, as may be applicable, to Buyer:

      i.      Bargain and Sale Deed with covenants against grantor's acts in sufficient and recordable form to convey the portion of the Property being purchased at the closing and incorporating the accurate metes and bounds description prepared pursuant to a current survey, obtained at the Buyer's sole cost and expense, as well as by reference by lot and block on the filed map creating the lots or units to be purchased at the closing;

      ii.     an affidavit of title in usual and customary form;

     iii.    an affidavit that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended;

     iv.    an executed form 1099-B ;

     v.    Corporate resolution,;

     vi.    discharges, in recordable form, of any and all mortgages and other liens encumbering the Premises; and

     vii.    such other documents as may be reasonably requested by Buyer's title insurance company to convey title to the Premises in accordance with the terms hereof.

5.    CONDITIONS PRECEDENT TO CLOSING. . It is understood and agreed that the obligations of Buyer to pay the Purchase Price for and to accept a tender of the Deed to the Premises is contingent upon achievement by Buyer of each and every material condition contained in the subparagraphs hereof for the Premises being conveyed. Buyer acknowledges that Seller is detrimentally relying upon the diligent and professional efforts of the Buyer to complete and satisfy all of the conditions precedent. It shall exercise best efforts to complete the conditions precedent in a timely and professional fashion. Buyer shall not engage, directly or indirectly, in any acts or omissions which might prejudice the successful closure of all conditions precedent. Any willful or negligent acts which cause the conditions precedent to fail shall be deemed a material breach of this Contract of Sale. Buyer shall have the right to waive any or all of the conditions precedent in whole or in part without adjustment, modification or amendment, in whole or in part, to this Contract of Sale. If such conditions cannot be satisfied, after diligent and good faith efforts to do so prior to the date of expiration of the time period(s) set forth below in Paragraph 5 shall, then, unless Buyer has waived such conditions, either party shall have the right to terminate this Agreement upon ten (10) days ("Termination Date") written notice to the other whereupon this Agreement shall terminated as of the Termination Date, and except as otherwise expressly provided in this Agreement, neither party will have any further rights or obligations hereunder. It being acknowledged by the parties that the Deposit, but not the Extension Payments as hereinafter defined, shall be returned by Seller if this Agreement is terminated pursuant to this Paragraph 5. The conditions are as follows

     a.    <u>Governmental Approvals</u>. Except as set forth herein, Buyer shall have secured, at Buyer's sole cost and expense, preliminary and final map subdivision and/or site plan approval, together with any and all other Federal, State, county and municipal approvals (collectively, the "Approvals"), required for the development of the property into a mix of two hundred (200) Housing Units With appropriate retail space and 10% affordable units . In addition, the Approvals shall have sufficient open space to accommodate amenities which Buyer in good faith believes reasonable and necessary . The Approvals shall be subject to only such conditions which are reasonable and customary for a project of this size and nature. It is understood and agreed that the Approvals shall not include any building or construction-related permits or similar certificates.

     b.    <u>Final Plat</u>. The final subdivision plat creating the Lots shall have been filed in the Orange County Clerk's Office. Buyer shall, post all necessary bonds and fees required as a precondition to the filing of the Plat the earlier of thirty (30) days of the approval of the bonding estimates by the Goshen Township Engineer or as otherwise may be required by law, statute or regulation. . If the bonds and fees are not paid within said thirty (30) day period, then this condition under Paragraph 5b shall be deemed waived by Buyer.

     c.    <u>Utilities</u>. The Buyer shall have secured "will-serve" or comparable letters from the applicable utility companies or governmental agencies for the supply of natural gas, cable television, telephone, electricity and all other necessary utilities for connection, at reasonable connection charges, to the

number of Units created by the Approvals

d.    Sewer and Water. Buyer shall have received any and all permits and approvals from all appropriate governmental authorities and/or utility company or utility authorities for the provision of public potable water service and public sanitary sewer service for all of the Lots and retail space created by the Approvals, with sufficient committed capacity for all Lots and retail space created by the Approvals.

e    Easements. Buyer shall have obtained all reasonably necessary easements and property rights, which shall be reasonably required for Buyer to develop the Property in accordance with the Approvals, and as otherwise contemplated by this Agreement, on price and terms reasonably acceptable to Buyer

f    Title. Title to the Property shall be as otherwise provided in Paragraph 2 hereof.

g.    Litigation. Any material pending judicial, quasi-judicial, administrative or other proceeding, attacking any Approval, appealing a denial thereof or involving any matter with respect to the development of or title to the Property, the zoning or any other ordinance applicable to the Property, or which would prevent, preclude or interfere with the furnishing of any utilities or other services necessary for Buyer's development of the Property, or which would otherwise materially interfere with the proposed use of the Property, shall be finally and favorably adjudicated without affecting the Approvals

h.    Moratorium. Any moratorium by an appropriate governmental entity preventing applications for or issuance of Approvals, building permits, utility hook-ups or the like, shall have expired or otherwise been lifted, repealed or terminated.

i    Representations and Warranties. All representations and warranties made by Seller pursuant to Paragraph 11, below shall be true and correct as of the date hereof, and Seller shall not do or fail to take any action which would cause the same to be materially false or misleading at Closing.

Except as to acts or omissions of Buyer, in the event, at any time following the execution of this Agreement through Closing, any of said representations relating to compliance with Environmental Laws are found to not be true and correct, then Seller, at its sole cost, must take all steps reasonably necessary to bring the Property into compliance with all Environmental Laws, including all cleanup, monitoring and other remedial measures and, if necessary, until such time as Seller obtains a final clearance and/or approval or similar written determination from the appropriate governmental Department or Agency that acknowledges that any contamination on the Property has been remediated to the satisfaction of the said Department or Agency. In lieu of the foregoing, Seller may designate Buyer its agent for such remediation and Buyer shall in good faith commence and prosecute to completion such remediation. The actual and good faith costs, fees and expenses of such remediation shall be credited against the Purchase price hereunder. In the event Seller is unable or unwilling to satisfy the foregoing condition, then Buyer may terminate this Agreement and recover all Deposits. For the purposes of this Agreement, "Environmental Laws" shall mean each and every applicable federal, state, county or municipal statute, ordinance, rule, regulation, order, code, directive or requirement relating to the environment.

j    Time Periods. Buyer shall have forty eight (48) months from the completion of the Feasibility Period within which to satisfy the conditions in Paragraphs 5a through 5j. Failure to do so shall be deemed a breach of this Contract of Sale so long as such failure is due to the willful and negligent acts or omissions of Buyer and not of Seller. Notwithstanding the foregoing, Buyer may waive the conditions precedent, Should Buyer satisfy the conditions precedent set forth in Paragraph 5 on or before the eighteenth)month following completion of the Feasibility Period, Buyer shall receive an incentive

credit of Two Hundred Thousand Dollars ($200,000.00) against the Purchase Price. If closing occurs after the eighteenth month following the Feasibility Period and prior to the twenty fourth month, no additional credit shall be granted to Buyer or Seller. As of the first day of the twenty fourth and thirty sixth month following the completion of the Feasibility Period, time being of the essence Buyer shall pay to Seller, on each of the twenty fourth and thirty sixth month the sum of $250,000.00 which shall be non-refundable, but applicable to the purchase price ("Extension Payments") If the conditions are not satisfied at the end of in this Paragraph 5k, the forty eighth month Buyer shall have the right to terminate the Agreement and Seller may retain both Extension Payments. To secure Buyer against an event of Seller's default under this Agreement, the Extension Payments shall be secured by a lien against that certain parcel commonly known as Section 15, Lot 1 in Block 33 on the Town of Goshen Tax Map.

6.    COOPERATION. The parties each hereby agree to cooperate with each other in accomplishing each and every condition precedent to Closing contemplated hereunder, and to that end agree, when necessary, to join in all applications and to execute all other documents, declarations and maps required to be signed by either of them for such purpose.

7.    FEASIBILITY STUDIES.

a.    Buyer shall have a period of sixty (60) days from the date hereof (the "Feasibility Period") to make such zoning, legal, title (updating and verifying the state of title as set forth in the Title Report attached hereto and made a part hereof as Exhibit B, engineering, environmental, soil, geological, financial and technical studies, and such other tests, investigations and inquiries (hereinafter "Feasibility Studies") as it shall deem necessary and appropriate, all at its own cost and expense, in order to determine whether to proceed with the acquisition of the Property. Upon completion of the Feasibility Period, any and all Seller representations set forth herein, or any contingencies affecting the Premises, shall be deemed merged into the Feasibility Studies and Seller shall be deemed to take the Premises as is, where is, as set forth in the Feasibility Studies. Buyer agrees to provide Seller with copies of any Feasibility Studies generated by Buyer or its agents in connection with Buyer's Feasibility Studies within five (5) days of Buyer's receipt thereof. It is acknowledged and agreed that should Buyer elect not to proceed based upon its due diligence during the Feasibility Period (a) the Feasibility Studies shall be deemed confidential and proprietary to Seller and (b) Buyer shall not disclose, directly or indirectly the Feasibility Studies, to any party for any reason whatsoever

b.    In the event that Buyer determines, in the sole exercise of its discretion, that it cannot proceed with the acquisition of the Property based upon the Feasibility Studies, Buyer shall have the right, at its option, upon written notice to Seller which said Notice shall specify that Buyer is electing to terminate this Agreement and the specific reasons therfor, delivered on or before the last day of the Feasibility Period, time being of the essence, to cancel this Agreement and recover the Deposit, following which there shall be no further liability or obligation on either of the parties hereto and this Agreement shall become NULL AND VOID.

c.    Buyer shall have the right to enter upon the Property for the purpose of making, at its sole cost and expense, surveys and site engineering studies, including, without limitation, soil analysis, hazardous waste or other environmental testing, ground tests, load bearing tests and verifying test boring data. Prior to entering the Property, Buyer shall provide to Seller a certificate evidencing that Buyer has comprehensive general liability insurance with a combined single limit for bodily injury and property damage with not less than $5,000,000 per occurrence and such policy or Accord certificate shall name Seller as an additional insured, and Buyer shall indemnify, defend and hold harmless Seller from and against any claims, damage or loss caused by Buyer's, its employees, agents contractors or sub-contractors, entry, acts or omissions in or upon the Property . Buyer agrees to repair any damages

caused to the Property by Buyer or its agents immediately following the completion of its Feasibility Studies and restore the Premises to the condition existent prior to the Feasibility Studies.

8.     ADJUSTMENTS. At each Closing, all adjustments, including real property taxes, shall be adjusted, apportioned and allowed as of the date of each Closing of title based upon a 365-day year for the Property purchased at each Closing. The date of Closing shall be treated as the day on which Buyer holds title. All realty transfer taxes and roll back taxes shall be paid by Buyer. Buyer shall have the right to deduct from the Purchase Price all sums required to pay in full or otherwise discharge any obligations secured by any lien or encumbrance or creating a lien or encumbrance on the Property which may be the responsibility of Seller, at each Closing of title.

9.     ASSESSMENTS. Assessments, if any, for public improvements which assessment or assessments were liens encumbering the Premises on or before the date of the Agreement, and which are at the time of delivery of the deed unpaid shall be paid and discharged by the Seller upon the delivery of the deed which may credited as a closing adjustment.

10.    CONDEMNATION. Seller represents that it has no knowledge of any action or proceeding, either contemplated or pending, for condemnation of the Property, or any portion thereof. Seller shall give Buyer prompt written notice of any such proceeding or action of which it becomes aware. Buyer will have the option of participating in such proceedings, at its cost and expense. Should all or any material portion of the Property to be conveyed be taken by condemnation or eminent domain or deed in lieu thereof prior to Closing of title, which affects the material economic benefit of this transaction and so long as such condemnation is not the result of any breach of contract, agreement, misrepresentation, fraud or other such act or omission by Buyer, then this Agreement may be terminated by the election of Buyer without penalty or damages, by sending written notice to Seller within five (5) days after the vesting of title in the condemning authority. In the event of such termination by Buyer, Buyer will be entitled to the return of the Deposit, together with accrued interest. If Buyer does not elect to so terminate this Agreement and the condemnation has resulted in the loss of any Units, then Seller shall be entitled to any condemnation awards or recoveries (hereinafter "Condemnation Proceeds") Any absolute denial of access to the Property shall be deemed a material taking. Anything to the contrary notwithstanding, if the entire Property is taken during the term of this Agreement, and the proceeds of the condemnation exceed the Thirty-Three Million Five Hundred Sixty Two Thousand Five Hundred ($33,562,500.00) Dollars, then, in addition to the return of the Deposit, together with accrued interest, the Buyer shall also be entitled to 50% of the proceeds in excess of the Thirty-Three Million Five Hundred Sixty Two Thousand Five Hundred ($33,562,500.00) Dollars .

11.    REPRESENTATIONS, WARRANTIES, AND COVENANTS.

      a.     Seller represents to Buyer that the following are true and correct to the best of the Seller's actual knowledge without independent investigation on the date hereof, which representations and warranties where the context so indicates, shall also be true on the date of closing of title hereunder.

            i.     There are not now outstanding with respect to the Premises, any notices of any uncorrected material violations of any laws, statutes, ordinances, rules or regulations and any such notices hereafter issued prior to Closing will be satisfied by Seller unless such violations or notices are the result of acts or omissions of Buyer..

            ii.     There are no agreements, written or oral, with the municipality, the county, or any other governmental agencies, which would materially or adversely affect or impair the development of the Premises as contemplated hereunder for the construction of single family Dwellings or townhouse units or other improvements thereon.

            iii.     Seller represents that the Seller has no knowledge of any storage, burial, or dumping of hazardous or toxic materials on the Premises (as defined by any and all applicable State

and Federal laws or statutes) or of the storage, burial, or dumping of any other debris or material on the Premises.

iv.     Seller is the owner of the Premises.

v.      Seller has the full right and authority to execute this Agreement and consummate all of the transactions hereby contemplated.

vi.     There are no actions, suits or proceedings pending, or to the best of Seller's knowledge and belief, threatened against Seller adversely affecting any portion of the Premises, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

vii.    There are no attachments, executions, assignments for the benefit of creditors or voluntary or involuntary proceedings in bankruptcy pending, contemplated or threatened against Seller.

viii.   Seller is not a foreign person (as the term is defined in Section 1445 of the Internal Revenue Code as amended by the Foreign Investment in Real Property Tax Act ["FIRPTA"]) and Seller shall provide Buyer with an affidavit to that effect in compliance with FIRPTA at closing.

ix.     Seller warrants and represents that the Premises shall be free and clear of all tenancies on or before the closing date.

b.  Buyer hereby represents and warrants to Seller as of the time of the closing as follows:

i.      Buyer is a limited liability company duly organized and validly existing under the laws of the State of Delaware with the right and authority to conduct business in the State of New York and has full power and authority and has taken all action required by law to execute, deliver, and perform this Agreement and the transactions contemplated hereby and thereby and has taken all action required by law its Certificate of Formation and Operating Agreement to authorize the execution and delivery of the Agreement and the transactions contemplated hereby.

ii.     Neither the authorization, execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby or thereby will conflict with or result in the breach of any terms or provisions of Buyer's Certificate of Formation and Operating Agreement or any applicable statutes, laws, rules or regulations of any governmental body having jurisdiction in the Premises, or of any judgment, decree, writ, injunction, order or award of any arbitrator, court or governmental authority binding upon Buyer, or result in the breach of any terms or provision, or constitute a default, or result in the acceleration of any obligation under any loan agreement, indenture, financing agreement, or any other agreement or instrument of any kind to which Buyer is a party.

iii.    Buyer has the financial liquidity and assets to perform all of its duties, liabilities and obligations hereunder including but not limited to the payment of sums which shall be due and owing to Seller, as well as the performance of all Feasibility Studies, securing any and all government approvals, performance all of Buyer's conditions precedent and the development contemplated hereunder

There are no claims, causes of action or regulatory proceedings pending against Buyer, or which have been settled within twenty four (24) months prior to the date hereof, which alleges any act of fraud, misrepresentation, material breach of contract or which would affect any evaluation of Buyer as a suitable developer of the Premises

12. BROKER. The parties certify to each other that no real estate broker or other intermediary was responsible for bringing about this Agreement other than D.M. Paul Real Estate, who shall be paid a 2.5% commission by Buyer at closing, pursuant to a separate agreement between Buyer and Broker. Should a claim arise on the part of any other person or entity seeking a real estate commission, finders fee or other similar compensation, each party agrees to indemnify and hold the other harmless against and from: (i) any claim for such commission, fee or compensation based upon any action by such party, and (ii) any damages or costs including reasonable attorney's fees incurred by the other as a result of or relating to such claim. The provisions of this Paragraph 12 shall survive the Closing and the delivery of the deed to the Property without further reference hereto or action by or documentation from either party.

13. BUYER'S DEFAULT If Buyer shall breach this Agreement or otherwise default in the performance of this Agreement, then Seller shall have the right to terminate the Agreement and shall be entitled to retain all Deposit Monies as liquidated damages, as Seller's sole and exclusive remedy and the Deposit Mortgage shall be forthwith satisfied and discharged of record by execution and tender of a Satisfaction of Mortgage in form and substance reasonable acceptable to Seller. Seller hereby waiving its right to seek monetary damages or specific performance, whereupon this Agreement shall be terminated and of no further effect and there shall be no further liability between the parties with respect hereto except for Buyer's obligation to restore the Premises or as otherwise contemplated by this Agreement. It is expressly understood and agreed that Seller will not have the right to declare Buyer in default until Buyer has received a written notice of default and been given fifteen (15) days to cure such default.

14. SELLER'S DEFAULT. In the event of Seller's default hereunder, Buyer shall be entitled to seek an action for specific performance. In the event specific performance is unavailable, or Seller is unable to convey title or Seller has ceased or failed to disclose any environmental condition, which makes development of the Property unfeasible Seller shall return the Deposit Monies to Buyer. It is expressly understood and agreed that Buyer will not have the right to declare Seller in default until Seller has received a written notice of default and been given fifteen (15) days to cure such default.

15. SURVIVAL. It is understood and agreed that whether or not expressly provided herein, any provision of this Agreement which, by its nature and effect, is required to be observed, kept or performed after delivery of the Deed, shall survive and shall not be merged herein, but shall remain binding upon and for the benefit of the parties hereto until fully performed, kept or observed.

16. RECORDING. Buyer shall not have the right to record this Agreement. Buyer shall, however, have the right to record a short form Memorandum of this Agreement, if the Agreement is not terminated at the end of the Feasibility Period, in the form attached hereto as Exhibit "D". Prior to the recording of the Memorandum, the Buyer shall deliver to Seller's attorney a Discharge of the Memorandum in the form attached hereto as Exhibit "E" executed by the Buyer which may be released by Seller's attorney for recordation upon the termination of the Agreement, provided however, that Seller's attorney is obligated to give fifteen (15) days written notice to the Buyer of his intention to record the Discharge of Agreement prior to his delivery thereof to the County Clerk.

17. NOTICES. Any notice, request, demand, instruction or other communication (a "Notice") to be given to any party with respect to this Agreement may be given either by the party or its counsel and shall be deemed to have been properly sent and given when delivered by hand or when sent by certified mail, return receipt requested, facsimile, or by reputable courier service. If delivered by hand, facsimile, confirmed by one of the other means

of communications set forth herein or courier, a Notice shall be deemed to have been sent, given and received when actually received by the addressee. If sent by certified mail, a Notice shall be deemed to have been sent and given when properly deposited with the United States Postal Service with the property address and postage paid therewith, and shall be deemed to have been received on the third (3rd) business day following the date of such deposit. Each party shall have the right to change its notice address upon notice in writing to the other party.

If to the Seller:

Dr. Olivia N. Serdarevic
103 East 84ᵗʰ Street
New York, NY 10028

With a copy to:

Leonard N Budow, Esq.
LEONARD N BUDOW PC
350 5ᵗʰ Avenue, Ste 4912
New York, NY 10118-4613
Tel: 212-561-7723 X 101
Fax: 212-214-0468
E Mail: len@budowlaw.com

If to the Buyer:

Robert A. Foitumiali, Senior Vice President
Centex Homes, L.L.C.
500 Craig Road
Manalapan, NJ 07726
(732) 790-1800
(732) 308-3303 Fax

With a copy thereof to:

Salvatore Alfieri, Esq.
Cleary Alfieri Jones & Hoyle
5 Ravine Drive
Post Office Box 533
Matawan, NJ 07747
(732) 583-7474
(732) 290-0753 Fax

18.    MISCELLANEOUS:

a.    **Captions and Headings.** Those used herein are for reference only, and shall in no way be deemed to define, limit, explain or amplify any provisions hereof.

b.    **Entire Agreement.** This Agreement constitutes the sole and entire Agreement between the parties hereto, and no modification, alteration, or amendment of this Agreement shall be binding unless signed by the party against whom such modification, alteration or amendment is sought to be enforced. No representation, warranty, covenant, inducement or obligation not included in this Agreement shall be binding upon either party hereto.

c.    **Governing Laws.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York. If all or any portion of any provision of this Agreement shall be declared invalid or unenforceable under applicable law, then the performance of such portion shall be excused to the extent of such invalidity or unenforceability, but the remainder of this Agreement shall remain

in full force and effect.

d. **References.** Whenever in this Agreement there is any reference to any paragraph, section, or schedule, unless the context shall clearly indicate otherwise such reference shall be interpreted to refer to a paragraph, section, or schedule in or to this Agreement. Each exhibit or schedule referred to in this Agreement is hereby incorporated herein by reference and made a party of this Agreement in the same manner as if it were recited verbatim herein. The titles and captions of the paragraphs and sections of this Agreement are included for ease of reference only, are not intended to represent the full scope of the matters included or excluded from such provisions, and shall not be used to interpret this Agreement or to construe the intent of the parties.

e. **Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be an original and all of which together shall constitute one and the same Agreement. It shall not be necessary that each party execute each counterpart, or that any one counterpart be executed by more than one party, so long as each party executes at least one counterpart. Further, the parties may execute this Contract of Sale by fax counterpart as follows: Buyer may execute this Contract of Sale and Fax the same to counsel for Seller; upon receipt of such Fax Seller shall have five (5) business days to return to Buyer a signed Fax counterpart; upon exchange of such counterparts the Contract of Sale shall be deemed effective and Buyer shall tender the First Deposit forthwith.

f. **Counsel.** The parties acknowledge that each party and its counsel have participated in the negotiation and preparation of this Agreement. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing the Agreement to be drafted. If any provision of this Agreement requires that action be taken on or before a particular date that falls on a day that is not a business day, the time for the taking of such action shall automatically be postponed until the next following business day.

g. **Gender Usage.** All words and phrases used in this Agreement, including without limitation, all defined words and phrases, regardless of the number or gender in which used, shall be deemed to include any other number or gender as may be reasonably required by the context. If Seller is designated in this Agreement to be more than one person, then, in such event, such person so designated shall be jointly and severally liable for all duties, obligations and liabilities of Seller.

h. **Waiver.** Each party shall have the right, in its sole discretion, for any reason or for no reason, to waive any condition precedent or contingency contained in this Agreement for the benefit of said party, provided that such waiver shall be in writing and if any such waiver occurs, this Agreement shall be interpreted and construed as if such condition precedent or contingency had never been a part of this Agreement, except to the extent that said condition precedent or contingency is stated in this Agreement to be also for the benefit of the other party.

i. **No Oral Changes.** This Agreement may not be altered or modified orally, but only by a written agreement executed by the parties hereto.

j. **Authority to Execute.** The individuals executing this Agreement represent and warrant that they have full authority and/or have been duly authorized by their respective corporations to do so on behalf of such corporations.

k. **Date of Agreement.** The date of this Agreement shall be the date on which it is executed by all parties or, if not executed simultaneously, the date on which it is executed by the last of the parties, which date will be inserted at the top of the first page hereof.

l. **Survival.** Except as otherwise expressly set forth, no provision of the Agreement shall survive the closing of title.

m.  **Soil and Tree Removal.** Seller agrees that subsequent to the execution of this Agreement, Seller will not sell any soil and trees from the Property unless required to do so as a matter of law, regulation or safety.

n.  **Jury Waiver.** The parties hereby waive the right to trial by jury in any litigation between them related to or arising out of this Agreement of Sale or any duty or obligation that either party may have to the other with respect to the transactions contemplated hereby.

o.  **Attorney Fees.** In the event litigation is instituted by any party related to or arising out of this Agreement or any duty or obligation that either party may have to the other with respect to the transactions contemplated hereby, the prevailing party in any such litigation shall be entitled to recover from the other party the reasonable counsel fees and other costs incurred in such litigation.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals and/or have caused their corporate seal to be affixed hereto the day and year first above written.

SELLER:

Date: May 9, 2005

_____
Dr. Olivia N. Serdarevic

BUYER:

CENTEX HOMES, LLC, A DELAWARE
LIMITED LIABILITY COMPANY

Date: May 9, 2005

By: _____
Bryan Read
Division President

EXHIBIT "A"

**DESCRIPTION OF PROPERTY**
See Schedule A Landstar Title Agency LT 8952
Incorporated here at as if fully set forth at length

**EXHIBIT B**
**TITLE SEARCH**
See Landstar Title Agency LT 8952
Incorporated here at as if fully set forth at length

EXHIBIT "C"

DEPOSIT OF MORTGAGE
NYBTU 8014

HY 013 - First Mortgage-Individual or Corporation (NYBTU 8014)

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT - THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY

THIS MORTGAGE, made the          day of           , in the year 200_

BETWEEN

OLIVIA N. SERDAREVIC
103 East 84th Street, New York,  New York 10028

                                                                                        , the mortgagor,
and
CENTEX HOMES, LLC
500 Craig Road, Manalapan, New Jersey 07726

                                                                                        , the mortgagee,
WITNESSETH, that to secure the payment of an indebtedness in the sum of
Ten Dollars ($10.00)————————————————————————————————— dollars,

lawful money of the United States, to be paid
in accordance with the terms and provisions of that certain Contract of Sale by and between
Mortgagee and Mortgagor dated as of the 9th day of April 2005

with interest thereon to be computed from the date hereof, at the rate of                            per centum
per annum, and to be paid on the          day of           , in the year          , next ensuing and
                            thereafter,

                                                                            according to a certain bond,
note or obligation bearing even date herewith, the mortgagor hereby mortgages to the mortgagee

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the
See Schedule A Landstar Title Agency LT 8952
Incorporated here at as if fully set forth at length

TOGETHER with all right, title and interest of the mortgagor in and to the land lying in the streets and roads in front of and adjoining said premises;

TOGETHER with all fixtures, chattels and articles of personal property now or hereafter attached to or used in connection with said premises, including but not limited to furnaces, boilers, oil burners, radiators and piping, coal stokers, plumbing and bathroom fixtures, refrigeration, air conditioning and sprinkler systems, wash-tubs, sinks, gas and electric fixtures, stoves, ranges, awnings, screens, window shades, elevators, motors, dynamos, refrigerators, kitchen cabinets, incinerators, plants and shrubbery and all other equipment and machinery, appliances, fittings, and fixtures of every kind in or used in the operation of the buildings standing on said premises, together with any and all replacements thereof and additions thereto;

TOGETHER with all awards heretofore and hereafter made to the mortgagor for taking by eminent domain the whole or any part of said premises or any easement therein, including any awards for changes of grade of streets, which said awards are hereby assigned to the mortgagee, who is hereby authorized to collect and receive the proceeds of such awards and to give proper receipts and acquittances therefor, and to apply the same toward the payment of the mortgage debt, notwithstanding the fact that the amount owing thereon may not then be due and payable; and the said mortgagor hereby agrees, upon request, to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning said awards to the mortgagee, free, clear and discharged of any encumbrances of any kind or nature whatsoever.

AND the mortgagor covenants with the mortgagee as follows:

1. That the mortgagor will pay the indebtedness as hereinbefore provided.

2. That the mortgagor will keep the buildings on the premises insured against loss by fire for the benefit of the mortgagee; that he will assign and deliver the policies to the mortgagee; and that he will reimburse the mortgagee for any premiums paid for insurance made by the mortgagee on the mortgagor's default in so insuring the buildings or in so assigning and delivering the policies.

3. That no building on the premises shall be altered, removed or demolished without the consent of the mortgagee.

4. That the whole of said principal sum and interest shall become due at the option of the mortgagee: after default in the payment of any installment of principal or of interest for fifteen days; or after default in the payment of any tax, water rate, sewer rent or assessment for thirty days after notice and demand; or after default after notice and demand either in assigning and delivering the policies insuring the buildings against loss by fire or in reimbursing the mortgagee for premiums paid on such insurance, as hereinbefore provided; or after default upon request in furnishing a statement of the amount due on the mortgage and whether any offsets or defenses exist against the mortgage debt, as hereinafter provided. An assessment which has been made payable in installments at the option of the mortgagor or lessee of the premises shall nevertheless, for the purpose of this paragraph, be deemed due and payable in its entirety on the day the first installment becomes due or payable or a lien.

5. That the holder of this mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver.

6. That the mortgagor will pay all taxes, assessments, sewer rents or water rates, and in default thereof, the mortgagee may pay the same.

7. That the mortgagor within five days upon request in person or within ten days upon request by mail will furnish a written statement duly acknowledged of the amount due on this mortgage and whether any offsets or defenses exist against the mortgage debt.

8. That notice and demand or request may be in writing and may be served in person or by mail.

9. That the mortgagor warrants the title to the premises.

10. That the fire insurance policies required by paragraph No. 2 above shall contain the usual extended coverage endorsement; that in addition thereto the mortgagor, within thirty days after notice and demand, will keep the premises insured against war risk and any other hazard that may reasonably be required by the mortgagee. All of the provisions of paragraphs No. 2 and No. 4 above relating to fire insurance and the provisions of Section 254 of the Real Property Law construing the same shall apply to the additional insurance required by this paragraph.

11. That in case of a foreclosure sale, said premises, or so much thereof as may be affected by this mortgage, may be sold in one parcel.

12. That if any action or proceeding be commenced (except an action to foreclose this mortgage or to collect the debt secured thereby), to which action or proceeding the mortgagee is made a party, or in which it becomes necessary to defend or uphold the lien of this mortgage, all sums paid by the mortgagee for the expense of any litigation to prosecute or defend the rights and lien created by this mortgage (including reasonable counsel fees), shall be paid by the mortgagor, together with interest thereon at the rate of six per cent per annum, and any such sum and the interest thereon shall be a lien on said premises, prior to any right, or title to, interest in or claim upon said premises attaching or accruing subsequent to the lien of this mortgage, and shall be deemed to be secured by this mortgage. In any action or proceeding to foreclose this mortgage, or to recover or collect the debt secured thereby, the provisions of law respecting the recovering of costs, disbursements and allowances shall prevail unaffected by this covenant.

13. That the mortgagor hereby assigns to the mortgagee the rents, issues and profits of the premises as further security for the payment of said indebtedness, and the mortgagor grants to the mortgagee the right to enter upon and to take possession of the premises for the purpose of collecting the same and to let the premises or any part thereof, and to apply the rents, issues and profits,

after payment of all necessary charges and expenses, on account of said indebtedness. This assignment and grant shall continue in effect until this mortgage is paid. The mortgagee hereby waives the right to enter upon and take possession of said premises for the purpose of collecting said rents, issues and profits, and the mortgagor shall be entitled to collect and receive said rents, issues and profits until default under any of the covenants, conditions or agreements contained in this mortgage, and agrees to use such rents, issues and profits in payment of principal and interest becoming due on this mortgage and in payment of taxes, assessments, sewer rents, water rates and carrying charges becoming due against said premises, but such right of the mortgagor may be revoked by the mortgagee upon any default, on five days' written notice. The mortgagor will not, without the written consent of the mortgagee, receive or collect rent from any tenant of said premises or any part thereof for a period of more than one month in advance, and in the event of any default under this mortgage will pay monthly in advance to the mortgagee, or to any receiver appointed to collect said rents, issues and profits, the fair and reasonable rental value for the use and occupation of said premises or of such part thereof as may be in the possession of the mortgagor, and upon default in any such payment will vacate and surrender the possession of said premises to the mortgagee or to such receiver, and in default thereof may be evicted by summary proceedings.

14. That the whole of said principal sum and the interest shall become due at the option of the mortgagee: (a) after failure to exhibit to the mortgagee, within ten days after demand, receipts showing payment of all taxes, water rates, sewer rents and assessments; or (b) after the actual or threatened alteration, demolition or removal of any building on the premises without the written consent of the mortgagee; or (c) after the assignment of the rents of the premises or any part thereof without the written consent of the mortgagee; or (d) if the buildings on said premises are not maintained in reasonably good repair; or (e) after failure to comply with any requirement or order or notice of violation of law or ordinance issued by any governmental department claiming jurisdiction over the premises within three months from the issuance thereof or (f) if on application of the mortgagee two or more fire insurance companies lawfully doing business in the State of New York refuse to issue policies insuring the buildings on the premises; or (g) in the event of the removal, demolition or destruction in whole or in part of any of the fixtures, chattels or articles of personal property covered hereby, unless the same are promptly replaced by similar fixtures, chattels and articles of personal property at least equal in quality and condition to those replaced, free from chattel mortgages or other encumbrances thereon and free from any reservation of title thereto; or (h) after thirty days' notice to the mortgagor, in the event of the passage of any law deducting from the value of land for the purpose of taxation any lien thereon, or changing in any way the taxation of mortgages or debts secured thereby for state or local purposes; or (i) if the mortgagor fails to keep, observe and perform any of the other covenants, conditions or agreements contained in this mortgage; or (j) if the mortgagor fails to keep, observe and perform any of the covenants, conditions or agreements contained in any prior mortgage or fails to repay to the mortgagee the amount of any instalment of principal or interest which the mortgagee may have paid on such mortgage with interest thereon as provided in paragraph 16 of this mortgage.

15. That the mortgagor will, in compliance with Section 13 of the Lien Law, receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

*Strike out clause if inapplicable.*

16. That the execution of this mortgage has been duly authorized by the board of directors of the mortgagor.

This mortgage may not be changed or terminated orally. The covenants contained in this mortgage shall run with the land and bind the mortgagor, the heirs, personal representatives, successors and assigns of the mortgagor and all subsequent owners, encumbrances, tenants and subtenants of the premises, and shall enure to the benefit of the mortgagee, the personal representatives, successors and assigns of the mortgagee and all subsequent holders of this mortgage. The word "mortgagor" shall be construed as if it read "mortgagors" and the word "mortgagee" shall be construed as if it read "mortgagees" whenever the sense of this mortgage so requires.

IN WITNESS WHEREOF, this mortgage has been duly executed by the mortgagor.

IN PRESENCE OF:

OLIVIA N. SERDAREVIC

USE ACKNOWLEDGMENT FORM BELOW WITHIN NEW YORK STATE ONLY:

State of New York, County of                                    } ss.:

On the    day of                              in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

USE ACKNOWLEDGMENT FORM BELOW WITHIN NEW YORK STATE ONLY:

State of New York, County of                                    } ss.:

On the    day of                              in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

ACKNOWLEDGMENT FORM FOR USE WITHIN NEW YORK STATE ONLY:
(New York Subscribing Witness Acknowledgment Certificate)

State of New York, County of                                    } ss.:

On the    day the year                        in the year
before me, the undersigned, personally appeared

the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that he/she/they reside(s) in

(if the place of residence is in a city, include the street and street number, if any, thereof); that he/she/they know(s)

to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said

execute the same; and that said witness at the same time subscribed his/her/their name(s) as a witness thereto.

ACKNOWLEDGMENT FORM FOR USE OUTSIDE NEW YORK STATE ONLY:
(Out of State or Foreign General Acknowledgment Certificate)

..................................................... } ss.:
(Complete Venue with State, Country, Province or Municipality)

On the    day of                              in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the

(Insert the city or other political subdivision and the state or country or other place the acknowledgment was taken).

MORTGAGE
Individual or Corporation

TITLE NO.

**OLIVIA N. SERDAREVIC**

TO

**CENTEX HOMES, LLC**

DISTRICT
SECTION 11
BLOCK 1
LOT 46
COUNTY OR TOWN Goshen

RECORDED AT REQUEST OF
Fidelity National Title Insurance Company
RETURN BY MAIL TO

FIDELITY NATIONAL TITLE
INSURANCE COMPANY
INCORPORATED 1928

"Appreciate the Fidelity Difference"
Member New York State Land Title Association

CENTEX HOMES, LLC
500 Craig Road,
Manalapan, New Jersey 07726

RESERVE THIS SPACE FOR USE OF RECORDING OFFICE

EXHIBIT "D"

MEMORANDUM OF AGREEMENT

THIS AGREEMENT made and dated _____, 20___, between , OLIVIA N. SERDAREVIC having an address at 103 East 84th Street , New York, NY 10028 (hereinafter called "Vendor") and: CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquarters at 500 Craig Road, Manalapan, New Jersey 07726 (hereinafter collectively "Vendee

WITNESSETH,

that the vendor agrees to sell and convey and the vendee agrees to purchase, all that lot or parcel of land, with the buildings and improvements thereon, in the in the Town of Goshen, Orange County, State of New York, commonly known as Section 11- Block 1- and Lot 46 in Block on the Town of Goshen Tax Map, as shown on the map Attached hereto as Exhibit "A pursuant to the terms, covenants, conditions and agreements contained in an agreement of even date between the parties hereto.

IN WITNESS WHEREOF, this agreement has been duly executed by the parties hereto.

Date:                                    _____
                                              Dr. Olivia N. Serdarevic


                                         CENTEX HOMES, LLC, A DELAWARE
                                         LIMITED LIABILITY COMPANY

Date:                                    By: _____
                                              Robert Fecso
                                              Senior Vice President

State of New York) ss.:
County of New York) ss.:

On the  day of  _____ in the year 200__ before me, the undersigned,  Dr. Olivia N. Serdarevic  personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Town of Goshen
Section: 11
Block: 1
Lot: 46

Record and Return to:
CENTEX HOMES, LLC,
500 Craig Road, Manalapan,
New Jersey 07726

## EXHIBIT "E"
### DISCHARGE OF MEMORANDUM OF AGREEMENT

## Know All Men by These Presents,

That CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquarters at 500 Craig Road, Manalapan, New Jersey 07726

## DO HEREBY CERTIFY

that a certain Memorandum of Contract is herewith discharged, terminated and void, and does hereby consent that the same be discharged of record. Memorandum of Contract dated the _____ day of 200_ , in the year , made by OLIVIA N. SERDAREVIC having an address at 103 East 84th Street , New York, NY 10028
to

CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquarters at 500 Craig Road, Manalapan, New Jersey 07726

and recorded on the day of , in the year_____ in Liber___ of Section of Mortgages ____ , at page ____ , in the office of the_____ of the County of _____ which Memorandum of Contract has not been assigned of record.

Dated the_____ day of_____ , in the year

CENTEX HOMES, LLC, A DELAWARE
LIMITED LIABILITY COMPANY

Date:

By: _____
      Robert Fecso
      Senior Vice President

State of New York)
County of New York) ss.:

On the  day of  _____ in the year 200__ before me, the undersigned, _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Town of Goshen
Section: 11
Block: 1
Lot: 46

Record and Return to:
OLIVIA N. SERDAREVIC
103 East 84th Street , New York, NY 10028

**Exhibit B**

AGREEMENT
(ACTIVE ADULT)

THIS AGREEMENT (the "Agreement") made and entered into this 9th day of May, 2005 by and between: DR. OLIVIA N. SERDAREVIC AND BOSILJKA SERDAREVIC having an office at 103 East 84th Street, New York, New York 10028 (hereinafter collectively called "Seller") and: CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquarters at 500 Craig Road, Manalapan, New Jersey 07726 (hereinafter collectively "Buyer").

WITNESSETH:

WHEREAS, Seller is the sole fee owner of that certain parcel of land located in the Town of Goshen, Orange County, State of New York, commonly known as Section 15, Lot 59 in Block 1 on the Town of Goshen Tax Map, as shown on the map attached hereto as Exhibit "A" (hereinafter the "Property");

WHEREAS, Seller desires to sell the Property and Buyer desires to acquire the Property on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Buyer and Seller, Seller hereby agrees to sell and convey the Property to Buyer upon the terms and conditions hereinafter set forth.

I.     PURCHASE PRICE.

a.     Buyer agrees to pay and Seller agrees to accept a Purchase Price for the Property in the amount of Forty-Eight Million Fifty Thousand ($48,050,000.00) Dollars. The Purchase Price is based on three hundred eighty (380) Active Adult Lots (as defined below) at a price of $90,000.00 per Lot, twenty (20) market rate single family lots at $300,000.00 per Lot, one hundred twenty (120) Active Adult Condominium Units at $55,000.00 per Unit and 40,000 square feet of retail space on approximately six (6) acres for $1,250,000.00 based upon $31.25 per square foot. The actual Purchase Price shall be adjusted based upon the actual numbers of units and retail square footage approved. Seller will receive no monetary consideration for approved Affordable Housing Units (as defined below).

In the event that the Property or any portion of the Property is developed so that the dwellings to be constructed on the Property will be owned under a condominium form of ownership as opposed to fee simple ownership, then the term "Lot" or "Lots" shall be deemed to mean the individual residential condominium unit created on the Property pursuant to the Approvals, as defined below. These residential condominium units shall be referred to as "Unit" or "Units" for all purposes under this Agreement and shall be interchangeable with the terms "Lot" or "Lots".

For the purposes of this Agreement, the term "Units" and "lots" shall not include any dwelling Unit, the sale, resale, lease or release of which is subject to restriction pertaining to the income level of the Buyer or Lessee thereof (hereinafter "Affordable Housing Units"). It is expressly understood and agreed that no consideration will be paid by Buyer to the Seller for any Affordable Housing Units required to be constructed on the property.

For the purposes of this Agreement, the term Active Adult, whether it be used in reference to Lots or Units, shall mean those Lots or Units which are limited to individuals age 55 or older, and in case of married owners, where at least one of the spouses is age 55 or older, all in accordance with the Federal "Housing for Older Persons Act of 1995" or such other Federal Standard as may be applicable.

b.    Deposit.

      i.    First Deposit. Upon the execution of this Agreement, Buyer shall pay a Deposit of One Hundred Thousand ($100,000.00) Dollars (the "First Deposit") to Seller.

      ii.    Second Deposit. Upon the expiration of the Feasibility Period (as hereinafter defined), Buyer shall pay a second deposit (the "Second Deposit"), by wire transfer Nine Hundred Thousand Dollars ($900,000) Dollars.

      iii.    Third Deposit. Upon securing zoning Buyer shall pay by wire transfer a third deposit of Five Hundred Thousand Dollars ($500,000)  Dollars.

      iv.    Fourth Deposit. Upon approval by the municipality of the Concept Plan Buyer shall pay by wire transfer a fourth deposit of Five Hundred Thousand ($500,000) Dollars.

      v.    Fifth Deposit. Upon the earlier of Preliminary site plan and/or subdivision approval or all municipal, county and state approvals for public potable water and public sanitary sewer service. By wire transfer One Million Dollars ($1,000,000.00)

      vi.    The First, Second, Third, Fourth and Fifth Deposit shall be collectively referred to in this Agreement as the "Deposit". The deposit shall be credited against the Purchase Price at the First Closing.

      vii.    Following expiration of the Feasibility Period the Second Deposit shall be tendered to Seller. Prior to release and/or payment of the Second, Third Fourth and Fifth Deposit to Seller, the following conditions must be satisfied: (i) title to the Property shall be  as set forth in Paragraph 2 herein below , (ii) Seller shall have executed and delivered to Buyer a first mortgage in recordable form, in the form commonly know as NYBTU 8014 (the "Deposit Mortgage"), set forth in Exhibit C, in an aggregate amount equal  to Deposit disbursed  and (iii) the Memorandum of Agreement described in paragraph 16, below, shall have been recorded. In the event that Buyer is entitled to the return of the Deposit under this Agreement, and after Buyer has complied with the Condition Precedent set forth in 1 B (viii) herein below, Seller shall repay the Deposit to Buyer, commencing the first day of the month succeeding eighteen (18) months after the date that the event ("Termination Event") which gives rise to Buyer's right to receive the return of the Deposit takes place.    The Deposit Mortgage shall be a lien against that certain parcel commonly known as Section 15, Lot 1 in Block 33 on the Town of Goshen Tax Map.

      viii.    Should Buyer elect to terminate this Contract of Sale and require re-payment of the Deposit, Buyer shall physically restore the physical and legal status, except as to zoning,  and condition of the Premises, and state of title, to its status as of the date hereof. Such reversionary acts shall include but is not limited to termination of any and all recorded agreements, memoranda, easements, covenants which Buyer shall have directly or indirectly caused to be recorded pursuant to this Agreement. Buyer must complete restoration within ninety (90) days of the Termination Event, time being of the essence.

      ix.    For purposes of this paragraph 1 the term "Zoning" shall mean any required rezoning or use variance or zone change required in order for the Property to be developed as contemplated by this Agreement. The term "Concept Plan" shall mean a concept plan or schematic plan presented to the appropriate governmental authority of the Town of Goshen which governmental authority thereupon consents to otherwise approves of the same. The term "Preliminary Site Plan and/or

Subdivision Approval" shall mean the approval granted by the appropriate governmental authority of the Town of Goshen which vests the development rights in the property as set forth in such approval.

    c.    <u>Payment of the Balance of the Purchase Price</u>. The Purchase Price at each Closing shall be paid by wire transfer in accordance with Paragraph 3, below.

    d.    <u>Costs and Expenses related to Transfer</u>. Buyer agrees to be responsible for all transfer taxes and recording fees. Buyer further agrees that should Seller be required to execute any documents or applications during the term of the Agreement and Seller desires to have same reviewed by an attorney or other consultants as the same may be appropriate in Seller's reasonable commercial judgment, the reasonable costs to be incurred by Seller in connection therewith shall be paid to Seller by Buyer.

2.    TITLE.

As of the Closing, title to the Property shall be good and insurable, in accordance with the title report issued by Landstar Title Agency LT 8952 attached hereto and made a part hereof as Exhibit B and as to those items not set forth in the Report title shall be good and insurable as to (i) liens mortgages and encumbrances, (ii) restrictions, easements, covenants, and other agreements of record which would prevent or unreasonably interfere with the use of the Property as contemplated by this Agreement, (iii) liens for taxes and assessments, and shall be insurable, at regular rates and without special exception which would materially affect the use of the Premises as intended by this Contract of Sale. Those items created or expressly assumed by Buyer, zoning ordinances, privileges or rights of public service companies will not constitute objections to title. during the Feasibility Period described in Paragraph 7 below, Buyer shall have the right to update the title search on the Property in order to determine whether or not material variations have occurred from title as attached hereto and made a part hereof as Exhibit B. If the title is determined to not so comply with the foregoing, then Seller shall have thirty (30) days within which to commence cure and diligently prosecute thereafter to completion any such title defects. If Seller is unable to cure such title defects within twelve (12) months after notice of the same, then Buyer shall have the right to terminate this Agreement, and shall be entitled to a return of the Deposit in accordance with 1 B (iv) hereinabove. Except as required by the preceding sentence in order to cure any title defects, Seller will do nothing while this Agreement is in effect to alter or otherwise encumber title to the Property.

  3.    CLOSING OF TITLE. Seller and Buyer agree that closing of title (the "Closing") will be accomplished in two (2) closings, the first of which will take place thirty (30) days after the conditions set forth in Paragraph 5 below have been satisfied and the second 1 year thereafter. The Purchase Price at each Closing shall be paid by wire transfer to an account designated by Seller in writing. No less than 50% of the Units shall be purchased at the first Closing. . Closing of title shall take place at office of Seller's attorney 350 5ᵗʰ Avenue, Ste 4613, New York, NY 10118, or at the offices of a title company insuring fee title to Buyer if said office is located in the County, City and State of New York. Seller shall deliver to Buyer, free and clear of all tenancies and other occupancies, title in and to the Property, together with all the tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining, and the reversion or reversions, remainder and remainders, rent, issues and profits thereof, if any, and all the estate, right, title, interest, property, possession, claim and demand whatsoever, in law as well as in equity, and every part and parcel thereof. Further, title to be conveyed to Buyer shall include all of Seller's right, title and interest, if any, in and to any lands lying in the bed of any existing or proposed street in front of or adjoining the Property. Seller agrees that at the time of the Closing of Title hereunder, Seller shall grant to Buyer an easement over that portion of the Property which Buyer has not yet purchased as reasonably required by Buyer to construct the improvements and infrastructure required or contemplated by the Approvals as necessary for Buyer to proceed with the development of the

portions of the Property to which Buyer has taken title, at no additional consideration to Seller. Notwithstanding the foregoing Buyer shall bear any and all costs, fees and expenses incurred or to be incurred in connection with the grant, draft and recordation of any such easements including but not limited to recordation charges and attorneys fees. Title to the easements described in this subparagraph (g) shall comply with Paragraph 2 hereof.

4.    DELIVERIES AT CLOSING OF TITLE.  At each closing, Seller shall deliver, as may be applicable, to Buyer:

    i.    Bargain and Sale Deed with covenants against grantor's acts in sufficient and recordable form to convey the portion of the Property being purchased at the closing and incorporating the accurate metes and bounds description prepared pursuant to a current survey, obtained at the Buyer's sole cost and expense, as well as by reference by lot and block on the filed map creating the lots or units to be purchased at the closing;

    ii.    an affidavit of title in usual and customary form;

    iii.    an affidavit that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended;

    iv.    an executed form 1099-B ;

    v.    Corporate resolution,;

    vi.    discharges, in recordable form, of any and all mortgages and other liens encumbering the Premises; and

    vii.    such other documents as may be reasonably requested by Buyer's title insurance company to convey title to the Premises in accordance with the terms hereof.

5.    CONDITIONS PRECEDENT TO CLOSING.  .  It is understood and agreed that the obligations of Buyer to pay the Purchase Price for and to accept a tender of the Deed to the Premises is contingent upon achievement by Buyer of each and every material condition contained in the subparagraphs hereof for the Premises being conveyed. Buyer acknowledges that Seller is detrimentally relying upon the diligent and professional efforts of the Buyer to complete and satisfy all of the conditions precedent. It shall exercise best efforts to complete the conditions precedent in a timely and professional fashion.  Buyer shall not engage, directly or indirectly, in any acts or omissions which might prejudice the successful closure of all conditions precedent.  Any willful or negligent acts which cause the conditions precedent to fail shall be deemed a material breach of this Contract of Sale.  Buyer shall have the right to waive any or all of the conditions precedent in whole or in part without adjustment, modification or amendment, in whole or in part, to this Contract of Sale. If such conditions cannot be satisfied, after diligent and good faith efforts to do so prior to the date of expiration of the time period(s) set forth below in this Paragraph 5, then, unless Buyer has waived such conditions, either party shall have the right to terminate this Agreement upon ten (10) days ("Termination Date") written notice to the other whereupon this Agreement shall terminated as of the Termination Date, and except as otherwise expressly provided in this Agreement, neither party will have any further rights or obligations hereunder.  It being acknowledged by the parties that the Deposit, but not the Extension Payments as hereinafter defined, shall be returned by Seller if this Agreement is terminated pursuant to this Paragraph 5.  The conditions are as follows

    a.    Governmental Approvals. Except as set forth herein, Buyer shall have secured, at Buyer's sole cost and expense, preliminary and final major subdivision and/or site plan approval, together with any and all other Federal, State, county and municipal approvals (collectively, the "Approvals"), required for the development of the property into a mix of two hundred fifty (250)  Housing Units with appropriate retail space and 10% affordable units.  In addition, the Approvals shall have sufficient open space to

accommodate amenities which Buyer in good faith believes reasonable and necessary  The Approvals shall be subject to only such conditions which are reasonable and customary for a project of this size and nature. It is understood and agreed that the Approvals shall not include any building or construction-related permits or similar certificates.

b.  Final Plat. The final subdivision plat creating the Lots shall have been filed in the Orange County Clerk's Office. Buyer shall, post all necessary bonds and fees required as a precondition to the filing of the Plat the earlier of thirty (30) days of the approval of the bonding estimates by the Goshen Township Engineer or as otherwise may be required by law, statute or regulation. . If the bonds and fees are not paid within said thirty (30) day period, then this condition under Paragraph 5b shall be deemed waived by Buyer.

c.  Utilities. The Buyer shall have secured "will-serve" or comparable letters from the applicable utility companies or governmental agencies for the supply of natural gas, cable television, telephone, electricity and all other necessary utilities for connection, at reasonable connection charges, to the number of Units created by the Approvals

d.  Sewer and Water. Buyer shall have received any and all permits and approvals from all appropriate governmental authorities and/or utility company or utility authorities for the provision of public potable water service and public sanitary sewer service for all of the Lots and retail space created by the Approvals, with sufficient committed capacity for all Lots and retail space created by the Approvals.

e   Easements. Buyer shall have obtained all reasonably necessary easements and property rights, which shall be reasonably required for Buyer to develop the Property in accordance with the Approvals, and as otherwise contemplated by this Agreement, on price and terms reasonably acceptable to Buyer

f   Title. Title to the Property shall be as otherwise provided in Paragraph 2 hereof.

g.  Litigation. Any material pending judicial, quasi-judicial, administrative or other proceeding, attacking any Approval, appealing a denial thereof or involving any matter with respect to the development of or title to the Property, the zoning or any other ordinance applicable to the Property, or which would prevent, preclude or interfere with the furnishing of any utilities or other services necessary for Buyer's development of the Property, or which would otherwise materially interfere with the proposed use of the Property, shall be finally and favorably adjudicated without affecting the Approvals

h.  Moratorium. Any moratorium by an appropriate governmental entity preventing applications for or issuance of Approvals, building permits, utility hook-ups or the like, shall have expired or otherwise been lifted, repealed or terminated.

i.  Representations and Warranties.  All representations and warranties made by Seller pursuant to Paragraph 11, below shall be true and correct as of  the date hereof, and  Seller shall not do or fail to take any action which would cause the same to be materially false or misleading at Closing..

Except as to acts or omissions of Buyer, in the event, at any time following the execution of this Agreement through Closing, any of said representations relating to compliance with Environmental Laws are found to not be true and correct, then Seller, at its sole cost, must take all steps reasonably necessary to bring the Property into compliance with all Environmental Laws, including all cleanup, monitoring and other remedial measures and, if necessary, until such time as Seller obtains a final clearance and/or approval or similar written determination from the appropriate governmental

Department or Agency that acknowledges that any contamination on the Property has been remediated to the satisfaction of the said Department or Agency. In lieu of the foregoing, Seller may designate Buyer its agent for such remediation and Buyer shall in good faith commence and prosecute to completion such remediation. The actual and good faith costs, fees and expenses of such remediation shall be credited against the Purchase price hereunder. In the event Seller is unable or unwilling to satisfy the foregoing condition, then Buyer may terminate this Agreement and recover all Deposits. . For the purposes of this Agreement, "Environmental Laws" shall mean each and every applicable federal, state, county or municipal statute, ordinance, rule, regulation, order, code, directive or requirement relating to the environment.

j.      Time Periods. Buyer shall have forty eight (48) months from the completion of the Feasibility Period within which to satisfy the conditions in Paragraphs 5a through 5j. Failure to do so shall be deemed a breach of this Contract of Sale so long as such failure is due to the willful and negligent acts or omissions of Buyer and not of Seller. Notwithstanding the foregoing, Buyer may waive the conditions precedent. Should Buyer satisfy the conditions precedent set forth in Paragraph 5 on or before the eighteenth month following completion of the Feasibility Period, Buyer shall receive an incentive credit of Two Hundred Thousand Dollars ($200,000.00) against the Purchase Price. If closing occurs after the eighteenth month following the Feasibility Period and prior to the twenty fourth month, no additional credit shall be granted to Buyer or Seller. As of the first day of the twenty fourth and thirty sixth month following the completion of the Feasibility Period, time being of the essence Buyer shall pay to Seller, on each of the twenty fourth and thirty sixth month the sum of $250,000.00 which shall be non-refundable, but applicable to the purchase price ("Extension Payments") If the conditions are not satisfied at the end of in this Paragraph 5k, the forty eighth month Buyer shall have the right to terminate the Agreement and Seller may retain both Extension Payments. To secure Buyer against an event of Seller's default under this Agreement, the Extension Payments shall be secured by a lien against that certain parcel commonly known as Section 15, Lot 1 in Block 33 on the Town of Goshen Tax Map.

6.      COOPERATION. The parties each hereby agree to cooperate with each other in accomplishing each and every condition precedent to Closing contemplated hereunder, and to that end agree, when necessary, to join in all applications and to execute all other documents, declarations and maps required to be signed by either of them for such purpose.

7.      FEASIBILITY STUDIES.

a.      Buyer shall have a period of sixty (60) days from the date hereof (the "Feasibility Period") to make such zoning, legal, title (updating and verifying the state of title as set forth in the Title Report attached hereto and made a part hereof as Exhibit B, engineering, environmental, soil, geological, financial and technical studies, and such other tests, investigations and inquiries (hereinafter "Feasibility Studies") as it shall deem necessary and appropriate, all at its own cost and expense, in order to determine whether to proceed with the acquisition of the Property. Upon completion of the Feasibility Period, any and all Seller representations set forth herein, or any contingencies affecting the Premises, shall be deemed merged into the Feasibility Studies and Seller shall be deemed to take the Premises as is, where is, as set forth in the Feasibility Studies. Buyer agrees to provide Seller with copies of any Feasibility Studies generated by Buyer or its agents in connection with Buyer's Feasibility Studies within five (5) days of Buyer's receipt thereof. It is acknowledged and agreed that should Buyer elect not to proceed based upon its due diligence during the Feasibility Period (a) the Feasibility Studies shall be deemed confidential and proprietary to Seller and (b) Buyer shall not disclose, directly or indirectly the Feasibility Studies, to any party for any reason whatsoever

Page 4 of 18
and Exhibits A to E
Serdarevic to Centex Active Adult

b.   In the event that Buyer determines, in the sole exercise of its discretion, that it cannot proceed with the acquisition of the Property based upon the Feasibility Studies, Buyer shall have the right, at its option, upon written notice to Seller which said Notice shall specify that Buyer is electing to terminate this Agreement and the specific reasons therfor, delivered on or before the last day of the Feasibility Period, time being of the essence, to cancel this Agreement and recover the Deposit, following which there shall be no further liability or obligation on either of the parties hereto and this Agreement shall become NULL AND VOID.

c.   Buyer shall have the right to enter upon the Property for the purpose of making, at its sole cost and expense, surveys and site engineering studies, including, without limitation, soil analysis, hazardous waste or other environmental testing, ground tests, load bearing tests and verifying test boring data. Prior to entering the Property, Buyer shall provide to Seller a certificate evidencing that Buyer has comprehensive general liability insurance with a combined single limit for bodily injury and property damage with not less than $5,000,000 per occurrence and such policy or Accord certificate shall name Seller as an additional insured, and Buyer shall indemnify, defend and hold harmless Seller from and against any claims, damage or loss caused by Buyer's, its employees, agents contractors or sub-contractors, entry, acts or omissions in or upon the Property . Buyer agrees to repair any damages caused to the Property by Buyer or its agents immediately following the completion of its Feasibility Studies and restore the Premises to the condition existent prior to the Feasibility Studies.

8.   ADJUSTMENTS. At each Closing, all adjustments, including real property taxes, shall be adjusted, apportioned and allowed as of the date of each Closing of title based upon a 365-day year for the Property purchased at each Closing. The date of Closing shall be treated as the day on which Buyer holds title. All realty transfer taxes and roll back taxes shall be paid by Buyer. Buyer shall have the right to deduct from the Purchase Price all sums required to pay in full or otherwise discharge any obligations secured by any lien or encumbrance or creating a lien or encumbrance on the Property which may be the responsibility of Seller, at each Closing of title.

9.   ASSESSMENTS. Assessments, if any, for public improvements which assessment or assessments were liens encumbering the Premises on or before the date of the Agreement, and which are at the time of delivery of the deed unpaid shall be paid and discharged by the Seller upon the delivery of the deed which may credited as a closing adjustment.

10.   CONDEMNATION. Seller represents that it has no knowledge of any action or proceeding, either contemplated or pending, for condemnation of the Property, or any portion thereof. Seller shall give Buyer prompt written notice of any such proceeding or action of which it becomes aware. Buyer will have the option of participating in such proceedings, at its cost and expense. Should all or any material portion of the Property to be conveyed be taken by condemnation or eminent domain or deed in lieu thereof prior to Closing of title, which affects the material economic benefit of this transaction and so long as such condemnation is not the result of any breach of contract, agreement, misrepresentation, fraud or other such act or omission by Buyer, then this Agreement may be terminated by the election of Buyer without penalty or damages, by sending written notice to Seller within five (5) days after the vesting of title in the condemning authority. In the event of such termination by Buyer, Buyer will be entitled to the return of the Deposit, together with accrued interest. If Buyer does not elect to so terminate this Agreement and the condemnation has resulted in the loss of any Units, then Seller shall be entitled to any condemnation awards or recoveries (hereinafter "Condemnation Proceeds") Any absolute denial of access to the Property shall be deemed a material taking. Anything to the contrary notwithstanding, if the entire Property is taken during the term of this Agreement, and the proceeds of the condemnation exceed the of Forty-Eight Million Fifty Thousand ($48,050,000.00) Dollars, then, in addition to the return of the Deposit, together with accrued interest, the Buyer shall also be entitled to 50% of the proceeds in excess of the of Forty-Eight Million Fifty Thousand ($48,050,000.00) Dollars

11.   REPRESENTATIONS, WARRANTIES, AND COVENANTS.

a. Seller represents to Buyer that the following are true and correct to the best of the Seller's actual knowledge without independent investigation on the date hereof, which representations and warranties where the context so indicates, shall also be true on the date of closing of title hereunder.

    i. There are not now outstanding with respect to the Premises, any notices of any uncorrected material violations of any laws, statutes, ordinances, rules or regulations and any such notices hereafter issued prior to Closing will be satisfied by Seller unless such violations or notices are the result of acts or omissions of Buyer.

    ii. There are no agreements, written or oral, with the municipality, the county, or any other governmental agencies, which would materially or adversely affect or impair the development of the Premises as contemplated hereunder for the construction of single family Dwellings or townhouse units or other improvements thereon.

    iii. Seller represents that the Seller has no knowledge of any storage, burial, or dumping of hazardous or toxic materials on the Premises (as defined by any and all applicable State and Federal laws or statutes) or of the storage, burial, or dumping of any other debris or material on the Premises.

    iv. Seller is the owner of the Premises.

    v. Seller has the full right and authority to execute this Agreement and consummate all of the transactions hereby contemplated.

    vi. There are no actions, suits or proceedings pending, or to the best of Seller's knowledge and belief, threatened against Seller adversely affecting any portion of the Premises, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

    vii. There are no attachments, executions, assignments for the benefit of creditors or voluntary or involuntary proceedings in bankruptcy pending, contemplated or threatened against Seller.

    viii. Seller is not a foreign person (as the term is defined in Section 1445 of the Internal Revenue Code as amended by the Foreign Investment in Real Property Tax Act ["FIRPTA"]) and Seller shall provide Buyer with an affidavit to that effect in compliance with FIRPTA at closing.

    ix. Seller warrants and represents that the Premises shall be free and clear of all tenancies on or before the closing date.

b. Buyer hereby represents and warrants to Seller as of the time of the closing as follows:

    i. Buyer is a limited liability company duly organized and validly existing under the laws of the State of Delaware with the right and authority to conduct business in the State of New York and has full power and authority and has taken all action required by law to execute, deliver, and perform this Agreement and the transactions contemplated hereby and thereby and has taken all action required by law its Certificate of Formation and Operating Agreement to authorize the execution and delivery of the Agreement and the

transactions contemplated hereby.

ii.     Neither the authorization, execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby or thereby will conflict with or result in the breach of any terms or provisions of Buyer's Certificate of Formation and Operating Agreement or any applicable statutes, laws, rules or regulations of any governmental body having jurisdiction in the Premises, or of any judgment, decree, writ, injunction, order or award of any arbitrator, court or governmental authority binding upon Buyer, or result in the breach of any terms or provision, or constitute a default, or result in the acceleration of any obligation under any loan agreement, indenture, financing agreement, or any other agreement or instrument of any kind to which Buyer is a party.

iii.     Buyer has the financial liquidity and assets to perform all of its duties, liabilities and obligations hereunder including but not limited to the payment of sums which shall be due and owing to Seller, as well as the performance of all Feasibility Studies, securing any and all government approvals, performance all of Buyer's conditions precedent and the development contemplated hereunder

iv.     There are no claims, causes of action or regulatory proceedings pending against Buyer, or which have been settled within twenty four (24) months prior to the date hereof, which alleges any act of fraud, misrepresentation, material breach of contract or which would affect any evaluation of Buyer as a suitable developer of the Premises

12.     **BROKER.** The parties certify to each other that no real estate broker or other intermediary was responsible for bringing about this Agreement other than D.M. Paul Real Estate, who shall be paid a 2.5% commission by Buyer at closing, pursuant to a separate agreement between Buyer and Broker. Should a claim arise on the part of any other person or entity seeking a real estate commission, finders fee or other similar compensation, each party agrees to indemnify and hold the other harmless against and from (i) any claim for such commission, fee or compensation based upon any action by such party, and (ii) any damages or costs including reasonable attorney's fees incurred by the other as a result of or relating to such claim. The provisions of this Paragraph 12 shall survive the Closing and the delivery of the deed to the Property without further reference hereto or action by or documentation from either party.

13.     **BUYER'S DEFAULT.** If Buyer shall breach this Agreement or otherwise default in the performance of this Agreement, then Seller shall have the right to terminate the Agreement and shall be entitled to retain all Deposit Monies as liquidated damages, as Seller's sole and exclusive remedy and the Deposit Mortgage shall be forthwith satisfied and discharged of record by execution and tender of a Satisfaction of Mortgage in form and substance reasonable acceptable to Seller. Seller hereby waiving its right to seek monetary damages or specific performance, whereupon this Agreement shall be terminated and of no further effect and there shall be no further liability between the parties with respect hereto except for Buyer's obligation to restore the Premises or as otherwise contemplated by this Agreement. It is expressly understood and agreed that Seller will not have the right to declare Buyer in default until Buyer has received a written notice of default and been given fifteen (15) days to cure such default.

14.     **SELLER'S DEFAULT.** In the event of Seller's default hereunder, Buyer shall be entitled to seek an action for specific performance. In the event specific performance is unavailable, or Seller is unable to convey title or Seller has caused or failed to disclose any environmental condition, which makes development of the Property unfeasible Seller shall return the Deposit Monies to Buyer. It is expressly understood and agreed that Buyer will not have the right to declare Seller in default until Seller has received a written notice of default and been given fifteen (15) days to cure such default.

15.   SURVIVAL. It is understood and agreed that whether or not expressly provided herein, any provision of this Agreement which, by its nature and effect, is required to be observed, kept or performed after delivery of the Deed, shall survive and shall not be merged herein, but shall remain binding upon and for the benefit of the parties hereto until fully performed, kept or observed.

16.   RECORDING. Buyer shall not have the right to record this Agreement. Buyer shall, however, have the right to record a short form Memorandum of this Agreement, if the Agreement is not terminated at the end of the Feasibility Period, in the form attached hereto as Exhibit "D". Prior to the recording of the Memorandum, the Buyer shall deliver to Seller's attorney a Discharge of the Memorandum in the form attached hereto as Exhibit "E" executed by the Buyer which may be released by Seller's attorney for recordation upon the termination of the Agreement, provided however, that Seller's attorney is obligated to give fifteen (15) days written notice to the Buyer of his intention to record the Discharge of Agreement prior to his delivery thereof to the County Clerk.

17.   NOTICES. Any notice, request, demand, instruction or other communication (a "Notice") to be given to any party with respect to this Agreement may be given either by the party or its counsel and shall be deemed to have been properly sent and given when delivered by hand or when sent by certified mail, return receipt requested, facsimile, or by reputable courier service. If delivered by hand, facsimile, confirmed by one of the other means of communication as set forth herein or courier, a Notice shall be deemed to have been sent, given and received when actually received by the addressee. If sent by certified mail, a Notice shall be deemed to have been sent and given when properly deposited with the United States Postal Service with the property address and postage paid therewith, and shall be deemed to have been received on the third (3rd) business day following the date of such deposit. Each party shall have the right to change its notice address upon notice in writing to the other party.

If to the Seller:               Dr. Olivia N. Serdarevic
                                103 East 84th Street
                                New York, NY 10028


                                With a copy to:

                                Leonard N Budow, Esq.
                                LEONARD N BUDOW PC
                                350 5th Avenue, Ste 4613
                                New York, NY 10118-4613
                                Tel: 212-563-7723 X 101
                                Fax: 212-214-0408
                                E Mail: len@budowlaw.com


If to the Buyer:                Robert A. Fourniadis, Senior Vice President
                                Centex Homes, L.L.C.
                                500 Craig Road
                                Manalapan, NJ 07726
                                (732) 780-1800
                                (732) 308-3503 Fax

With a copy thereof to:         Salvatore Alfieri, Esq.
                                Cleary Alfieri Jones & Hoyle

                                Page 10 of 16
                                and Exhibits A to E
                            Serdarevic to Centex Active Adult

5 Ravine Drive
Post Office Box 539
Matawan, NJ 07747
(732) 583-7474
(732) 290-0753 Fax

18.    MISCELLANEOUS.

a.    <u>Captions and Headings</u>. Those used herein are for reference only and shall in no way be deemed to define, limit, explain or amplify any provisions hereof.

b.    <u>Entire Agreement</u>. This Agreement constitutes the sole and entire Agreement between the parties hereto, and no modification, alteration, or amendment of this Agreement shall be binding unless signed by the party against whom such modification alteration or amendment is sought to be enforced. No representation, warranty, covenant, inducement or obligation not included in this Agreement shall be binding upon either party hereto.

c.    <u>Governing Laws</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York. If all or any portion of any provision of this Agreement shall be declared invalid or unenforceable under applicable law, then the performance of such portion shall be excused to the extent of such invalidity or unenforceability, but the remainder of this Agreement shall remain in full force and effect.

d.    <u>References</u>. Whenever in this Agreement there is any reference to any paragraph, section, or schedule, unless the context shall clearly indicate otherwise such reference shall be interpreted to refer to a paragraph, section, or schedule in or to this Agreement. Each exhibit or schedule referred to in this Agreement is hereby incorporated herein by reference and made a party of this Agreement in the same manner as if it were restated verbatim herein. The titles and captions of the paragraphs and sections of this Agreement are included for ease of reference only, are not intended to represent the full scope of the matters included or excluded from such provisions, and shall not be used to interpret this Agreement or to construe the intent of the parties.

e.    <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be an original and all of which together shall constitute one and the same Agreement. It shall not be necessary that each party execute each counterpart, or that any one counterpart by executed by more than one party, so long as each party executes at least one counterpart. Further, the parties may execute this Contract of Sale by fax counterpart as follows; Buyer may execute this Contract of Sale and Fax the same to counsel for Seller; upon receipt of such Fax Seller shall have five (5) business days to return to Buyer a signed Fax counterpart; upon exchange of such counterparts the Contract of Sale shall be deemed effective and Buyer shall tender the First Deposit forthwith

f.    <u>Counsel</u>. The parties acknowledge that each party and its counsel have participated in the negotiation and preparation of this Agreement. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing the Agreement to be drafted. If any provision of this Agreement requires that action be taken on or before a particular date that falls on a day that is not a business day, the time for the taking of such action shall automatically be postponed until the next following business day.

g.    <u>Gender Usage</u>. All words and phrases used in this Agreement, including, without limitation, all defined words and phrases, regardless of the number or gender in which used, shall be deemed to include any other number or gender as may be reasonably required by the context. If Seller is

Page 11 of 18
and Exhibits A to E
Serdarevic to Centex Active Adult

designated in this Agreement to be more than one person, then, in such event, each person so designated shall be jointly and severally liable for all duties, obligations and liabilities of Seller.

h. **Waiver.** Each party shall have the right, in its sole discretion, for any reason or for no reason, to waive any condition precedent or contingency contained in this Agreement for the benefit of said party, provided that such waiver shall be in writing and if any such waiver occurs, this Agreement shall be interpreted and construed as if such condition precedent or contingency had never been a part of this Agreement, except to the extent that said condition precedent or contingency is stated in this Agreement to be also for the benefit of the other party.

i. **No Oral Changes.** This Agreement may not be altered or modified orally, but only by a written agreement executed by the parties hereto.

j. **Authority to Execute.** The individuals executing this Agreement represent and warrant that they have full authority and/or have been duly authorized by their respective corporations to do so on behalf of such corporations.

k. **Date of Agreement.** The date of this Agreement shall be the date on which it is executed by all parties or, if not executed simultaneously, the date on which it is executed by the last of the parties, which date will be inserted at the top of the first page hereof.

l. **Survival.** Except as otherwise expressly set forth, no provision of the Agreement shall survive the closing of title.

m. **Soil and Tree Removal.** Seller agrees that subsequent to the execution of this Agreement, Seller will not sell any soil and trees from the Property unless required to do so as a matter of law, regulation or safety.

n. **Jury Waiver.** The parties hereby waive the right to trial by jury in any litigation between them related to or arising out of this Agreement of Sale or any duty or obligation that either party may have to the other with respect to the transactions contemplated hereby.

o. **Attorney Fees.** In the event litigation is instituted by any party related to or arising out of this Agreement or any duty or obligation that either party may have to the other with respect to the transactions contemplated hereby, the prevailing party in any such litigation shall be entitled to recover from the other party the reasonable counsel fees and other costs incurred in such litigation.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals and/or have caused their corporate seal to be affixed hereto the day and year first above written.

Date: May 2, 200?

Dr. Olivia N. Serdarevic

BOSILJKA SERDAREVIC

CENTEX HOMES, LLC, A DELAWARE LIMITED LIABILITY COMPANY

Date: May 9 2003

By:

Page 12 of 13
and Exhibits A to E
Serdarevic Center Active Adult

Bryon Reed
Division President

EXHIBIT "A"

DESCRIPTION OF PROPERTY
See Schedule A Landstar Title Agency LT 8952
Incorporated here at as if fully set forth at length

**EXHIBIT B**
**TITLE SEARCH**
See Landstar Title Agency LT 8952
Incorporated here at as if fully set forth at length

EXHIBIT "C"

DEPOSIT OF MORTGAGE
NYBTU 8014

NY 013 - Firs Mortgage-Individual or Corporation (NYBTU 8014)

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT - THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY

THIS MORTGAGE, made the          day of `              , in the year 200_

BETWEEN

OLIVIA N. SERDAREVIC AND BOSILJKA SERDAREVIC
103 East 84th Street, New York,  New York 10028

, the mortgagor,

and
CENTEX HOMES, LLC
500 Craig Road, Manalapan, New Jersey 07726

, the mortgagee,

WITNESSETH, that to secure the payment of an indebtedness in the sum of
Ten Dollars ($10.00)———————————————————————————— dollars,

lawful money of the United States, to be paid
in accordance with the terms and provisions of that certain Contract of Sale by and between
Mortgagee and Mortgagor dated as of the 9th day of April 2005

with interest thereon to be computed from the date hereof, at the rate of                        per centum
per annum, and to be paid on the           day of              , is the year    , next ensuing and
                thereafter,

                                                                   according to a certain bond,
note or obligation bearing even date herewith, the mortgagor hereby mortgages to the mortgagee

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the
See Schedule A Landstar Title Agency LT 8952
Incorporated here at as if fully set forth at length

TOGETHER with all right, title and interest of the mortgagor in and to the land lying in the streets and roads in front of and adjoining said premises;

TOGETHER with all fixtures, chattels and articles of personal property now or hereafter attached to or used in connection with said premises, including but not limited to furnaces, boilers, oil burners, radiators and piping, coal stokers, plumbing and bathroom fixtures, refrigeration, air conditioning and sprinkler systems, wash-tubs, sinks, gas and electric fixtures, stoves, ranges, awnings, screens, window shades, elevators, motors, dynamos, refrigerators, kitchen cabinets, incinerators, plants and shrubbery and all other equipment and machinery, appliances, fittings, and fixtures of every kind in or used in the operation of the buildings standing on said premises, together with any and all replacements thereof and additions thereto;

TOGETHER with all awards heretofore and hereafter made to the mortgagor for taking by eminent domain the whole or any part of said premises or any easement therein, including any awards for changes of grade of streets, which said awards are hereby assigned to the mortgagee, who is hereby authorized to collect and receive the proceeds of such awards and to give proper receipts and acquittances therefor, and to apply the same toward the payment of the mortgage debt, notwithstanding the fact that the amount owing thereon may not then be due and payable; and the said mortgagor hereby agrees, upon request, to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning said awards to the mortgagee, free, clear and discharged of any encumbrances of any kind or nature whatsoever.

AND the mortgagor covenants with the mortgagee as follows:

1. That the mortgagor will pay the indebtedness as hereinbefore provided.

2. That the mortgagor will keep the buildings on the premises insured against loss by fire for the benefit of the mortgagee; that he will assign and deliver the policies to the mortgagee; and that he will reimburse the mortgagee for any premiums paid for insurance made by the mortgagee on the mortgagor's default in so insuring the buildings or in so assigning and delivering the policies.

3. That no building on the premises shall be altered, removed or demolished without the consent of the mortgagee.

4. That the whole of said principal sum and interest shall become due at the option of the mortgagee: after default in the payment of any instalment of principal or of interest for fifteen days; or after default in the payment of any tax, water rate, sewer rent or assessment for thirty days after notice and demand; or after default after notice and demand either in assigning and delivering the policies insuring the buildings against loss by fire or in reimbursing the mortgagee for premiums paid on such insurance, as hereinbefore provided; or after default upon request in furnishing a statement of the amount due on the mortgage and whether any offsets or defenses exist against the mortgage debt, as hereinafter provided. An assessment which has been made payable in instalments at the application of the mortgagor or lessee of the premises shall nevertheless, for the purpose of this paragraph, be deemed due and payable in its entirety on the day the first instalment becomes due or payable or a lien.

5. That the holder of this mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver.

6. That the mortgagor will pay all taxes, assessments, sewer rents or water rates, and in default thereof, the mortgagee may pay the same.

7. That the mortgagor within five days upon request in person or within ten days upon request by mail will furnish a written statement duly acknowledged of the amount due on this mortgage and whether any offsets or defenses exist against the mortgage debt.

8. That notice and demand or request may be in writing and may be served in person or by mail.

9. That the mortgagor warrants the title to the premises.

10. That the fire insurance policies required by paragraph No. 2 above shall contain the usual extended coverage endorsement; that in addition thereto the mortgagor, within thirty days after notice and demand, will keep the premises insured against war risk and any other hazard that may reasonably be required by the mortgagee. All of the provisions of paragraphs No. 2 and No. 4 above relating to fire insurance and the provisions of Section 254 of the Real Property Law construing the same shall apply to the additional insurance required by this paragraph.

11. That in case of a foreclosure sale, said premises, or so much thereof as may be affected by this mortgage, may be sold in one parcel.

12. That if any action or proceeding be commenced (except an action to foreclose this mortgage or to collect the debt secured thereby), to which action or proceeding the mortgagee is made a party, or in which it becomes necessary to defend or uphold the lien of this mortgage, all sums paid by the mortgagee for the expense of any litigation to prosecute or defend the rights and lien created by this mortgage (including reasonable counsel fees), shall be paid by the mortgagor, together with interest thereon at the rate of six per cent per annum, and any such sum and the interest thereon shall be a lien on said premises, prior to any right, or title to, interest in or claim upon said premises attaching or accruing subsequent to the lien of this mortgage, and shall be deemed to be secured by this mortgage. In any action or proceeding to foreclose this mortgage, or to recover or collect the debt secured thereby, the provisions of law respecting the recovering of costs, disbursements and allowances shall prevail unaffected by this covenant.

13. That the mortgagor hereby assigns to the mortgagee the rents, issues and profits of the premises as further security for the payment of said indebtedness, and the mortgagor grants to the mortgagee the right to enter upon and to take possession of the premises for the purpose of collecting the same and to let the premises or any part thereof, and to apply the rents, issues and profits.

after payment of all necessary charges and expenses, on account of said indebtedness. This assignment and grant shall continue in effect until this mortgage is paid. The mortgagee hereby waives the right to enter upon and take possession of said premises for the purpose of collecting said rents, issues and profits, and the mortgagor shall be entitled to collect and receive said rents, issues and profits until default under any of the covenants, conditions or agreements contained in this mortgage, and agrees to use such rents, issues and profits in payment of principal and interest becoming due on this mortgage; and in payment of taxes, assessments, sewer rents, water rates and carrying charges becoming due against said premises, but such right of the mortgagee may be revoked by the mortgagee upon any default, on five days' written notice. The mortgagor will not, without the written consent of the mortgagee, receive or collect rent from any tenant of said premises or any part thereof for a period of more than one month in advance, and in the event of any default under this mortgage will pay monthly in advance to the mortgagee, or to any receiver appointed to collect said rents, issues and profits, the fair and reasonable rental value for the use and occupation of said premises or of such part thereof as may be in the possession of the mortgagor, and upon default in any such payment will vacate and surrender the possession of said premises to the mortgagee or to such receiver, and in default thereof may be evicted by summary proceedings.

14. That the whole of said principal sum and the interest shall become due at the option of the mortgagee: (a) after failure to exhibit to the mortgagee, within ten days after demand, receipts showing payment of all taxes, water rates, sewer rents and assessments; or (b) after the actual or threatened alteration, demolition or removal of any building on the premises without the written consent of the mortgagee; or (c) after the assignment of the rents of the premises or any part thereof without the written consent of the mortgagee; or (d) if the buildings on said premises are not maintained in reasonably good repair; or (e) after failure to comply with any requirement or order or notice of violation of law or ordinance issued by any governmental department claiming jurisdiction over the premises within three months from the issuance thereof or (f) if on application of the mortgagee two or more fire insurance companies lawfully doing business in the State of New York refuse to issue policies insuring the buildings on the premises; or (g) in the event of the removal, demolition or destruction in whole or in part of any of the fixtures, chattels and articles of personal property covered hereby, unless the same are promptly replaced by similar fixtures, chattels and articles of personal property at least equal in quality and condition to those replaced, free from chattel mortgages or other encumbrances thereon and free from any reservation of title thereto; or (h) after thirty days' notice to the mortgagor, in the event of the passage of any law deducting from the value of land for the purposes of taxation any lien thereon, or changing in any way the taxation of mortgages or debts secured thereby for state or local purposes; or (i) if the mortgagor fails to keep, observe and perform any of the other covenants, conditions or agreements contained in this mortgage; or (j) if the mortgagor fails to keep, observe and perform any of the covenants, conditions or agreements contained in any prior mortgage or fails to repay to the mortgagee the amount of any instalment of principal or interest which the mortgagee may have paid on such mortgage with interest thereon as provided in paragraph 16 of this mortgage.

15. That the mortgagee will, in compliance with Section 13 of the Lien Law, receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

16. That the execution of this mortgage has been duly authorized by the board of directors of the mortgagor.

*Strike out clause if inapplicable*

This mortgage may not be changed or terminated orally. The covenants contained in this mortgage shall run with the land and bind the mortgagor, the heirs, personal representatives, successors and assigns of the mortgagor and all subsequent owners, encumbrances, tenants and subtenants of the premises, and shall enure to the benefit of the mortgagee, the personal representatives, successors and assigns of the mortgagee and all subsequent holders of this mortgage. The word "mortgagor" shall be construed as if it read "mortgagors" and the word "mortgagee" shall be construed as if it read "mortgagees" whenever the sense of this mortgage so requires.

IN WITNESS WHEREOF, this mortgage has been duly executed by the mortgagor.

IN PRESENCE OF:

_____
OLIVIA N. SERDAREVIC

_____
BOSILJKA SERDAREVIC

_____

_____

USE ACKNOWLEDGMENT FORM BELOW WITHIN NEW YORK STATE ONLY:

State of New York, County of                    } ss.:

On the    day of                    in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the person upon
behalf of which the individual(s) acted, executed the instrument.

USE ACKNOWLEDGMENT FORM BELOW WITHIN NEW YORK STATE ONLY:

State of New York, County of                    } ss.:

On the    day of                    in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the person upon
behalf of which the individual(s) acted, executed the instrument.

ACKNOWLEDGMENT FORM FOR USE WITHIN NEW YORK STATE ONLY:
(New York Subscribing Witness Acknowledgment Certificate)

State of New York, County of                    } ss.:

On the    day of                    in the year
before me, the undersigned, personally appeared

the subscribing witness to the foregoing instrument, with whom I am
personally acquainted, who, being by me duly sworn, did depose and
say that he/she/they reside(s) in

(if the place of residence is in a city, include the street and street number,
if any, thereof); that he/she/they know(s)

to be the individual described in and who executed the foregoing
instrument; that said subscribing witness was present and saw said

execute the same; and that said witness at the same time subscribed
his/her/their name(s) as a witness thereto.

ACKNOWLEDGMENT FORM FOR USE OUTSIDE NEW YORK STATE ONLY:
(Out of State or Foreign General Acknowledgment Certificate)

(Complete Venue with State, County, Province or Municipality)  } ss.:

On the    day of                    in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their capacity(ies), that by his/her/their signature(s)
on the instrument, the individual(s), or the person upon behalf of which
the individual(s) acted, executed the instrument, and that such individual
made such appearance before the undersigned in the

(Insert the city or other political subdivision and the state or country or
other place the acknowledgment was taken).

MORTGAGE
INDIVIDUAL OR CORPORATION

TITLE No.

OLIVIA N. SERDAREVIC AND
BOSILJKA SERDAREVIC

TO

CENTEX HOMES, LLC

FIDELITY NATIONAL TITLE
INSURANCE COMPANY
INCORPORATED 1928

"Experience the Fidelity Difference"

DISTRICT
SECTION 15
BLOCK 59
LOT 1
COUNTY OR TOWN Goshen

RECORDED AT REQUEST OF
Fidelity National Title Insurance Company
RETURN BY MAIL TO

CENTEX HOMES, LLC
500 Craig Road,
Manalapan, New Jersey 07726

RESERVE THIS SPACE FOR USE OF RECORDING OFFICE

EXHIBIT "D"

## MEMORANDUM OF AGREEMENT

THIS AGREEMENT made and dated _____, 20___, between, OLIVIA N. SERDAREVIC AND BOSILJKA SERDAREVIC having an address at 103 East 84th Street , New York, NY 10028 (hereinafter called "Vendor") and: CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquaters at 500 Craig Road, Manalapan, New Jersey 07726 (hereinafter collectively "Vendee

WITNESSETH,

that the vendor agrees to sell and convey and the vendee agrees to purchase, all that lot or parcel of land, with the buildings and improvements thereon, in the in the Town of Goshen, Orange County, State of New York, commonly known as Section 15- Block 59- and Lot 1 in Block  on the Town of Goshen Tax Map, as shown on the map Attached hereto as Exhibit "A pursuant to the terms, covenants, conditions and agreements contained in an agreement of even date between the parties hereto,

IN WITNESS WHEREOF, this agreement has been duly executed by the parties hereto.

Date:

_____
Dr. Olivia N. Serdarevic

_____
BOSILJKA SERDAREVIC

State of New York)
County of New York) ss.:

On the  day of _____  in the year 200__ before me, the undersigned,  Dr. Olivia N. Serdarevic and Bosiljka Serdarevic  personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Town of Goshen
Section: 15
Block: 59
Lot: 1

Record and Return to:
CENTEX HOMES, LLC,
500 Craig Road, Manalapan,
New Jersey 07726

**EXHIBIT "E"**
DISCHARGE OF MEMORANDUM OF AGREEMENT

## Know All Men by These Presents,

That CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquarters at 500 Craig Road, Manalapan, New Jersey 07726

## DO HEREBY CERTIFY

that a certain Memorandum of Contract is herewith discharged, terminated and void, and does hereby consent that the same be discharged of record. Memorandum of Contract dated the _____ day of 200_ , in the year, made by OLIVIA N. SERDAREVIC AND BOSILJKA SERDAREVIC having an address at 103 East 84ᵗʰ Street , New York, NY 10028

to

CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquarters at 500 Craig Road, Manalapan, New Jersey 07726

and recorded on the day of, in the year_____ in Liber___ of Section of Mortgages ____, at page _ , in the office of the_____ of the County of _____ which Memorandum of Contract has not been assigned of record.

Dated the ___ day of _____ , in the year

CENTEX HOMES, LLC, A DELAWARE
LIMITED LIABILITY COMPANY

Date:

By: _____
Robert Feeso
Senior Vice President

State of New York)
County of New York) ss.:

On the day of _____ in the year 200__ before me, the undersigned, _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Town of Goshen
Section: 15
Block: 59
Lot: 1

Record and Return to:
OLIVIA N. SERDAREVIC
103 East 84ᵗʰ Street , New York, NY 10028

Page 16 of 18
and Exhibits A to E
Serdarevic to Centex Active Adult

Exhibit C

AGREEMENT
(PARCEL 3)

THIS AGREEMENT (the "Agreement") made and entered into this 9th day of May , 2005 by and between:

DR. OLIVIA N. SERDAREVIC AND BOSILJKA SERDAREVIC having an office at 103 East 84th Street, New York, New York 10028 (hereinafter collectively called "Seller") and: CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquarters at 500 Craig Road, Manalapan, New Jersey 07726 (hereinafter collectively "Buyer").

WITNESSETH:

WHEREAS, Seller is the sole fee owner of that certain parcel of land located in the Town of Goshen, Orange County, State of New York, commonly known as Section 15, Lot 1 in Block 33 on the Town of Goshen Tax Map, as shown on the map attached hereto as Exhibit "A" (hereinafter the "Property");

WHEREAS, Seller desires to sell the Property and Buyer desires to acquire the Property on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Buyer and Seller, Seller hereby agrees to sell and convey the Property to Buyer upon the terms and conditions hereinafter set forth.

1.      PURCHASE PRICE.

    a.      Buyer agrees to pay and Seller agrees to accept a Purchase Price for the Property in the amount of Three Million ($3,000,000.00) Dollars. The Purchase Price is based on ten (10) market rate single family lots at Three Hundred Thousand Dollars ($300,000.00) per lot. The actual Purchase Price shall be adjusted based upon the actual numbers of units approved

    In the event that the Property or any portion of the Property is developed so that the dwellings to be constructed on the Property will be owned under a condominium form of ownership as opposed to fee simple ownership, then the term "Lot" or "Lots" shall be deemed to mean the individual residential condominium unit created on the Property pursuant to the Approvals, as defined below. These residential condominium units shall be referred to as "Unit" or "Units" for all purposes under this Agreement and shall be interchangeable with the terms "Lot" or "Lots".

    b.      Deposit.

        i.      First Deposit. Upon the execution of this Agreement, Buyer shall pay a Deposit of One Hundred Thousand ($100,000.00) Dollars (the "First Deposit") to Seller.

        ii.      Second Deposit. Upon the expiration of the Feasibility Period (as hereinafter defined), Buyer shall pay a second deposit (the "Second Deposit"), by wire transfer, One Hundred Thousand ($100,000) Dollars.

        iii.      Third Deposit. Upon securing zoning Buyer shall pay by wire transfer a third deposit of One Hundred Thousand ($100,000) Dollars.

        iv.      Fourth Deposit. Upon approval by the municipality of the Concept Plan Buyer shall

Page 1 of 17
and Exhibits A to E
Serdarevic to Centex Parcel 3

pay by wire transfer a fourth deposit of Fifty Thousand ($50,000) Dollars.

  v. Intentionally Omitted Prior to execution

  vi. The First, Second, Third, Fourth and Fifth Deposit shall be collectively referred to in this Agreement as the "Deposit". The deposit shall be credited against the Purchase Price at the First Closing.

  vii Following expiration of the Feasibility Period the Second Deposit shall be tendered to Seller. Prior to release and/or payment of the Second, Third Fourth and Fifth Deposit to Seller, the following conditions must be satisfied: (i) title to the Property shall be as set forth in Paragraph 2 herein below , (ii) Seller shall have executed and delivered to Buyer a first mortgage in recordable form, in the form commonly know as NYBTU 8014 (the "Deposit Mortgage") attached hereto as Exhibit C., in an aggregate amount equal to Deposit disbursed (the "Deposit Mortgage")and (iii) the Memorandum of Agreement described in paragraph 16, below, shall have been recorded. In the event that Buyer is entitled to the return of the Deposit under this Agreement, and after Buyer has complied with the Condition Precedent set forth in 1 B (viii) herein below, Seller shall repay the Deposit to Buyer, commencing the first day of the month succeeding eighteen (18) months after the date that the event ("Termination Event") which gives rise to Buyer's right to receive the return of the Deposit takes place.   The Deposit Mortgage shall be a lien against that certain parcel commonly known as Section 15, Lot  1 in Block 33 on the Town of Goshen Tax Map

  viii. Should Buyer elect to terminate this Contract of Sale and require re-payment of the Deposit, Buyer shall physically restore the physical and legal status except as to zoning and condition of the Premises, and state of title, to its status as of the date hereof. Such reversionary acts shall include but is not limited to re-zoning and termination of any and all recorded agreements, memoranda, and easements, covenants which Buyer shall have directly or indirectly caused to be recorded pursuant to this Agreement. Buyer must complete restoration within ninety (90) days of the Termination Event, time being of the essence.

  ix. For purposes of this paragraph 1 the term "Zoning" shall mean any required rezoning or use variance or zone change required in order for the Property to be developed as contemplated by this Agreement. The term "Concept Plan" shall mean a concept plan or schematic plan presented to the appropriate governmental authority of the Town of Goshen which governmental authority thereupon consents to otherwise approves of the same.

c. <u>Payment of the Balance of the Purchase Price</u>. The Purchase Price at each Closing shall be paid by wire transfer in accordance with Paragraph 3, below.

d. <u>Costs and Expenses related to Transfer</u>.  Buyer agrees to be responsible for all transfer taxes and recording fees.  Buyer further agrees that should Seller be required to execute any documents or applications during the term of the Agreement and Seller desires to have same reviewed by an attorney or other consultants as the same may be appropriate in Seller's reasonable commercial judgment, the reasonable costs to be incurred by Seller in connection therewith shall be paid to Seller by Buyer.

2. TITLE. As of the Closing, title to the Property shall be good and insurable, in accordance with the title report issued by Landstar Title Agency  and as to those items not set forth in the Report title shall be good and insurable as to (i) liens mortgages and encumbrances, (ii) restrictions, easements, covenants, and other agreements of record which would prevent or unreasonably interfere with the use of the Property as contemplated by this Agreement, (iii) liens for taxes and assessments, and shall be insurable, at regular rates and without special exception which would materially affect the use of the Premises as intended by this Contract of

Sale.. Those items created or expressly assumed by Buyer, zoning ordinances, privileges or rights of public service companies will not constitute objections to title during the Feasibility Period described in Paragraph 7 below, Buyer shall have the right to update the title search on the Property in order to determine whether or not material variations have occurred from title as attached hereto and made a part hereof as Exhibit B. If the title is determined to not so comply with the foregoing, then Seller shall have thirty (30) days within which to commence cure and diligently prosecute thereafter to completion any such title defects. If Seller is unable to cure such title defects within twelve (12) months after notice of the same, then Buyer shall have the right to terminate this Agreement, and shall be entitled to a return of the Deposit in accordance with 1 B (iv) hereinabove. Except as required by the preceding sentence in order to cure any title defects, Seller will do nothing while this Agreement is in effect to alter or otherwise encumber title to the Property.

3.      CLOSING OF TITLE. Seller and Buyer agree that closing of title (the "Closing") will take place thirty (30) days after fulfillment of the conditions precedent in Paragraph 5 herein below. Closing of title shall take place at office of Seller's attorney 350 5th Avenue, Ste 4613, New York, NY 10118, or at the offices of a title company insuring fee title to Buyer if said office is located in the County, City and State of New York. Seller shall deliver to Buyer, free and clear of all tenancies and other occupancies, title in and to the Property, together with all the tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining, and the reversion or reversions, remainder and remainders, rent, issues and profits thereof, if any, and all the estate, right, title, interest, property, possession, claim and demand whatsoever, in law as well as in equity, and every part and parcel thereof. Further, title to be conveyed to Buyer shall include all of Seller's right, title and interest, if any, in and to any lands lying in the bed of any existing or proposed street in front of or adjoining the Property. Seller agrees that at the time of the  Closing of Title hereunder, Seller shall grant to Buyer an easement over that portion of the Property which Buyer has not yet purchased as reasonably required by Buyer to construct the improvements and infrastructure required or contemplated by the Approvals as necessary for Buyer to proceed with the development of the portions of the Property to which Buyer has taken title, at no additional consideration to Seller. Notwithstanding the foregoing Buyer shall bear any and all costs, fees and expenses incurred or to be incurred in connection with the grant, draft and recordation of any such easements including but not limited to recordation charges and attorneys fees. Title to the easements described in this subparagraph (g) shall comply with Paragraph 2 hereof.

4.      DELIVERIES AT CLOSING OF TITLE. At each closing, Seller shall deliver, as may be applicable, to Buyer:

i.      Bargain and Sale Deed with covenants against grantor's acts in sufficient and recordable form to convey the portion of the Property being purchased at the closing and incorporating the accurate metes and bounds description prepared pursuant to a current survey, obtained at the Buyer's sole cost and expense, as well as by reference by lot and block on the filed map creating the lots or units to be purchased at the closing;

ii.     an affidavit of title in usual and customary form;

iii.    an affidavit that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended;

iv.     an executed form 1099-B;

v.      Corporate resolution,;

vi.     discharges, in recordable form, of any and all mortgages and other liens encumbering the Premises; and

vii.    such other documents as may be reasonably requested by Buyer's title insurance company to convey

title to the Premises in accordance with the terms hereof.

5.      CONDITIONS PRECEDENT TO CLOSING. It is understood and agreed that the obligations of Buyer to pay the Purchase Price for and to accept a tender of the Deed to the Premises is contingent upon achievement by Buyer of each and every material condition contained in the subparagraphs hereof for the Premises being conveyed. Buyer acknowledges that Seller is detrimentally relying upon the diligent and professional efforts of the Buyer to complete and satisfy all of the conditions precedent. It shall exercise best efforts to complete the conditions precedent in a timely and professional fashion. Buyer shall not engage, directly or indirectly, in any acts or omissions which might prejudice the successful closure of all conditions precedent. Any willful or negligent acts which cause the conditions precedent to fail shall be deemed a material breach of this Contract of Sale.    Buyer shall have the right to waive any or all of the conditions precedent in whole or in part without adjustment, modification or amendment, in whole or in part, to this Contract of Sale. If such conditions cannot be satisfied, after diligent and good faith efforts to do so prior to the date of expiration of the time period(s) set forth below in this Paragraph 5, then, unless Buyer has waived such conditions, either party shall have the right to terminate this Agreement upon ten (10) days ("Termination Date") written notice to the other whereupon this Agreement shall terminated as of the Termination Date, and except as otherwise expressly provided in this Agreement, neither party will have any further rights or obligations hereunder. It being acknowledged by the parties that the Deposit, but not the Extension Payments as hereinafter defined, shall be returned by Seller if this Agreement is terminated pursuant to this Paragraph 5. The conditions are as follows

a.      Governmental Approvals. Except as set forth herein, Buyer shall have secured, at Buyer's sole cost and expense, preliminary and final major subdivision and/or site plan approval, together with any and all other Federal, State, county and municipal approvals (collectively, the "Approvals"), required for the development of the property into a mix of ten (10) Housing Units  The Approvals shall be subject to only such conditions which are reasonable and customary for a project of this size and nature. It is understood and agreed that the Approvals shall not include any building or construction-related permits or similar certificates.

b.      Final Plat. The final subdivision plat creating the Lots shall have been filed in the Orange County Clerk's Office. Buyer shall, post all necessary bonds and fees required as a precondition to the filing of the Plat the earlier of thirty (30) days of the approval of the bonding estimates by the Goshen Township Engineer or as otherwise may be required by law, statute or regulation. . If the bonds and fees are not paid within said thirty (30) day period, then this condition under Paragraph 5b shall be deemed waived by Buyer.

c.      Utilities. The Buyer shall have secured "will-serve" or comparable letters from the applicable utility companies or governmental agencies for the supply of natural gas, cable television, telephone, electricity and all other necessary utilities for connection, at reasonable connection charges, to the number of Units created by the Approvals

d.      Easements. Buyer shall have obtained all reasonably necessary easements and property rights, which shall be reasonably required for Buyer to develop the Property in accordance with the Approvals, and as otherwise contemplated by this Agreement, on price and terms reasonably acceptable to Buyer

e       Title. Title to the Property shall be as otherwise provided in Paragraph 2 hereof.

f.      Litigation. Any material pending judicial, quasi-judicial, administrative or other proceeding, attacking any Approval, appealing a denial thereof or involving any matter with respect to the development of or title to the Property, the zoning or any other ordinance applicable to the Property, or which would prevent, preclude or interfere with the furnishing of any utilities or other services necessary for Buyer's

development of the Property, or which would otherwise materially interfere with the proposed use of the Property, shall be finally and favorably adjudicated without affecting the Approvals

g.    Moratorium. Any moratorium by an appropriate governmental entity preventing applications for or issuance of Approvals, building permits, utility hook-ups or the like, shall have expired or otherwise been lifted, repealed or terminated.

h.    Representations and Warranties. All representations and warranties made by Seller pursuant to Paragraph 11, below shall be true and correct as of the date hereof, and Seller shall not do or fail to take any action which would cause the same to be materially false or misleading at Closing. Except as to acts or omissions of Buyer, in the event, at any time following the execution of this Agreement through Closing, any of said representations relating to compliance with Environmental Laws are found to not be true and correct, then Seller, at its sole cost, must take all steps reasonably necessary to bring the Property into compliance with all Environmental Laws, including all cleanup, monitoring and other remedial measures and, if necessary, until such time as Seller obtains a final clearance and/or approval or similar written determination from the appropriate governmental Department or Agency that acknowledges that any contamination on the Property has been remediated to the satisfaction of the said Department or Agency. In lieu of the foregoing, Seller may designate Buyer its agent for such remediation and Buyer shall in good faith commence and prosecute to completion such remediation. The actual and good faith costs, fees and expenses of such remediation shall be credited against the Purchase price hereunder. In the event Seller is unable or unwilling to satisfy the foregoing condition, then Buyer may terminate this Agreement and recover all Deposits. For the purposes of this Agreement, "Environmental Laws" shall mean each and every applicable federal, state, county or municipal statute, ordinance, rule, regulation, order, code, directive or requirement relating to the environment.

i.    Time Periods. Buyer shall have forty eight (48) months from the completion of the Feasibility Period within which to satisfy the conditions in Paragraphs 5a through 5j. Failure to do so shall be deemed a breach of this Contract of Sale so long as such failure is due to the willful and negligent acts or omissions of Buyer and not of Seller. Notwithstanding the foregoing, Buyer may waive the conditions precedent, Should Buyer satisfy the conditions precedent set forth in Paragraph 5 on or before the eighteenth month following completion of the Feasibility Period, Buyer shall receive an incentive credit of Two Hundred Thousand Dollars ($200,000.00) against the Purchase Price. If closing occurs after the eighteenth month following the Feasibility Period and prior to the twenty fourth month, no additional credit shall be granted to Buyer or Seller. As of the first day of the twenty fourth and thirty sixth month following the completion of the Feasibility Period, time being of the essence   Buyer shall pay to Seller, on each of the twenty fourth and thirty sixth month the sum of $250,000.00 which shall be non-refundable, but applicable to the purchase price ("Extension Payments") If the conditions are not satisfied at the end of in this Paragraph 5k, the forty eighth month Buyer shall have the right to terminate the Agreement and Seller may retain both Extension Payments. To secure Buyer against an event of Seller's default under this Agreement, the Extension Payments shall be secured by a lien against that certain parcel commonly known as Section 15, Lot 1 in Block 33 on the Town of Goshen Tax Map.

6.    COOPERATION. The parties each hereby agree to cooperate with each other in accomplishing each and every condition precedent to Closing contemplated hereunder, and to that end agree, when necessary, to join in all applications and to execute all other documents, declarations and maps required to be signed by either of them for such purpose.

7.    FEASIBILITY STUDIES.

a.  Buyer shall have a period of sixty (60) days from the date hereof (the "Feasibility Period") to make such zoning, legal, title (updating and verifying the state of title as set forth in the Title Report attached hereto and made apart hereof as Exhibit B, engineering, environmental, soil, geological, financial and technical studies, and such other tests, investigations and inquiries (hereinafter "Feasibility Studies") as it shall deem necessary and appropriate, all at its own cost and expense, in order to determine whether to proceed with the acquisition of the Property. Upon completion of the Feasibility Period, any and all Seller representations set forth herein, or any contingencies affecting the Premises, shall be deemed merged into the Feasibility Studies and Seller shall be deemed to take the Premises as is, where is, as set forth in the Feasibility Studies. Buyer agrees to provide Seller with copies of any Feasibility Studies generated by Buyer or its agents in connection with Buyer's Feasibility Studies within five (5) days of Buyer's receipt thereof. It is acknowledged and agreed that should Buyer elect not to proceed based upon its due diligence during the Feasibility Period (a) the Feasibility Studies shall be deemed confidential and proprietary to Seller and (b) Buyer shall not disclose, directly or indirectly the Feasibility Studies, to any party for any reason whatsoever

b.  In the event that Buyer determines, in the sole exercise of its discretion, that it cannot proceed with the acquisition of the Property based upon the Feasibility Studies, Buyer shall have the right, at its option, upon written notice to Seller which said Notice shall specify that Buyer is electing to terminate this Agreement, delivered on or before the last day of the Feasibility Period, time being of the essence, to cancel this Agreement and recover the Deposit, following which there shall be no further liability or obligation on either of the parties hereto and this Agreement shall become NULL AND VOID.

c.  Buyer shall have the right to enter upon the Property for the purpose of making, at its sole cost and expense, surveys and site engineering studies, including, without limitation, soil analysis, hazardous waste or other environmental testing, ground tests, load bearing tests and verifying test boring data. Prior to entering the Property, Buyer shall provide to Seller a certificate evidencing that Buyer has comprehensive general liability insurance with a combined single limit for bodily injury and property damage with not less than $5,000,000 per occurrence and such policy or Accord certificate shall name Seller as an additional insured, and Buyer shall indemnify, defend and hold harmless Seller from and against any claims, damage or loss caused by Buyer's, its employees, agents contractors or sub-contractors, entry, acts or omissions in or upon the Property. Buyer agrees to repair any damages caused to the Property by Buyer or its agents immediately following the completion of its Feasibility Studies and restore the Premises to the condition existent prior to the Feasibility Studies.

8.  ADJUSTMENTS. At each Closing, all adjustments, including real property taxes, shall be adjusted, apportioned and allowed as of the date of each Closing of title based upon a 365-day year for the Property purchased at each Closing. The date of Closing shall be treated as the day on which Buyer holds title. All realty transfer taxes and roll back taxes shall be paid by Buyer. Buyer shall have the right to deduct from the Purchase Price all sums required to pay in full or otherwise discharge any obligations secured by any lien or encumbrance or creating a lien or encumbrance on the Property which may be the responsibility of Seller, at each Closing of title.

9.  ASSESSMENTS. Assessments, if any, for public improvements which assessment or assessments were liens encumbering the Premises on or before the date of the Agreement, and which are at the time of delivery of the deed unpaid shall be paid and discharged by the Seller upon the delivery of the deed which may credited as a closing adjustment.

10.  CONDEMNATION. Seller represents that it has no knowledge of any action or proceeding, either contemplated or pending, for condemnation of the Property, or any portion thereof. Seller shall give Buyer prompt written notice of any such proceeding or action of which it becomes aware. Buyer will have the option of participating in such proceedings, at its cost and expense. Should all or any material portion of the Property to be conveyed be taken by condemnation or deed in lieu thereof prior to Closing of title, which affects the

material economic benefit of this transaction and so long as such condemnation is not the result of any breach of contract, agreement, misrepresentation, fraud or other such act or omission by Buyer, then this Agreement may be terminated by the election of Buyer without penalty or damages, by sending written notice to Seller within five (5) days after the vesting of title in the condemning authority. In the event of such termination by Buyer, Buyer will be entitled to the return of the Deposit, together with accrued interest. If Buyer does not elect to so terminate this Agreement and the condemnation has resulted in the loss of any Units, then Seller shall be entitled to any condemnation awards or recoveries (hereinafter "Condemnation Proceeds") Any absolute denial of access to the Property shall be deemed a material taking. Anything to the contrary notwithstanding, if the entire Property is taken during the term of this Agreement, and the proceeds of the condemnation exceed the $3,000,000.00, then, in addition to the return of the Deposit, together with accrued interest, the Buyer shall also be entitled to 50% of the proceeds in excess of the $3,000,000.00.

11.    REPRESENTATIONS, WARRANTIES, AND COVENANTS.

    a.    Seller represents to Buyer that the following are true and correct to the best of the Seller's actual knowledge without independent investigation on the date hereof, which representations and warranties where the context so indicates, shall also be true on the date of closing of title hereunder.

        i.    There are not now outstanding with respect to the Premises, any notices of any uncorrected material violations of any laws, statutes, ordinances, rules or regulations and any such notices hereafter issued prior to Closing will be satisfied by Seller unless such violations or notices are the result of acts or omissions of Buyer..

        ii.    There are no agreements, written or oral, with the municipality, the county, or any other governmental agencies, which would materially or adversely affect or impair the development of the Premises as contemplated hereunder for the construction of single family Dwellings or townhouse units or other improvements thereon.

        iii.    Seller represents that the Seller has no knowledge of any storage, burial, or dumping of hazardous or toxic materials on the Premises (as defined by any and all applicable State and Federal laws or statutes) or of the storage, burial, or dumping of any other debris or material on the Premises.

        iv.    Seller is the owner of the Premises.

        v.    Seller has the full right and authority to execute this Agreement and consummate all of the transactions hereby contemplated.

        vi.    There are no actions, suits or proceedings pending, or to the best of Seller's knowledge and belief, threatened against Seller adversely affecting any portion of the Premises, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

        vii.    There are no attachments, executions, assignments for the benefit of creditors or voluntary or involuntary proceedings in bankruptcy pending, contemplated or threatened against Seller.

        viii.    Seller is not a foreign person (as the term is defined in Section 1445 of the Internal Revenue Code as amended by the Foreign Investment in Real Property Tax Act ["FIRPTA"]) and Seller shall provide Buyer with an affidavit to that effect in compliance with FIRPTA at closing.

ix.     Seller warrants and represents that the Premises shall be free and clear of all tenancies on or before the closing date.

b.     Buyer hereby represents and warrants to Seller as of the time of the closing as follows:

i.     Buyer is a limited liability company duly organized and validly existing under the laws of the State of Delaware with the right and authority to conduct business in the State of New York and has full power and authority and has taken all action required by law to execute, deliver, and perform this Agreement and the transactions contemplated hereby and thereby and has taken all action required by law its Certificate of Formation and Operating Agreement to authorize the execution and delivery of the Agreement and the transactions contemplated hereby.

ii.     Neither the authorization, execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby or thereby will conflict with or result in the breach of any terms or provisions of Buyer's Certificate of Formation and Operating Agreement or any applicable statutes, laws, rules or regulations of any governmental body having jurisdiction in the Premises, or of any judgment, decree, writ, injunction, order or award of any arbitrator, court or governmental authority binding upon Buyer, or result in the breach of any terms or provision, or constitute a default, or result in the acceleration of any obligation under any loan agreement, indenture, financing agreement, or any other agreement or instrument of any kind to which Buyer is a party.

iii.     Buyer has the financial liquidity and assets to perform all of its duties, liabilities and obligations hereunder including but not limited to the payment of sums which shall be due and owing to Seller, as well as the performance of all Feasibility Studies, securing any and all government approvals, performance all of Buyer's conditions precedent and the development contemplated hereunder

iv.     There are no claims, causes of action or regulatory proceedings pending against Buyer, or which have been settled within twenty four (24) months prior to the date hereof, which alleges any act of fraud, misrepresentation, material breach of contract or which would affect any evaluation of Buyer as a suitable developer of the Premises

12.     BROKER. The parties certify to each other that no real estate broker or other intermediary was responsible for bringing about this Agreement other than D.M. Paul Real Estate, who shall be paid a 2.5% commission by Buyer at closing, pursuant to a separate agreement between Buyer and Broker. Should a claim arise on the part of any other person or entity seeking a real estate commission, finders fee or other similar compensation, each party agrees to indemnify and hold the other harmless against and from (i) any claim for such commission, fee or compensation based upon any action by such party, and (ii) any damages or costs including reasonable attorney's fees incurred by the other as a result of or relating to such claim. The provisions of this Paragraph 12 shall survive the Closing and the delivery of the deed to the Property without further reference hereto or action by or documentation from either party.

13.     BUYER'S DEFAULT If Buyer shall breach this Agreement or otherwise default in the performance of this Agreement, then Seller shall have the right to terminate the Agreement and shall be entitled to retain all Deposit Monies as liquidated damages, as Seller's sole and exclusive remedy and the Deposit Mortgage shall be forthwith satisfied and discharged of record by execution and tender of a Satisfaction of Mortgage in form and substance reasonable acceptable to Seller. Seller hereby waiving its right to seek monetary damages or specific

performance, whereupon this Agreement shall be terminated and of no further effect and there shall be no further liability between the parties with respect hereto except for Buyer's obligation to restore the Premises or as otherwise contemplated by this Agreement. It is expressly understood and agreed that Seller will not have the right to declare Buyer in default until Buyer has received a written notice of default and been given fifteen (15) days to cure such default.

14.     SELLER'S DEFAULT. In the event of Seller's default hereunder, Buyer shall be entitled to seek an action for specific performance.  In the event specific performance is unavailable, or Seller is unable to convey title or Seller has caused or failed to disclose any environmental condition, which makes development of the Property unfeasible Seller shall return the Deposit Monies to Buyer. It is expressly understood and agreed that Buyer will not have the right to declare Seller in default until Seller has received a written notice of default and been given fifteen (15) days to cure such default.

15.     SURVIVAL. It is understood and agreed that whether or not expressly provided herein, any provision of this Agreement which, by its nature and effect, is required to be observed, kept or performed after delivery of the Deed, shall survive and shall not be merged herein, but shall remain binding upon and for the benefit of the parties hereto until fully performed, kept or observed.

16.     RECORDING. Buyer shall not have the right to record this Agreement. Buyer shall, however, have the right to record a short form Memorandum of this Agreement, if the Agreement is not terminated at the end of the Feasibility Period, in the form attached hereto as Exhibit "D". Prior to the recording of the Memorandum, the Buyer shall deliver to Seller's attorney a Discharge of the Memorandum in the form attached hereto as Exhibit "E" executed by the Buyer which may be released by Seller's attorney for recordation upon the termination of the Agreement, provided however, that Seller's attorney is obligated to give fifteen (15) days written notice to the Buyer of his intention to record the Discharge of Agreement prior to his delivery thereof to the County Clerk.

17.     NOTICES. Any notice, request, demand, instruction or other communication (a "Notice") to be given to any party with respect to this Agreement may be given either by the party or its counsel and shall be deemed to have been properly sent and given when delivered by hand or when sent by certified mail, return receipt requested, facsimile, or by reputable courier service. If delivered by hand, facsimile, confirmed by one of the other means of communication as set forth herein or courier, a Notice shall be deemed to have been sent, given and received when actually received by the addressee. If sent by certified mail, a Notice shall be deemed to have been sent and given when properly deposited with the United States Postal Service with the property address and postage paid therewith, and shall be deemed to have been received on the third (3rd) business day following the date of such deposit. Each party shall have the right to change its notice address upon notice in writing to the other party.

If to the Seller:              Dr. Olivia N. Serdarevic
                               103 East 84th Street
                               New York, NY 10028

With a copy to:

Leonard N Budow, Esq.
LEONARD N BUDOW PC
350 5th Avenue, Ste 4613
New York, NY 10118-4613
Tel: 212-563-7723 X 101
Fax: 212-214-0408
E Mail: len@budowlaw.com

If to the Buyer:        Robert A. Fourniadis, Senior Vice President
                        Centex Homes, L.L.C.
                        500 Craig Road
                        Manalapan, NJ 07726
                        (732) 780-1800
                        (732) 308-3503 Fax

With a copy thereof to: Salvatore Alfieri, Esq.
                        Cleary Alfieri Jones & Hoyle
                        5 Ravine Drive
                        Post Office Box 533
                        Matawan, NJ 07747
                        (732) 583-7474
                        (732) 290-0753 Fax

18.    MISCELLANEOUS.

   a.    Captions and Headings. Those used herein are for reference only and shall in no way be deemed to
         define, limit, explain or amplify any provisions hereof.

   b.    Entire Agreement. This Agreement constitutes the sole and entire Agreement between the parties
         hereto, and no modification, alteration, or amendment of this Agreement shall be binding unless
         signed by the party against whom such modification alteration or amendment is sought to be enforced.
         No representation, warranty, covenant, inducement or obligation not included in this Agreement shall
         be binding upon either party hereto.

   c.    Governing Laws. This Agreement shall be governed by and construed in accordance with the laws of
         the State of New York. If all or any portion of any provision of this Agreement shall be declared
         invalid or unenforceable under applicable law, then the performance of such portion shall be excused
         to the extent of such invalidity or unenforceability, but the remainder of this Agreement shall remain
         in full force and effect.

   d.    References. Whenever in this Agreement there is any reference to any paragraph, section, or schedule,
         unless the context shall clearly indicate otherwise such reference shall be interpreted to refer to a
         paragraph, section, or schedule in or to this Agreement. Each exhibit or schedule referred to in this
         Agreement is hereby incorporated herein by reference and made a party of this Agreement in the same
         manner as if it were restated verbatim herein. The titles and captions of the paragraphs and sections of
         this Agreement are included for ease of reference only, are not intended to represent the full scope of
         the matters included or excluded from such provisions, and shall not be used to interpret this
         Agreement or to construe the intent of the parties.

Page 10 of 17
and Exhibits A to E
Secdusevic to Centex  Parcel 3

e.  Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be an original and all of which together shall constitute one and the same Agreement. It shall not be necessary that each party execute each counterpart, or that any one counterpart by executed by more than one party, so long as each party executes at least one counterpart. Further, the parties may execute this Contract of Sale by fax counterpart as follows: Buyer may execute this Contract of Sale and Fax the same to counsel for Seller; upon receipt of such Fax Seller shall have five (5) business days to return to Buyer a signed Fax counterpart; upon exchange of such counterparts the Contract of Sale shall be deemed effective and Buyer shall tender the First Deposit forthwith

f.  Counsel. The parties acknowledge that each party and its counsel have participated in the negotiation and preparation of this Agreement. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing the Agreement to be drafted. If any provision of this Agreement requires that action be taken on or before a particular date that falls on a day that is not a business day, the time for the taking of such action shall automatically be postponed until the next following business day.

g.  Gender Usage. All words and phrases used in this Agreement, including, without limitation, all defined words and phrases, regardless of the number or gender in which used, shall be deemed to include any other number or gender as may be reasonably required by the context. If Seller is designated in this Agreement to be more than one person, then, in such event, each person so designated shall be jointly and severally liable for all duties, obligations and liabilities of Seller.

h.  Waiver. Each party shall have the right, in its sole discretion, for any reason or for no reason, to waive any condition precedent or contingency contained in this Agreement for the benefit of said party, provided that such waiver shall be in writing and if any such waiver occurs, this Agreement shall be interpreted and construed as if such condition precedent or contingency had never been a part of this Agreement, except to the extent that said condition precedent or contingency is stated in this Agreement to be also for the benefit of the other party.

i.  No Oral Changes. This Agreement may not be altered or modified orally, but only by a written agreement executed by the parties hereto.

j.  Authority to Execute. The individuals executing this Agreement represent and warrant that they have full authority and/or have been duly authorized by their respective corporations to do so on behalf of such corporations.

k.  Date of Agreement. The date of this Agreement shall be the date on which it is executed by all parties or, if not executed simultaneously, the date on which it is executed by the last of the parties, which date will be inserted at the top of the first page hereof.

l.  Survival. Except as otherwise expressly set forth, no provision of the Agreement shall survive the closing of title.

m.  Soil and Tree Removal. Seller agrees that subsequent to the execution of this Agreement, Seller will not sell any soil and trees from the Property unless required to do so as a matter of law, regulation or safety.

n.  Jury Waiver. The parties hereby waive the right to trial by jury in any litigation between them related to or arising out of this Agreement of Sale or any duty or obligation that either party may have to the other with respect to the transactions contemplated hereby.

b.    Attorney Fees. In the event litigation is instituted by any party related to our arising out of this Agreement or any duty or obligation that either party may have to the other with respect to the transactions contemplated hereby, the prevailing party in any such litigation shall be entitled to recover from the other party the reasonable counsel fees and other costs incurred in such litigation.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals and/or have caused their corporate seal to be affixed hereto the day and year first above written.

Date: May 9, 2005

_____
Dr. Olivia N. Serdarevic

BOSILJKA SERDAREVIC

CENTEX HOMES, LLC, A DELAWARE
LIMITED LIABILITY COMPANY

Date: May 9, 2005

by: _____
Bryor Reed
Division President

## EXHIBIT "A"

### DESCRIPTION OF PROPERTY
See Schedule A Landstar Title Agency LT 8952 Pending Order
Incorporated here at as if fully set forth at length

**EXHIBIT B**
**TITLE SEARCH**
See Landstar Title Agency LT 8952 Pending Order
Incorporated here at as if fully set forth at length

<u>EXHIBIT "C"</u>

DEPOSIT OF MORTGAGE
NYBTU 2014

NY 013 - First Mortgage-Individual or Corporation (NYBTU 8014)

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT - THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY

THIS MORTGAGE, made the          day of            , in the year 200___

BETWEEN

OLIVIA N. SERDAREVIC  AND BOSILJKA SERDAREVIC
103 East 84th Street, New York,  New York 10028

                                                                        , the mortgagor,
and
CENTEX HOMES, LLC
500 Craig Road, Manalapan, New Jersey 07726

                                                                        , the mortgagee,

WITNESSETH, that to secure the payment of an indebtedness in the sum of
Ten Dollars ($10.00)                                                         dollars,

lawful money of the United States, to be paid
In accordance with the terms and provisions of that certain Contract of Sale by and between
Mortgagee and Mortgagor dated as of the 9th day of April 2005

with interest thereon to be computed from the date hereof, at the rate of                per centum
per annum, and to be paid on the          day of          , in the year          , next ensuing and
                    thereafter.

                                                                        according to a certain bond,
note or obligation bearing even date herewith, the mortgagor hereby mortgages to the mortgagee

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the
See Schedule A Landstar Title Agency LT 8952
Incorporated here at as if fully set forth at length

TOGETHER with all right, title and interest of the mortgagor in and to the land lying in the streets and roads in front of and adjoining said premises;

TOGETHER with all fixtures, chattels and articles of personal property now or hereafter attached to or used in connection with said premises, including but not limited to furnaces, boilers, oil burners, radiators and piping, coal stokers, plumbing and bathroom fixtures, refrigeration, air conditioning and sprinkler systems, wash-tubs, sinks, gas and electric fixtures, stoves, ranges, awnings, screens, window shades, elevators, motors, dynamos, refrigerators, kitchen cabinets, incinerators, plants and shrubbery and all other equipment and machinery, appliances, fittings, and fixtures of every kind in or used in the operation of the buildings standing on said premises, together with any and all replacements thereof and additions thereto;

TOGETHER with all awards heretofore and hereafter made to the mortgagor for taking by eminent domain the whole or any part of said premises or any easement therein, including any awards for changes of grade of streets, which said awards are hereby assigned to the mortgagee, who is hereby authorized to collect and receive the proceeds of such awards and to give proper receipts and acquittances therefor, and to apply the same toward the payment of the mortgage debt, notwithstanding the fact that the amount owing thereon may not then be due and payable; and the said mortgagor hereby agrees, upon request, to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning said awards to the mortgagee, free, clear and discharged of any encumbrances of any kind or nature whatsoever.

AND the mortgagor covenants with the mortgagee as follows:

1.  That the mortgagor will pay the indebtedness as hereinbefore provided.

2.  That the mortgagor will keep the buildings on the premises insured against loss by fire for the benefit of the mortgagee; that he will assign and deliver the policies to the mortgagee; and that he will reimburse the mortgagee for any premiums paid for insurance made by the mortgagee on the mortgagor's default in so insuring the buildings or in so assigning and delivering the policies.

3.  That no building on the premises shall be altered, removed or demolished without the consent of the mortgagee.

4.  That the whole of said principal sum and interest shall become due at the option of the mortgagee: after default in the payment of any instalment of principal or of interest for fifteen days; or after default in the payment of any tax, water rate, sewer rent or assessment for thirty days after notice and demand; or after default after notice and demand either in assigning and delivering the policies insuring the buildings against loss by fire or in reimbursing the mortgagee for premiums paid on such insurance, as hereinbefore provided; or after default upon request in furnishing a statement of the amount due on the mortgage and whether any offsets or defenses exist against the mortgage debt, as hereinafter provided. An assessment which has been made payable in instalments at the application of the mortgagor or lessee of the premises shall nevertheless, for the purpose of this paragraph, be deemed due and payable in its entirety on the day the first instalment becomes due or payable or a lien.

5.  That the holder of this mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver.

6.  That the mortgagor will pay all taxes, assessments, sewer rents or water rates, and in default thereof, the mortgagee may pay the same.

7.  That the mortgagor within five days upon request in person or within ten days upon request by mail will furnish a written statement duly acknowledged of the amount due on this mortgage and whether any offsets or defenses exist against the mortgage debt.

8.  That notice and demand or request may be in writing and may be served in person or by mail.

9.  That the mortgagor warrants the title to the premises.

10. That the fire insurance policies required by paragraph No. 2 above shall contain the usual extended coverage endorsement; that in addition thereto the mortgagor, within thirty days after notice and demand, will keep the premises insured against war risk and any other hazard that may reasonably be required by the mortgagee. All of the provisions of paragraphs No. 2 and No. 4 above relating to fire insurance and the provisions of Section 254 of the Real Property Law construing the same shall apply to the additional insurance required by this paragraph.

11. That in case of a foreclosure sale, said premises, or so much thereof as may be affected by this mortgage, may be sold in one parcel.

12. That if any action or proceeding be commenced (except an action to foreclose this mortgage or to collect the debt secured thereby), to which action or proceeding the mortgagee is made a party, or in which it becomes necessary to defend or uphold the lien of this mortgage, all sums paid by the mortgagee for the expense of any litigation to prosecute or defend the rights and lien created by this mortgage (including reasonable counsel fees), shall be paid by the mortgagor, together with interest thereon at the rate of six per cent per annum, and any such sum and the interest thereon shall be a lien on said premises, prior to any right, or title to, interest in or claim upon said premises attaching or accruing subsequent to the lien of this mortgage, and shall be deemed to be secured by this mortgage. In any action or proceeding to foreclose this mortgage, or to recover or collect the debt secured thereby, the provisions of law respecting the recovering of costs, disbursements and allowances shall prevail unaffected by this covenant.

13. That the mortgagor hereby assigns to the mortgagee the rents, issues and profits of the premises as further security for the payment of said indebtedness, and the mortgagor grants to the mortgagee the right to enter upon and to take possession of the premises for the purpose of collecting the same and to let the premises or any part thereof, and to apply the rents, issues and profits,

after payment of all necessary charges and expenses, on account of said indebtedness. This assignment and grant shall continue in effect until this mortgage is paid. The mortgagee hereby waives the right to enter upon and take possession of said premises for the purpose of collecting said rents, issues and profits, and the mortgagor shall be entitled to collect and receive said rents, issues and profits until default under any of the covenants, conditions or agreements contained in this mortgage, and agrees to use such rents, issues and profits in payment of principal and interest becoming due on this mortgage and in payment of taxes, assessments, sewer rents, water rates and carrying charges becoming due against said premises, but such right of the mortgagor may be revoked by the mortgagee upon any default, on five days' written notice. The mortgagor will not, without the written consent of the mortgagee, receive or collect rent from any tenant of said premises or any part thereof for a period of more than one month in advance, and in the event of any default under this mortgage will pay monthly in advance to the mortgagee, or to any receiver appointed to collect said rents, issues and profits, the fair and reasonable rental value for the use and occupation of said premises or of such part thereof as may be in the possession of the mortgagor, and upon default in any such payment will vacate and surrender the possession of said premises to the mortgagee or to such receiver, and in default thereof may be evicted by summary proceedings.

14. That the whole of said principal sum and the interest shall become due at the option of the mortgagee: (a) after failure to exhibit to the mortgagee, within ten days after demand, receipts showing payment of all taxes, water rates, sewer rents and assessments; or (b) after the actual or threatened alteration, demolition or removal of any building on the premises without the written consent of the mortgagee; or (c) after the assignment of the rents of the premises or any part thereof without the written consent of the mortgagee; or (d) if the buildings on said premises are not maintained in reasonably good repair; or (e) after failure to comply with any requirement or order or notice of violation of law or ordinance issued by any governmental department claiming jurisdiction over the premises within three months from the issuance thereof or (f) it on application of the mortgagee two or more fire insurance companies lawfully doing business in the State of New York refuse to issue policies insuring the buildings on the premises; or (g) in the event of the removal, demolition or destruction in whole or in part of any of the fixtures, chattels or articles of personal property covered hereby, unless the same are promptly replaced by similar fixtures, chattels and articles of personal property at least equal in quality and condition to those replaced, free from chattel mortgages or other encumbrances thereon and free from any reservation of title thereto; or (h) after thirty days' notice to the mortgagor, in the event of the passage of any law deducting from the value of land for the purposes of taxation any lien thereon, or changing in any way the taxation of mortgages or debts secured thereby for state or local purposes; or (i) if the mortgagor fails to keep, observe and perform any of the other covenants, conditions or agreements contained in this mortgage; or (j) if the mortgagor fails to keep, observe and perform any of the covenants, conditions or agreements contained in any prior mortgage or fails to repay to the mortgagee the amount of any instalment of principal or interest which the mortgagee may have paid on such mortgage with interest thereon as provided in paragraph 16 of this mortgage.

15. That the mortgagor will, in compliance with Section 13 of the Lien Law, receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

*Strike out clause if inapplicable.*  16. That the execution of this mortgage has been duly authorized by the board of directors of the mortgagor.

This mortgage may not be changed or terminated orally. The covenants contained in this mortgage shall run with the land and bind the mortgagor, the heirs, personal representatives, successors and assigns of the mortgagor and all subsequent owners, encumbrances, tenants and subtenants of the premises, and shall enure to the benefit of the mortgagee, the personal representatives, successors and assigns of the mortgagee and all subsequent holders of this mortgage. The word "mortgagor" shall be construed as if it read "mortgagors" and the word "mortgagee" shall be construed as if it read "mortgagees" whenever the sense of this mortgage so requires.

IN WITNESS WHEREOF, this mortgage has been duly executed by the mortgagor.

IN PRESENCE OF:

OLIVIA N. SERDAREVIC

BOSILJKA SERDAREVIC

USE ACKNOWLEDGMENT FORM BELOW WITHIN NEW YORK STATE ONLY:

State of New York, County of                              } ss.:

On the      day of                              in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the person upon
behalf of which the individual(s) acted, executed the instrument.

USE ACKNOWLEDGMENT FORM BELOW WITHIN NEW YORK STATE ONLY:

State of New York, County of                              } ss.:

On the      day of                              in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the person upon
behalf of which the individual(s) acted, executed the instrument.

ACKNOWLEDGMENT FORM FOR USE WITHIN NEW YORK STATE ONLY:
[New York Subscribing Witness Acknowledgment Certificate]

State of New York, County of                              } ss.:

On the      day of                              in the year
before me, the undersigned, personally appeared

the subscribing witness to the foregoing instrument, with whom I am
personally acquainted, who, being by me duly sworn, did depose and
say that he/she/they reside(s) in

(if the place of residence is in a city, include the street and street number,
if any, thereof); that he/she/they know(s)

to be the individual described in and who executed the foregoing
instrument; that said subscribing witness was present and saw said

execute the same; and that said witness at the same time subscribed
his/her/their name(s) as a witness thereto.

ACKNOWLEDGMENT FORM FOR USE OUTSIDE NEW YORK STATE ONLY:
[Out of State or Foreign General Acknowledgment Certificate]

.............................................................. } ss.:
[Complete Venue with State, Country, Province or Municipality]

On the      day of                              in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their capacity(ies), that by his/her/their signature(s)
on the instrument, the individual(s), or the person upon behalf of which
the individual(s) acted, executed the instrument, and that such individual
made such appearance before the undersigned in the

(Insert the city or other political subdivision and the state or country or
other place the acknowledgment was taken).

MORTGAGE
INDIVIDUAL OR CORPORATION

TITLE No.

OLIVIA N. SERDAREVIC  AND
BOSILJKA SERDAREVIC

TO

CENTEX HOMES, LLC

DISTRICT
SECTION 15
BLOCK 1
LOT 33
COUNTY OR TOWN Goshen

FIDELITY NATIONAL TITLE
INSURANCE COMPANY
INCORPORATED 1933

"Experience the Fidelity Difference"

RECORDED AT REQUEST OF
Fidelity National Title Insurance Company
RETURN BY MAIL TO

CENTEX HOMES, LLC
500 Craig Road,
Manalapan, New Jersey 07726

RESERVE THIS SPACE FOR USE OF RECORDING OFFICE

EXHIBIT "D"

MEMORANDUM OF AGREEMENT

THIS AGREEMENT made and dated_____, 20___ between , OLIVIA N. SERDAREVIC AND BOSILJKA SERDAREVIC having an address at 103 East 84th Street , New York, NY 10028 (hereinafter called "Vendor") and: CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquarters at 500 Craig Road, Manalapan, New Jersey 07726 (hereinafter collectively "Vendee

WITNESSETH,

that the vendor agrees to sell and convey and the vendee agrees to purchase, all that lot or parcel of land, with the buildings and improvements thereon, in the in the Town of Goshen, Orange County, State of New York, commonly known as Section 15- Block 1- and Lot 33 in Block  on the Town of Goshen Tax Map, as shown on the map Attached hereto as Exhibit "A pursuant to the terms, covenants, conditions and agreements contained in an agreement of even date between the parties hereto,

IN WITNESS WHEREOF, this agreement has been duly executed by the parties hereto.

Date:

_____
Dr. Olivia N. Serdarevic

_____
Bosiljka Serdarevic

State of New York)
County of New York) ss.:

On the  day of _____ in the year 200__ before me, the undersigned, Dr. Olivia N. Serdarevic and Bosiljka Serdarevic personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Town of Goshen
Section: 15
Block: 1
Lot: 33

Record and Return to:
CENTEX HOMES, LLC,
500 Craig Road, Manalapan,
New Jersey 07726

EXHIBIT "E"
DISCHARGE OF MEMORANDUM OF AGREEMENT

## Know All Men by These Presents,

That CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquarters at 500 Craig Road, Manalapan, New Jersey 07726

## DO HEREBY CERTIFY

that a certain Memorandum of Contract is herewith discharged, terminated and void, and does hereby consent that the same be discharged of record. Memorandum of Contract dated the _____ day of 200_ , in the year , made by OLIVIA N. SERDAREVIC AND BOSILJKA SERDAREVIC having an address at 103 East 84th Street , New York, NY 10028

to

CENTEX HOMES, LLC, a Delaware Limited Liability Company, having its headquarters at 500 Craig Road, Manalapan, New Jersey 07726

and recorded on the day of , in the year_____ in Liber___ of Section of Mortgages ____ , at page ____ , in the office of the_____ of the County of _____ which Memorandum of Contract has not been assigned of record.

Dated the____ day of_____ , in the year

                                    CENTEX HOMES, LLC, A DELAWARE
                                    LIMITED LIABILITY COMPANY

Date:

                              By: _____
                                       Robert Fecso
                                       Senior Vice President

State of New York)
County of New York) ss.:

On the  day of  _____ in the year 200__ before me, the undersigned, _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Town of Goshen
Section: 15
Block: 1
Lot: 33

Record and Return to:
OLIVIA N. SERDAREVIC
103 East 84th Street , New York, NY 10028

Exhibit D

# ZARIN & STEINMETZ

ATTORNEYS AT LAW

## 81 MAIN STREET
· SUITE 415
WHITE PLAINS, NEW YORK 10601

DAVID S. STEINMETZ •
MICHAEL D. ZARIN

• ALSO ADMITTED IN D.C.
• ALSO ADMITTED IN MA.
• ALSO ADMITTED IN CT.
♦ ALSO ADMITTED IN N.J.

TELEPHONE: (914) 682-7800
FACSIMILE: (914) 683-5490

JODY T. CROSS •
ADAM L. PAQET •
DANIEL M. RICHMOND
MARK R. RIELLY ♦
BRAD K. SCHWARTZ

MARSHA RUBIN GOLDSTEIN
HELEN COLLIER MAUCH •
SUSAN H. SARCH •
LISA F. SMITH •
OF COUNSEL

February 13, 2007

**By Federal Express**
Leonard N. Budow, Esq.
350 Fifth Avenue, Suite 4613
New York, N.Y. 10118

Re:    *Hamlet at Goshen*
       *Section 11, Block 1, Lot 46*

Dear Len:

        I am writing to you with regard to an Agreement, dated May 9, 2005, between your client, Dr. Serdarevic, as Seller, and our client, Centex Homes, LLC, as Purchaser, concerning the above-captioned property (the "Agreement").

        As you know, our client has approached you various times over the last eight months in an attempt to renegotiate the Agreement. The reason for this is that Centex will not be able to develop the property as densely as originally contemplated by the Agreement, primarily due to certain environmental constraints on the land such as wetlands and steep slopes. Specifically, while the Agreement contemplated a minimum of two hundred (200) single-family homes, as indicated on the attached plans prepared by Esposito & Associates, the actual maximum number of approvable single-family units will likely only be one hundred and seventy seven (177). Indeed, a condition precedent to Closing is that at least two hundred (200) be approved.

        For this reason, at this time, our client would like to propose a revised contract price of one hundred thousand dollars ($100,000.00) per single-family lot approved, based upon 177 lots ($17,700,000.00) and 28 condominium units at the price of $25,000.00 per approved unit ($700,000.00). The commercial portion of the Agreement would remain the same. Further, in light of current market conditions and the proposed reduced contract price, our client would also propose that there be no additional cash deposits and that the balance be paid at Closing.

Please call me if you have any questions.  Otherwise, please discuss these terms with your client and get back to me at your earliest convenience.

Very truly yours,

David S. Steinmetz

cc:    Robert A. Fourniadis

**Exhibit E**

ZARIN & STEINMETZ
ATTORNEYS AT LAW
81 MAIN STREET
SUITE 415
WHITE PLAINS, NEW YORK 10601

TELEPHONE: (914) 682-7800
FACSIMILE: (914) 683-5490

· DAVID S. STEINMETZ ·
MICHAEL D. ZARIN

· ALSO ADMITTED IN DC
· ALSO ADMITTED IN MA.
· ALSO ADMITTED IN CT.
· ALSO ADMITTED IN NJ

JODY T. CROSS ·
ADAM L. PAGET ·
DANIEL M. RICHMOND
MARK R. RIELLY ·
BRAD K. SCHWARTZ

MARSHA RUBIN GOLDSTEIN
HELEN COLLIER MAULK ·
SUSAN H. SARCH ·
LISA F. SMITH ·
OF COUNSEL

February 12, 2007

**By Federal Express**
Leonard N. Budow, Esq.
350 Fifth Avenue, Suite 4613
New York, N.Y. 10118

Re:    *Hamlet at Goshen*
       *Section 15, Block 1, Lot 59*

Dear Len:

I am writing to you with regard to an Agreement, dated May 9, 2005, between your client, Dr. Serdarevic, as Seller, and our client, Centex Homes, LLC, as Purchaser, concerning the above-captioned property (the "Agreement").

As you know, the Agreement contemplated an Active Adult development necessitating a rezoning. Centex has not made the Third Deposit under the Contract because, as you are also undoubtedly aware, the Town of Goshen has unequivocally indicated that it will not rezone Lot 59 to allow the development of the Active Adult lots contemplated by the Agreement. Centex is, therefore, unable to fulfill the condition precedent of obtaining the necessary governmental approvals for the Active Adult portion of the project. Its hands are tied.

We request that your client acknowledge that it would be a futile waste of time and money to proceed with a formal rezoning petition in light of the Town's clear message. Assuming that your client is willing to do this, Centex will be terminating the Contract and requesting return of its First and Second Deposits.

Nevertheless, in the event that your client is unwilling to acknowledge the futility of bringing the rezoning petition, we have prepared the petition and have included it herein. Since your clients are the owners of the property, they will have to consent to it, and we have included verifications to that effect. If necessary, once we have their signatures, we will take the next step, including preparation of the Environmental Assessment Form for the rezoning. Obviously, if your clients refuse to either acknowledge the futility of the petition or consent

thereto, they will be in breach of the Agreement, entitling our client to terminate the Agreement and obtain the return of its First and Second Deposits.

I hope that we can count on yours and your client's cooperation in this matter.

Very truly yours,

David S. Steinmetz

cc:    Robert A. Fourniadis

**Exhibit F**

# ZARIN & STEINMETZ
### ATTORNEYS AT LAW
## 81 MAIN STREET
### SUITE 415
## WHITE PLAINS, NEW YORK 10601

DAVID S. STEINMETZ •
MICHAEL D. ZARIN
DANIEL M. RICHMOND

• ALSO ADMITTED IN D.C.
• ALSO ADMITTED IN CT
• ALSO ADMITTED IN N.J.

TELEPHONE: (914) 682-7800
FACSIMILE: (914) 683-5490
WEBSITE: WWW.ZARIN-STEINMETZ.NET

JODY T. CROSS •
JILLIAN K. MOONEY ▫
KEBRA A. RHEDRICK
BRAD K. SCHWARTZ

MARSHA RUBIN GOLDSTEIN
HELEN COLLIER MAUCH •
SUSAN H. SARCH •
LISA F. SMITH •

OF COUNSEL

March 29, 2007

**By Federal Express**

Dr. Olivia N. Serdarevic
103 East 84th Street
New York, N.Y. 10028

Re:     *Hamlet at Goshen-Hamlet Parcel*

Dear Dr. Serdarevic:

I am writing to you in reference to the Agreement, dated May 9, 2005 (the "Agreement"), between you as Seller, and our client, Centex Homes, LLC, as Purchaser, concerning the above-captioned property known as Section 11, Block 1, Lot 46 in the Town of Goshen (the "Town").

As you probably recall, Centex has approached you several times over the last eight months in an attempt to renegotiate this Agreement since it is inconsistent with the Concept Plan which shows Hamlet units in the RU zone and because of the situation concerning zoning of the Active Adult Parcel.

Since it has become clear that any renegotiation of this Agreement, either separately or in conjunction with the Agreement of the same date for the Active Adult Parcel, is probably unlikely at this point, Centex is in the process of preparing a new concept plan for the Hamlet parcel alone (Lot 46). Centex will submit this new plan, which will be consistent with the Agreement, to the Town as soon as is practicable. Our Development Team met this afternoon and are very eager to proceed. While we cannot say at this time exactly how many units will be proposed, Centex shall strive to achieve a minimum of two hundred (200) units, excluding affordable housing and retail, as contemplated by the Agreement.

Please have your attorney contact us if you have any questions.

Very truly yours,

ZARIN & STEINMETZ

By: _____
David S. Steinmetz

cc:    Mr. Robert Fourniadis
       Leonard Budow, Esq.
       Brian Dunefsky, Esq.

**Exhibit G**

# ZARIN & STEINMETZ

ATTORNEYS AT LAW

81 MAIN STREET

SUITE 415

WHITE PLAINS, NEW YORK 10601

DAVID S. STEINMETZ *
MICHAEL D. ZARIN
DANIEL M. RICHMOND

* ALSO ADMITTED IN D.C.
* ALSO ADMITTED IN CT.
◊ ALSO ADMITTED IN NJ

TELEPHONE: (914) 682-7800

FACSIMILE: (914) 683-5490

WEBSITE: WWW.ZARIN-STEINMETZ.NET

JODY T. CROSS *
JILLIAN K. MOONEY ◊
KEERA A. RHEDRICK
BRAD K. SCHWARTZ

MARSHA RUBIN GOLDSTEIN
HELEN COLLIER MAUCH *
SUSAN H. SAROH *
LISA F. SMITH *

OF COUNSEL

March 29, 2007

**By Federal Express**

Dr. Olivia N. Serdarevic
103 East 84th Street
New York, N.Y. 10028

Re:    *Goshen-Active Adult Parcel (Block 1, Lot 59)*

Dear Dr. Serdarevic:

I am writing to you in reference to the Agreement, dated May 9, 2005 (the "Agreement"), between you and our client, Centex Homes, LLC, ("Centex") as Purchaser, concerning the above-captioned property located in the Town of Goshen (the "Town").

As you must by now know, by letters dated June 2006 and February 12, 2007, we notified you through your attorney, Leonard Budow, Esq., that in order for Centex to proceed under the Agreement, it would need a rezoning, which the Town has made clear it will not grant. While we believe that it would be futile and a waste of time, money and effort to formally seek this rezoning based upon the clear message our Development Team received from the Town, we were ready and willing to do so with your necessary cooperation and consent. In fact, we enclosed a Petition for Rezoning, which we requested that you either sign or admit was futile. This was over one month ago and to date we have yet to hear from you or your attorney regarding your willingness to do either of the above.

Not only has Centex been unable to proceed because of your unwillingness to cooperate with the steps necessary to attempt a rezoning but, as you recall, Centex proposed to renegotiate the Agreement to account for a development other than the contemplated Active Adult housing. However, once again, you refused to respond in a constructive manner.

For all of these reasons, we must now declare you, as Seller, to be in default of the Agreement and we hereby demand return of all deposit monies pursuant to paragraph 14 of the Agreement. Please consider this to be your "Notice of Default" pursuant to that section of the

Agreement. If you have not cured this default within the fifteen (15) day period, either by signing the Petition for Rezoning or otherwise cooperating, Centex will seek all remedies available to it under the Agreement and the law.

Please have your attorney contact me at your earliest convenience.

Very truly yours,

ZARIN & STEINMETZ

By: _____

David S. Steinmetz

cc:    Mr. Robert Fourniadis
       Leonard Budow, Esq.
       Brian Dunefsky, Esq.

**Exhibit H**

# DREIER LLP

ATTORNEYS AT LAW

Marc S. Dreier
Direct 212 328 6111
mdreier@dreierllp.com

April 23, 2007

**BY FEDEX**

David S. Steinmetz, Esq.
Zarin & Steinmetz
81 Main Street, Suite 415
White Plains, New York 10601

Re:    Goshen - Hamlet and Active Adult Parcels

Dear Mr. Steinmetz:

We represent Dr. Olivia Serdarevic. I am writing in response to your two letters to her, each dated March 29, 2007, concerning the Hamlet property (Section 11, Block 1, Lot 46) (the "Hamlet Parcel") and Active Adult property (Section 15, Lot 59, Block 1) (the "Active Adult Parcel"). As discussed below, your assertions that Dr. Serdarevic's actions are in breach of the parties' agreements and are preventing Centex's development of those properties are entirely baseless. In fact, it is Centex that is in breach, and, unfortunately, it is now apparent that Dr. Serdarevic will need to pursue legal recourse.

In your letter relating to the Hamlet Parcel, you assert that Centex must prepare a new concept plan since the present "Concept Plan which shows Hamlet units in the RU zone" is inconsistent with the parties' agreement. You further suggest that the new plan is necessary due to Dr. Serdarevic's refusal to renegotiate her agreement with Centex. Dr. Serdarevic, of course, is under no obligation to renegotiate. Centex's position is nothing more than a wholly unsupportable effort on its part to extricate itself from its agreements with Dr. Serdarevic.

As no doubt you are aware, Centex, not Dr. Serdarevic, conceived of, drafted and submitted the Concept Plan which you now say is contrary to the parties' agreement. Moreover, the Town of Goshen approved that Plan at its September 21, 2006 Planning Board meeting. Thus, Centex cannot credibly assert that its own acts or omissions -- namely, the submission of a concept plan purportedly not in conformity with its contract with Dr. Serdarevic -- constitutes a failure of a condition precedent under the contract. Further, the preparation of the supposed non-conforming concept plan itself would constitute a material breach of the contract and Centex's duties thereunder.

499 Park Avenue  New York, New York 10022
Telephone 212 328 6100  Facsimile 212 328 6101
Los Angeles · Stamford · Albany
www.dreierllp.com

It appears that Centex's desire to change the Plan at this late date arises only from Centex's desire to abandon the development in its entirety -- as well as its obligations to Dr. Serdarevic. As Robert Fourniadis has confirmed on several occasions, subsequent to gaining Town approval of the Plan, Centex made a unilateral decision to exit the development of housing in Orange County. Mr. Fourniadis also acknowledged that Centex does not want to go forward with its agreements with Dr. Serdarevic. Thus, your present efforts to scuttle the approved Plan (which provides for Centex to build 562 market rate units, including single family, townhouse and multi-family homes) -- which Dr. Serdarevic fully supports    and substitute a belated plan consisting of only 177 single family homes and 28 condominiums that bears no relation whatsoever to the number of units originally contemplated by the parties is simply an obvious attempt to pressure Dr. Serdarevic to let Centex out of its agreements with her. She is unwilling to do so.

Likewise, there is no basis whatsoever for Centex's assertion that Dr. Serdarevic is in default under the agreement governing the Active Adult Parcel because she supposedly "refused to respond in a constructive manner" to Centex's Petition for Rezoning. You contend that the Town has made it clear that it will not grant rezoning to accommodate an active adult development on the property, and that is why the Active Adult Agreement must be terminated. However, if in fact the Town is not presently prepared to accept active adult housing, it is Centex's own conduct in breach of its agreement with Dr. Serdarevic that is to blame. There is ample evidence that the Town had long been fully supportive of a development by Centex which would include active adult housing. However, after submitting its first concept plan which included such housing, Centex unilaterally chose to remove any such units from all subsequent plans -- in breach of the Active Adult Agreement. Now, apparently, the Town does not want such housing after having already approved in September a Concept Plan submitted by Centex that did not include it. This is entirely Centex's fault.[1]

Therefore, please consider this to be Notice of Centex's Default under the Active Adult Agreement. Please be advised too that Dr. Serdarevic objects to any effort by Centex to present a new concept plan to the Town that is not in substantial conformity with the Concept Plan approved in September and which would require new approval from the Town. If Centex intends to move forward largely in accordance with the approved Concept Plan, Dr. Serdarevic is willing to discuss making whatever minimal changes are necessary to her agreements with Centex to accommodate that Plan. If, however, Centex presents a new concept plan to the Town -- which likely would cause irreparable harm to Dr. Serdarevic -- be advised that this letter shall constitute notice of Centex's breach of the Hamlet Agreement, as well as the Active Adult Agreement, for which Dr. Serdarevic will pursue all available legal recourse.

---

[1]    Moreover, the fact that Centex did not submit a Rezoning Petition as soon as the feasibility period passed itself constitutes a breach of its contract with Dr. Serdarevic. In fact, to draft such a petition only now -- almost 18 months later -- only confirms that Centex breached its obligations under the Active Adult Agreement by sitting on its hands for a year and a half while the real estate market -- and apparently the Town's views -- changed to Dr. Serdarevic's detriment.

2

Also be advised that any legal action by Dr. Serdarevic will include seeking appropriate relief regarding Centex's default under the "Parcel 3" contract dated May 9, 2005.

We shall expect to hear of Centex's intentions not later than April 30.

Sincerely,

Marc S. Dreier

cc:    Dr. Olivia Serdarevic
       Leonard N. Budow, Esq.
       Robert Fourniadis, Esq.
       Salvatore Alfieri, Esq.

Exhibit I

# ZARIN & STEINMETZ

ATTORNEYS AT LAW

## 81 MAIN STREET
## SUITE 415
## WHITE PLAINS, NEW YORK 10601

TELEPHONE: (914) 682-7800
FACSIMILE:  (914) 683-5490
WEBSITE: WWW.ZARIN-STEINMETZ.NET

DAVID S. STEINMETZ *
MICHAEL D. ZARIN
DANIEL M. RICHMOND

* ALSO ADMITTED IN D.C.
* ALSO ADMITTED IN CT
* ALSO ADMITTED IN N.J.

JODY T. CROSS *
JILLIAN K. MOONEY *
KEBRA A. FRIEDRICK
BRAD K. SCHWARTZ

MARSHA RUBIN GOLDSTEIN
HELEN COLLIER MAUCH *
SUSAN H. SARCH *
LISA F. SMITH *
OF COUNSEL

May 10, 2007

**By Federal Express**

Dr. Olivia N. Serdarevic
103 East 84th Street
New York, N.Y. 10028

Re:    *Hamlet at Goshen*

Dear Dr. Serdarevic:

I am writing to you, once again, in reference to the Agreement, dated May 9, 2005 (the "Agreement"), between you as Seller, and our client, Centex Homes, LLC, as Purchaser, concerning the above-captioned property known as Section 11, Block 1, Lot 46 in the Town of Goshen (the "Town").

As you are probably aware, David Steinmetz, Esq., recently spoke with your attorney, Brian Dunefsky, Esq. of Dreier LLP concerning Mark Dreier's letter of April 23, 2007 regarding the Hamlet and Active Adult Parcels.  While your attorney made certain default allegations in that letter, much as we had claimed default on your part in earlier correspondence, Brian Dunefsky and David agreed to toll Centex's contractual cure period on the alleged default while the parties attempt to work things out short of litigation.  It is toward that end that I am writing to you now.

I am enclosing the latest Concept Plan for the Hamlet Parcel, which is dated April 16, 2007 and shows 114 market rate and 11 affordable single family units, and 87 market rate and 9 affordable town house units, for a total of 221 units.  We previously asked our engineers to do exploratory test well drilling on the property to determine whether there was sufficient water supply for the proposed development.  What we learned, as you can see from the attached letter from Thomas B. Vanderbeck, P.E., dated April 25, 2007, is that the supply is probably insufficient.

To service the Hamlet based upon this current layout, Centex would need wells that produce a certain minimum water supply.  State Regulations require a developer to assume

Dr. Olivia N. Serdarevic
May 10, 2007
Page 2

that the largest well will fail at some point of time and require that a minimum flow of 145 gallons per minute be available through back up wells in case the largest well is unavailable. Based upon our test well drilling, as described in Mr. Vanderbeek's letter, the only two useful wells, TW-3 and TW-4 are located in the RU zone (and on the Active Adult Parcel). Wells TW-1 and TW-2 do not produce any water, and TW-5 and TW-6 do produce some water but are located too close to the Hamlet property line. This means that Centex would not be able to provide the required 200 foot buffer around TW-5 and TW-6's well heads because a large portion of the buffer for each well would be on adjoining property. This means that TW-5 and TW-6 are of no use.

The largest well, TW-4, produces 120 gallons per minute and TW-3 produces 50 gallons per minute. However, discounting TW-4 as the largest well, which the regulations dictate we must, we still need additional wells that produce a total of at least 95 gallons per minute. We have reason to believe that we would only be able to find that capacity on property in the RU zone or on your own property.

I would like to suggest a meeting between our client, David Steinmetz and/or myself, you and your attorneys to discuss this issue and whether there is any way to resolve the water supply problem. Since short of using your homestead property, Centex may need to drill wells on the RU zoned property, the larger issue of the Active Adult Parcel will need to be addressed as well. Perhaps if we all sit down with these very real logistical problems before us, we may be able to reach a resolution concerning the Hamlet and Active Adult Parcels.

I already spoke with Brian Dunefsky in an attempt to schedule this meeting before you leave for Europe, and will follow up.

Please have your attorney contact us if you have any questions.

Very truly yours,

ZARIN & STEINMETZ

By: _Marsha Rubin Goldstein_
     Marsha Rubin Goldstein

cc:  Mr. Robert Fourniadis
     Mr. Gary Hillen
     Mark S. Dreier, Esq.
     Brian Dunefsky, Esq.
     Leonard Budow, Esq.



# GREATER HUDSON VALLEY
## ENGINEERING & LAND SURVEYING, P.C.

*Land Planning · Municipal Services*

25 April 2007
GHV Job No. 1011a

Mr. Gary Hillen
Centex Homes
500 Craig Road
Manalapen, NJ 07726-8790

| Re: Hamlets of Goshen |
| Water Supply |

Dear Mr. Hillen:

As you are aware, we are currently undergoing exploratory well drilling on the Sedarevic property under contract to Centex in Goshen. We have drilled 6 test wells to date with unconfirmed yields on the order of 0 to 120 gallons per minute (gpm).

The New York State design criteria for public well water supply requires us to be able to serve the peak daily demand with the largest well out of service. For the latest layout prepared for the Hamlet zone, the average daily demand is as follows:

| No. Of Bedrooms | Units | Total Bedrooms | Flow (gpd) |
|---|---|---|---|
| 1 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 3 | 48 | 144 | 18,000 |
| 4 | 173 | 692 | 86,500 |
| Total | 221 | 836 | 104,500 |

The value of approximately 104,500 gpd converts to 72.5 gpm, or 145 gpm peak flow. This is based on the Orange County Department of Health's use of 125 gallons per bedroom per day for water supply and wastewater treatment. Other agencies allow the use of 100 gallons per person per day or actual local use data. Peak flows, if not based on actual data, are generally calculated at a factor of 2.

Greater Hudson Valley Engineering & Land Surveying, P.C.

233 Lafayette Avenue, Suite M-1

Suffern, NY 10901

Stormwater Management · Commercial & Residential Site Design · Water Supply & Distribution · Environmental Services
NYS Cert.Auth. 0004119 & 0004120

Greater Hudson Valley Consulting, L.L.C.

Phone 845-357-7450
Fax 845-357-7460



**GREATER HUDSON VALLEY**
ENGINEERING & LAND SURVEYING, P.C.

*Land Planning · Municipal Services*

Mr. Gary Hillen, 25 April 2007, Page 2 of 2

Our drilling to date has produced the following test wells:

| Well | TW-1 | TW-2 | TW-3 | TW-4 | TW-5 | TW-6 | TOTAL |
|------|------|------|------|------|------|------|-------|
| GPM  | ng   | ng   | 50   | 120  | 40   | 30   | 240   |

As you can see, the untested results show we have the required flow, but not with the largest well out of service.   With regard to the wells:

In our limited testing we did not see any influence among the wells.

TW-3 and TW-4 are located in the RU section of the property.

TW-5 and TW-6 may need to be relocated due to the 200 foot radius of control falling outside the property line.

Based on the revised layout, there are only three locations where wells can be drilled on the Hamlet side.  It is likely that additional testing needs to occur on the RU side.

Please call if you have any questions or require further information.

Very truly yours,

Thomas B. Vanderbeek, P.E.
President

Greater Hudson Valley Engineering & Land Surveying, P.C.
233 Lafayette Avenue, Suite M-1
Suffern, NY 10901
Stormwater Management · Commercial & Residential Site Design · Water Supply & Distribution · Environmental Services
NYS Cert.Auth. 0004119 & 0004120

Greater Hudson Valley Consulting, LLC.
Phone 845-357-7450
Fax 845-357-7460





**Exhibit J**

# ZARIN & STEINMETZ

### ATTORNEYS AT LAW

### 81 MAIN STREET

### SUITE 415

### WHITE PLAINS, NEW YORK 10601

TELEPHONE: (914) 682-7800
FACSIMILE: (914) 683-5490
WEBSITE: WWW.ZARIN-STEINMETZ.NET

DAVID S. STEINMETZ •
MICHAEL D. ZARIN
DANIEL M. RICHMOND

• ALSO ADMITTED IN D.C
• ALSO ADMITTED IN CT.
• ALSO ADMITTED IN N.J.

JODY T. CROSS •
JILLIAN K. MOONEY •
KEBRA A. RHEDRICK
BRAD K. SCHWARTZ

MARSHA RUBIN GOLDSTEIN
HELEN COLLIER MAUCH •
SUSAN H. SARCH •
LISA F. SMITH •
OF COUNSEL

July 6, 2007

## By Facsimile and Regular Mail

Marc S. Dreier, Esq.
Dreier LLP
499 Park Avenue
New York, N.Y. 10022

Re:    *Goshen: Centex Homes with Serdarevic*

Dear Marc:

I am writing to you to follow up on the meeting that we attended in your offices on May 30, 2007, with our respective clients, in an attempt to discuss and possibly renegotiate portions of two contracts both dated May 9, 2005, between your client, Dr. Olivia Serdarevic, as Seller, and our client, Centex Homes, LLC, as Purchaser, concerning Section 11, Block 1, Lot 46 (the "Hamlet Parcel") and Section 15, Block 1, Lot 59 (the "Active Adult Parcel") in the Town of Goshen.

After much internal analysis, Centex has reached the conclusion that it cannot renegotiate these agreements.

Therefore, we must reiterate our previously stated positions with regard to each of the Contracts. First, as for the Active Adult Parcel, once again, Centex is ready to proceed with the Rezoning Petition that we previously forwarded, even though the Town had led Centex to believe that any such efforts would be futile. As you know, we cannot do so without your client's signature, and other cooperation and consent. If you agree that this Rezoning Petition is a waste of time, effort and money, we must exercise our right to terminate the Active Adult Contract since that Agreement clearly contemplates the development of Active Adult housing.

As for the Hamlet Parcel, also as previously stated, Centex is willing to proceed under the latest Concept Plan, dated April 16, 2007, which shows 114 market rate and 11 affordable single-family units, and 87 market rate and 9 affordable town house units, for a total of 221 units. Please be advised, however, that our previously expressed concerns about there

being insufficient water supply for the proposed development on that site remain quite real and compelling.

Please feel free to contact me or my colleague Marsha Rubin Goldstein with any questions. Thank you.

Very truly yours,

David S. Steinmetz

cc:     Mr. Robert Fourniadis
        Leonard Budow, Esq.

**Exhibit K**

Sep. 28 2007 02:26PM P2

Received: 8/27/07  4:37PM;

09/27/2007  15:55  8452912533    8452912533 -> GOSHEN TOWN CLERK;  Page 2

OCPLAN    PAGE  82



**COUNTY OF ORANGE**                    DEPARTMENT OF PLANNING
                                                          124 MAIN STREET
EDWARD A. DIANA                          GOSHEN, New York 10924-2124
COUNTY EXECUTIVE                         Tel. (845)291-2318  Fax (845)291-2533
                                                          www.orangecountygov.com/planning

                                                          DAVID CHURCH, A.I.C.P.
                                                          COMMISSIONER

## ORANGE COUNTY DEPARTMENT OF PLANNING
## 239 L, M OR N REPORT

This proposed action is being reviewed as an aid in coordinating such action between and among governmental agencies by bringing pertinent inter-community and countywide considerations to the attention of the municipal agency having jurisdiction.

**Referred by:**          *Town of Goshen*        **Reference/County ID No.:** *GOT12-07M*
**Applicant:**            *Town of Goshen*        **County Tax ID:** *Town-wide*
**Proposed Action:**      *Zoning Map Changes — Local Law No. 2 of 2007*
**Date of Full Statement:** *August 30, 2007*

### Comments on Goshen Zoning District and Zoning Ordinance Amendments:

*The Orange County Department of Planning is in receipt of the proposed zoning district and ordinance amendments and have reviewed them as the agency responsible for bringing pertinent inter-community and countywide planning and zoning considerations to the attention of the municipality having jurisdiction. The most significant issue presented involves the amendments which if approved severely restrict future mixed-use development in Goshen. Also important is the consistency of such amendments with the Goshen Comprehensive Plan and Orange County Comprehensive Plan, Strategies for Quality Communities.*

*This office acknowledges an August 30, 2007 receipt of a completed Environmental Assessment Form (EAF) to supplement the application for Local Law No. 2 submitted July 16, 2007. However, we disagree with the information appearing on page 11 of the EAF that states no anticipated impact is expected to affect the existing transportation system. This department remains concerned that no traffic study was performed analyzing the specific rezoning proposals or alternatives. To this end, we recommend the Town clarify and document how the proposed zoning will decrease traffic, as consistent with the Town of Goshen's Comprehensive Plan Goal #7, encouraging development that will help create an efficient transportation network.*

*The following comments are offered as an aid in identifying important issues that should be addressed in completing the application for Local Law 2.*

### Transportation

*The recently completed Goshen Town-Wide Traffic Study prepared by Stantec Engineering Inc. analyzed and documented the traffic impact of 40 existing separate development proposals on 30 intersections critical to the mobility of people living and working in the Goshen. It determined the number of potential vehicular trips generated from the 40 proposed development projects and then calculated the impact on operating conditions for 30 intersections in terms of vehicular delay. The overall purpose was to forecast the cumulative traffic impact of the 40 projects and then determine the necessary intersection and road improvements to alleviate such impacts in the future.*

ROM :                                                                    Sep. 28 2007 02:27PM  P3
Received:  8/27/07  4:36PM;                8452912633 -> GOSHEN TOWN CLERK;  Page 3
       09/27/2007  16:55   8452912533              OCPLAN                           PAGE  03

The narrative for the proposed zoning district and ordinance amendments, in part, cites the need to mitigate the traffic impacts identified in the Goshen Town-Wide Traffic Study as the impetus and justification for such amendments. The Goshen Town-Wide Traffic Study, however, did not compare and contrast different land use scenarios or development alternatives to determine which would produce the least number of vehicle trips, traffic congestion and impact to intersection levels-of-serve. Similarly, the narrative for the proposed zone changes does compare and contrast the traffic impact of potential development under existing zoning versus the traffic impact from potential development attributable to the proposed zoning amendments. Therefore, without such a quantitative analysis, there is no rational basis for the underlying contention that the intended zone changes will mitigate future traffic impact.

Clustered, mixed-use development such as currently permitted in the Hamlet Residential and Hamlet-Mixed Use Zones of Goshen is the very foundation of new urbanism and neo-traditional development. It allows residences to be located within walking distance of a variety of other compatible land uses, thereby eliminating the necessity for people to utilize their cars to access essential services, public facilities and recreation amenities. Numerous case studies on the subject substantiate that mixed use development reduces the number and length of vehicular trips in comparison to development located miles away from essential services and public facilities. As a result, the proposed zoning amendments which reduce the potential for Hamlet Residential and Hamlet-Mixed Use development in Goshen will likely increase people's dependency on their automobile for mobility and the number vehicle trips and traffic congestion throughout the town as a consequence.

### Official Map
We encourage the Town of Goshen to consider the adoption of an official map as a means of creating an efficient interconnected road network, and, in doing, mitigating the traffic impacts associated with further development. An "official map" (pursuant to Section 270 of Town Law) is a useful tool to determine the location of roads and intersections, as well as to ensure that an efficient interconnected, road network is created. With an official map, a municipality may reserve and protect rights-of-way from encroaching development for purposes of preplanning road networks, drainage ways and recreation facilities. Official maps are effective tools in fulfilling the design objectives of a community by serving to better direct development to appropriate locations. For example, internal loop roads, parallel service roads and interconnecting residential and commercial streets can be preplanned with an official map along major roadways and highway corridor. In so doing, strip commercial and residential development with numerous associated driveways can be eliminated, thereby preserving the capacity, safety and overall functionality of roadways and intersections.

### Affordable Housing
Lastly, this office reminds the Town that the proposed zoning will decrease the number of affordable housing units available, not only because the overall developable amount of units will be reduced because of the proposed rezoning to CO from HR and HM, but also because HM and HR units are typically more affordable simply due to their smaller size, design, and layout.

### Zoning Map Changes – Local Law No. 2 of 2007
We offer the following specific comments on each section of the Town's proposed zoning map changes:

**Section 3** - This office is concerned that the above application proposes to eliminate the HM (Hamlet Mixed-Use) zone and to limit the HR (Hamlet Residential) zone to only two potential districts (Lone Oak and Hambletonian Park final phase). The Orange County Planning Department defines a hamlet, among other traits, as a walkable community. In an effort to avoid sprawl, the Town of Goshen needs to determine where density should occur, usually in an area providing connectivity to its residents. A

FROM :                Case 7:08-cv-05563-KMK     Document 9-2     Filed 08/20/2008     Page 97 of 110
FAX NO.                                                        Sep. 28 2007 02:28PM  P4

Received:   9/27/07  4:30PM;

09/27/2007   16:55      8452912533          8452912633 -> GOSHEN TOWN CLERK;   Page 4

                                            OCPLAN
                                                                               PAGE  04

rationale should be expressed as to why districts were designated for a change in zoning. For example, in section 3.1A it could be argued that while this parcel is directly across Craigville Road from the HR-zoned Hambletonian Park, it will still be surrounded by such low-density uses as a cemetery, park, and one family rural residential parcels. However, section 3.1B is surrounded by the Village boundary, several multifamily buildings, Hambletonian Park, and a proposed cluster development of nearly 70 units called Heritage Estates. In reality, this last site is largely comprised of wetlands and could not develop as an HR district.

Section 3.2 – This office questions the need for rezoning this area as one third of it is currently being used as an educational institution. The balance of the lots do not lend themselves to commercial activity, and lot 35 presents access issues.

Section 3.3 – Our opinion is that this sizeable area may prove to be the best placed of the HM zones, as these lots are strategically located to serve a mixed use community with additional bolstering from the current density in Arcardia Hills, the proposed Lone Oaks residential development, current and future Elant development, Arden Hill Hospital conversions, and the nearby Route 17 highway access.

Section 3.4 and 3.5 – Similarly, in the southern part of the Town, the HM and HR districts are being replaced with HC and CO districts as well as two RU districts. This office notes that the proposed RU districts will be largely surrounded by commercial uses. A rationale must be made as to why the Town proposes to convert the western side of State Route 17A to CO while converting a section across it (SBL 20-1-17.1, 17.2, and 18) to RU. The western side of State Route 17A, specifically SBL 20-1-57, 58 and 152.2, has true scenic beauty and should be carefully zoned for the most aesthetically pleasing use. We suggest that this approach be reconsidered because most of the proposed southern rezoning occurs within the Town's Scenic Road Corridor Overlay.

We feel strongly that the density should be planned near public transportation. The Town of Warwick operates a bus along Route 17A that connects to the Main Line Trolley, providing mass transit options to employment centers, professional offices, and commuter bus and train stations from Harriman to Middletown. For this reason, along with its proximity to the Village of Florida, HR and HM districts seem appropriate here. Goals # 1 and 2 of the Town's Comprehensive Plan support this premise.

## County Recommendation:                    We recommend approval of the proposed map rezoning based upon the following conditions:

1- Traffic analysis is performed comparing current zoning to the proposed rezoning.
2- The Town retains the HM district just north of the Village of Florida.
3- The Town retains the HM district near Route 17's exit #125.


**Date:**          September 27, 2007

                                                           David Church, AICP
                                                           Commissioner of Planning

IMPORTANT NOTE: As per NYS General Municipal Law 239-n(6), within 30 days of municipal final action taken with the above referred project, the referring board must file a report of the final action report form attached to this review or available on-line at www.orangecountygov.com/planning.



## COUNTY OF ORANGE

EDWARD A. DIANA
COUNTY EXECUTIVE

### DEPARTMENT OF PLANNING

124 MAIN STREET
GOSHEN, NEW YORK 10924-2124
TEL: (845)291-2318  FAX: (845)291-2533
www.orangecountygov.com/planning

DAVID CHURCH, A.I.C.P.
COMMISSIONER

## ORANGE COUNTY DEPARTMENT OF PLANNING
## 239 L, M OR N REPORT

This proposed action is being reviewed as an aid in coordinating such action between and among governmental agencies by bringing pertinent inter-community and countywide considerations to the attention of the municipal agency having jurisdiction.

| | | |
|---|---|---|
| **Referred by:** | | |
| **Applicant:** | *Town of Goshen* | **Reference/County ID No.:** *GOTI3-07M* |
| **Proposed Action:** | *Town of Goshen* | **County Tax ID:** *Town-wide* |
| | *Zoning Text Changes -- Local Law No.3 of 2007* | |
| **Date of Full Statement:** | *August 30, 2007* | |

**Comments on Goshen Zoning District and Zoning Ordinance Amendments:**

The Orange County Department of Planning is in receipt of the proposed zoning district and ordinance amendments and have reviewed them as the agency responsible for bringing pertinent inter-community and countywide planning and zoning considerations to the attention of the municipality having jurisdiction. The most significant issue presented involves the amendments which if approved severely restrict future mixed-use development in Goshen. Also important is the consistency of such amendments with the Goshen Comprehensive Plan and Orange County Comprehensive Plan, Strategies for Quality Communities.

This office acknowledges an August 30, 2007 receipt of a completed Environmental Assessment Form (EAF) to supplement the application for Local Law No. 2 submitted July 16, 2007. However, we disagree with the information appearing on page 11 of the EAF that states no anticipated impact is expected to affect the existing transportation system. This department remains concerned that no traffic study was performed analyzing the specific rezoning proposals or alternatives. To this end, we recommend the Town clarify and document how the proposed zoning will decrease traffic, as consistent with the Town of Goshen's Comprehensive Plan Goal #7, encouraging development that will help create an efficient transportation network.

The following comments are offered as an aid in identifying important issues that should be addressed in completing the application for Local Law 3.

**Transportation**

The recently completed Goshen Town-Wide Traffic Study prepared by Stantec Engineering Inc. analyzed and documented the traffic impact of 40 separate development proposals on 30 intersections critical to the mobility of people living and working in the Goshen. It determined the number of potential vehicular trips generated from the 40 existing proposed development projects and then calculated the impact on operating conditions for 30 intersections in terms of vehicular delay. The overall purpose was to forecast the cumulative traffic impact of the 40 projects and then determine the necessary intersection and road improvements to alleviate such impacts in the future.

**Exhibit L**

# DREIER LLP

ATTORNEYS AT LAW

**Brian Dunefsky** *Partner*
Direct 212 328 6145
bdunefsky@dreierllp.com

October 23, 2007

**BY FEDEX**

David S. Steinmetz, Esq.
Zarin & Steinmetz
81 Main Street, Suite 415
White Plains, New York 10601

Re:    Goshen - Hamlet and Active Adult Parcels

Dear David:

I write to inform you that several monies are due and owing to Dr. Serdarevic pursuant to her agreements with Centex. Specifically, pursuant to Section 5.j. of the Active Adult and Hamlet Agreements, Centex is obligated to pay Dr. Serdarevic on the twenty fourth month following the completion of the Feasibility Period the sum of $250,000.00, for a total of $500,000.00. As you know, the Feasibility Period ended on July 15, 2005. Accordingly, those payments are overdue.

In addition, both the Active Adult and Hamlet Agreements obligate Centex to pay certain deposits to Dr. Serdarevic that are also past due. On September 21, 2006, the Town of Goshen Planning Board accepted (*i.e.,* "consented or otherwise approved") the Concept Plan (*i.e.,* schematic/sketch) submitted to it by Centex. Thus, the Third ($500,000) and Fourth ($500,000) Deposits for the Active Adult Agreement and the Fourth (500,000) Deposit for the Hamlet Agreement are owed to Dr. Serdarevic as well.

David S. Steinmetz, Esq.
October 23, 2007
Page 2

Given the foregoing, Dr. Serdarevic requests that all monies owed to her pursuant to the Active Adult and Hamlet Agreements (which total $2 million) be paid.[1]

Sincerely,

Brian Dunefsky

cc:    Dr. Olivia Serdarevic
       Leonard N. Budow, Esq.
       Robert Fourniadis, Esq.
       Salvatore Alfieri, Esq.

---

[1]    Please be advised that Dr. Serdarevic continues to reserve all of her rights concerning the Parcel 3 Agreement, including, but not limited to, her right to hold Centex in default under that Agreement and the right to deposits thereunder.

2

Exhibit M

# CENTEX HOMES

October 30, 2007

**Via Facsimile & Certified Mail – Return Receipt Requested**

Dr. Olivia N. Serdarevic
103 East 84th Street
New York, N.Y. 10028

> Re:    *Dr. Olivia N. Serdarevic to Centex Homes*
> *Contract of Sale – Section 11, Block 1 – Lot 46*

Dear Dr. Serdarevic:

This letter shall serve as Centex's Notice of Termination of its Agreement with you for the sale of Section 11, Block 1, Lot 46. The Agreement is dated May 9, 2005.

It has become increasingly clear that the Project, as originally contemplated by both of us and the Contracts, is infeasible. With regard to Lot 59, as you know, we tried earnestly to process an application for Active Adult housing. As we explained in our various letters to you and your counsel, the Contract of Sale for Lot 59 contemplated securing the necessary zoning, yet you were repeatedly unwilling to participate in a rezoning application. While the Town is now considering zoning amendments, which might allow for a Planned Adult Community within the RU zone, that is far from certain. Indeed, it will likely be at least six months to a year until the Town of Goshen completes the SEQRA process for the proposed zoning amendments. Further, even assuming a favorable result, it would take at least a year or two after that until a site specific application could go through the environmental review process. Despite our best efforts, it would be virtually impossible for Centex to obtain all Governmental Approvals for a minimum of 250 Housing Units on Lot 59 prior to July 15, 2009 (48 months from the end of the Feasibility Period). Under Paragraph 5 of the Contract, that is a condition precedent.

A similar factual scenario holds true for the Hamlet Parcel, Lot 46. Because we have both always considered development of the two parcels as an integrated whole, Centex's efforts with regard to the Hamlet piece were also previously thwarted by your unwillingness to either cooperate with the rezoning application for Lot 59 or renegotiate the contracts. Now, with the Town of Goshen's proposed amendment to eliminate the HM zone with regard to Lot 46, Centex's ability to develop that property is largely uncertain. Again, it will likely take at least a year until the Town completes SEQRA with regard to the proposed rezoning and Comprehensive Plan amendments. As proposed, a large portion of Lot 46 would be rezoned CO, which would make it certain that Centex could not meet the Contract minimum of 200 Housing Units. As

Centex Homes, LLC
New Jersey Division
500 Craig Road, Manalapan, New Jersey 07726-8790
Telephone: (732) 780-1800 • Fax (732) 780-7257

07/30/2007 15:57 FAX                    CENTEX HOMES                              ☑ 003/005

Page Two
October 30, 2007

already explained, the process would almost definitely go beyond July 15, 2009, again rendering it impossible to meet the condition precedent of obtaining governmental approvals by that date.

Regardless of what the Town of Goshen does in terms of the proposed amendments, there are at least two further problems, both of which we have raised in our previous conversations and correspondence. First, as you know, the Contracts of Sale are erroneous in that they include what we have both referred to as the "Neck" as part of Lot 46 (the Hamlet piece). Actually the "Neck" is part of Lot 59. Hence, the Contracts are based upon a crucial mutual mistake of fact. Second, and quite significantly, as our attorneys explained to you in detail in their letter dated May 10, 2007, based upon the conceptual development plan for the Hamlet, there is an insufficient water supply. We provided you with a letter to this effect from Thomas B. Vanderbeek, P.E., demonstrating that based upon the six test wells drilled at that time, and the necessary discounting of the largest well, water supply for development of your property was highly deficient. Further, according to the Town's proposed amendments for PACs, sufficient water supply is a basic prerequisite to allowing that floating zone. This renders development of a PAC on Lot 59 extremely tenuous.

For all of the foregoing reasons, and without waiving any claims, rights or causes of action, please be advised that Centex is exercising its right to terminate its Contract with you, dated May 9, 2005, for the sale of Lot 46. As you are undoubtedly aware, Centex has at its sole cost and expense, defended your property from the recent rezoning proposed by the Town of Goshen. Centex has expended a great deal of resources in order to preserve your landowner rights.

Please accept this as our demand for return of all deposits made to date under the May 9, 2005 Agreement for the sale of Lot 46.

Very truly yours,

Robert A. Fourniadis
Senior Vice President
Centex Homes, LLC

cc:     Brian Dunefsky, Esq.
        Mark Dreier, Esq.
        Leonard N. Budow, Esq.
        Salvatore Alfieri, Esq.
        David S. Steinmetz, Esq.

**Exhibit N**

10/30/2007 15:57 FAX                    CENTEX HOMES                          ☑ 004/005

# CENTEX HOMES

October 30, 2007

<u>Via Facsimile & Certified Mail – Return Receipt Requested</u>

Dr. Olivia N. Serdarevic
103 East 84th Street
New York, N.Y. 10028

      *Re:   Dr. Olivia N. Serdarevic and Bosiljka Serdarevic to Centex Homes*
               *Contract of Sale – Section 15, Block 1 - Lot 59*

Dear Dr. Serdarevic:

      This letter shall serve as Centex's Notice of Termination of its Agreement with you for the sale of Section 15, Block 1, Lot 59. The Agreement is dated May 9, 2005.

      It has become increasingly clear that the Project, as originally contemplated by both of us and the Contracts, is infeasible. With regard to Lot 59, as you know, we tried earnestly to process an application for Active Adult housing. As we explained in our various letters to you and your counsel, the Contract of Sale for Lot 59 contemplated securing the necessary zoning, yet you were repeatedly unwilling to participate in a rezoning application. While the Town is now considering zoning amendments, which might allow for a Planned Adult Community within the RU zone, that is far from certain. Indeed, it will likely be at least six months to a year until the Town of Goshen completes the SEQRA process for the proposed zoning amendments. Further, even assuming a favorable result, it would take at least a year or two after that until a site specific application could go through the environmental review process. Despite our best efforts, it would be virtually impossible for Centex to obtain all Governmental Approvals for a minimum of 250 Housing Units on Lot 59 prior to July 15, 2009 (48 months from the end of the Feasibility Period). Under Paragraph 5 of the Contract, that is a condition precedent.

      A similar factual scenario holds true for the Hamlet Parcel, Lot 46. Because we have both always considered development of the two parcels as an integrated whole, Centex's efforts with regard to the Hamlet piece were also previously thwarted by your unwillingness to either cooperate with the rezoning application for Lot 59 or renegotiate the contracts. Now, with the Town of Goshen's proposed amendment to eliminate the HM zone with regard to Lot 46, Centex's ability to develop that property is largely uncertain. Again, it will likely take at least a year until the Town completes SEQRA with regard to the proposed rezoning and Comprehensive Plan amendments. As proposed, a large portion of Lot 46 would be rezoned CO, which would make it certain that Centex could not meet the Contract minimum of 200 Housing Units. As

Centex Homes, LLC
New Jersey Division
500 Craig Road, Manalapan, New Jersey 07726-8790
Telephone: (732) 780-1800 • Fax: (732) 780-7257

10/30/2007 15:57 FAX                    CENTEX HOMES                                    ☑ 005/005

Page Two
October 30, 2007

already explained, the process would almost definitely go beyond July 15, 2009, again rendering it impossible to meet the condition precedent of obtaining governmental approvals by that date.

Regardless of what the Town of Goshen does in terms of the proposed amendments, there are at least two further problems, both of which we have raised in our previous conversations and correspondence. First, as you know, the Contracts of Sale are erroneous in that they include what we have both referred to as the "Neck" as part of Lot 46 (the Hamlet piece). Actually the "Neck" is part of Lot 59. Hence, the Contracts are based upon a crucial mutual mistake of fact. Second, and quite significantly, as our attorneys explained to you in detail in their letter dated May 10, 2007, based upon the conceptual development plan for the Hamlet, there is an insufficient water supply. We provided you with a letter to this effect from Thomas B. Vanderbeek, P.E., demonstrating that based upon the six test wells drilled at that time, and the necessary discounting of the largest well, water supply for development of your property was highly deficient. Further, according to the Town's proposed amendments for PACs, sufficient water supply is a basic prerequisite to allowing that floating zone. This renders development of a PAC on Lot 59 extremely tenuous.

For all of the foregoing reasons, and without waiving any claims, rights or causes of action, please be advised that Centex is exercising its right to terminate its Contract with you, dated May 9, 2005, for the sale of Lot 59. As you are undoubtedly aware, Centex has at its sole cost and expense, defended your property from the recent rezoning proposed by the Town of Goshen. Centex has expended a great deal of resources in order to preserve your landowner rights.

Please accept this as our demand for return of all deposits made to date under the May 9, 2005 Agreement for the sale of Lot 59.

Very truly yours,

Robert A. Fourniadis
Senior Vice President
Centex Homes, LLC

cc:    Brian Dunefsky, Esq.
       Mark Dreier, Esq.
       Leonard N. Budow, Esq.
       Salvatore Alfieri, Esq.
       David S. Steinmetz, Esq.

Exhibit D

# DREIER LLP

ATTORNEYS AT LAW

Brian Dunefsky *Partner*
Direct 212 328 6145
bdunefsky@dreierllp.com

November 5, 2007

**BY FEDEX**

David S. Steinmetz, Esq.
Zarin & Steinmetz
81 Main Street, Suite 415
White Plains, New York 10601

Re:   Goshen - Hamlet and Active Adult Agreements

Dear David:

I write in response to Robert Fourniadis' letters to Dr. Serdarevic dated October 30, 2007, purportedly terminating the Active Adult and Hamlet Agreements.

We reject Centex's efforts to terminate those agreements and the baseless rationale provided by Mr. Fourniadis to justify those terminations. While Mr. Fourniadis purports to provide several bases for the termination, it is clear that those reasons have no merit whatsoever. Nor is the timing of those letters lost on us, or would they be to any objective observer -- just days after Dr. Serdarevic properly demanded monies owed to her pursuant to her agreements with Centex. That timing is all the more inappropriate given the Town of Goshen's recent positive statements to Centex and Dr. Serdarevic concerning the desireability of the development. In sum, Centex's transparent effort to avoid payment of monies owed to Dr. Serdarevic prior to the supposed termination will not succeed.

Accordingly, Dr. Serdarevic reiterates her demand for those monies (as detailed

David S. Steinmetz, Esq.
November 5, 2007
Page 2

in my letter dated October 23, 2007), and further demands that such monies be paid, by wire
transfer, to the account provided below within 10 days of the date of this letter.

      Wire Instructions:

      Bank:  Chase JP Morgan
             ABA:  02100021
             Account # 034 1157 352
             Beneficiary:  B Serdarevic

                           Sincerely,

                           Brian Dunefsky

cc:    Dr. Olivia Serdarevic
       Marc S. Dreier, Esq.
       Leonard N. Budow, Esq.
       Robert Fourniadis, Esq.
       Salvatore Alfieri, Esq.